# EXHIBIT A



COPY

APR 29 2008

MICHAEL K. JEANES, CLERK
M. BOND
DEPUTY CLERK

1  Michael C. Manning (#016255)
   Leslie E. O'Hara (#005923)
2  John T. White (#022091)
   STINSON MORRISON HECKER LLP
3  1850 North Central Avenue, Suite 2100
   Phoenix, Arizona 85004-4584
4  (602) 279-1600
   Fax: (602) 240-6925
5  Email: mmanning@stinson.com
   Attorneys for Plaintiffs

## SUPERIOR COURT OF ARIZONA

## MARICOPA COUNTY

MICHAEL LACEY; JIM LARKIN; and PHOENIX NEW TIMES, LLC,

Plaintiffs,

v.

SHERIFF JOSEPH ARPAIO and AVA ARPAIO, husband and wife; MARICOPA COUNTY SHERIFF'S OFFICE; DENNIS WILENCHIK and BECKY BARTNESS, husband and wife; ANDREW THOMAS and ANN THOMAS, husband and wife; and MARICOPA COUNTY ATTORNEY'S OFFICE; JOHN DOES I-X; JANE DOES I-X; BLACK CORPORATIONS I-V; and WHITE PARTNERSHIPS, I-V,

Defendants.

No. CV2008-009808

**COMPLAINT**

(Jury Trial Demanded)

## COMPLAINT

Plaintiffs Phoenix New Times, LLC, Michael Lacey, and Jim Larkin, for their Complaint against Defendants, hereby allege as follows:

DB04/811373.0002/363337.2

## JURISDICTIONAL ALLEGATIONS

1. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983; the First, Fourth, and Fourteenth Amendments of the United States Constitution; 18 U.S.C. § 1961, *et seq.*; and A.R.S. § 13-2301, *et seq.* and other pendent state common and statutory laws.

2. Plaintiffs have satisfied the provisions of A.R.S. § 12-821.01 by serving upon Defendants a Notice of Claim more than sixty (60) days prior to the date of the filing of this Complaint. Defendants have not responded to the Notice of Claim.

3. This Court has jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1988. Additionally, this Court has jurisdiction over Plaintiffs' state and federal claims pursuant to Article 6, Section 14 of the Arizona Constitution.

4. Venue is proper in this Court pursuant to A.R.S. § 12-401, as the parties are residents of Maricopa County, Arizona, and the events underlying this lawsuit occurred in Maricopa County. Plaintiffs expressly reserve the right, however, to timely change venue pursuant to A.R.S. §12-406, § 12-408, and/or other applicable law, because (*inter alia*) Maricopa County divisions, entities, officers, employees, and/or agents are parties to this lawsuit.

## GENERAL ALLEGATIONS

5. Plaintiffs reallege and incorporate, by this reference, their claims, facts, and allegations in the paragraphs above, as if set forth fully herein.

6. At all times material herein, Plaintiffs Michael Lacey and Jim Larkin were individuals, residing in Maricopa County, Arizona, and officers, executives, editors, and/or owners of the Phoenix New Times, LLC, a Delaware company, authorized to do and doing business in Maricopa County, Arizona (collectively, "Plaintiffs," "*The New Times*," or "the newspaper").

7. Maricopa County (the "County") is a public entity, formed and designated as such pursuant to Title 11 of the Arizona Revised Statutes, and (as such) it and its officers and divisions are subject to civil suit and may be held independently or vicariously liable for the

DB04/811373.0002/363337.2

2

wrongful conduct of its divisions, agents, officers, and employees, including (*inter alia*) the individual members of the Maricopa County Board of Supervisors, the officers and employees of its divisions, Sheriff Joseph Arpaio and the Maricopa County Sheriff's Office ("MCSO"), County Attorney Andrew Thomas and the Maricopa County Attorney's Office, and Special Prosecutor Dennis Wilenchik. Plaintiffs have not named Maricopa County, the entity, as a Defendant in this lawsuit, based on representations by the named Defendants that they are independent jural entities. In the event Defendants attempt to argue otherwise, Plaintiffs reserve the right to amend this Complaint to name Maricopa County as the proper party.

8. At all times material herein, Defendant Joseph Arpaio ("Arpaio" or "Sheriff Arpaio") was the duly-elected Sheriff of Maricopa County and the head of the Maricopa County Sheriff's Office, with ultimate authority and responsibility for the MCSO and the actions of its officers and agents, and with the authority and responsibility to establish policy, practices, customs, procedures, protocols, and training for the MCSO. His actions and/or inactions constitute actions of the MCSO and the MCSO is vicariously and directly liable for his wrongful conduct, as alleged herein. Sheriff Arpaio is named herein in both his official and individual capacities. As the elected Sheriff, Sheriff Arpaio has official, vicarious, direct, individual, and/or supervisory liability for the MCSO and its officers, agents, and employees.

9. At all times material herein, Defendant Andrew Thomas ("Thomas" or "County Attorney") was the duly-elected Maricopa County Attorney and the head of the Maricopa County Attorney's Office ("MCAO"), with ultimate authority and responsibility for the MCAO and the actions of its officers and agents, and with the authority and responsibility to establish policy, practices, customs, procedures, protocols, and training for the MCAO. His actions and/or inactions constitute actions of the MCAO and the MCAO is vicariously and directly liable for his wrongful conduct, as alleged herein. Thomas is named herein in both his official and individual capacities. As the elected County Attorney, Thomas has official,

vicarious, direct, individual, and/or supervisory liability for the MCAO and its officers, agents, and employees.

10. At all times material herein, Defendant Dennis Wilenchik ("Wilenchik") was an agent and employee of the Sheriff, MCSO, Thomas, and/or MCAO, who, at the time of the events complained of herein, was acting within the course and scope of his employment by the Sheriff, MCSO, Thomas, and/or MCAO, and under color of law. Wilenchik engaged in wrongful conduct that allowed, caused, and/or contributed to cause the violations of Plaintiffs' rights. His actions and/or inactions constitute actions of Sheriff Arpaio, MCSO, Thomas, and/or MCAO. The Sheriff, MCSO, Thomas, and/or MCAO are vicariously and directly liable for his wrongful conduct, as alleged herein.

11. The Defendants designated herein as Ava Arpaio, Ann Thomas, and Becky Bartness, are the spouses of the respective Defendants and are so designated because the wrongful conduct of the Defendants was engaged in for the benefit of their marital communities, thereby rendering the spouses and marital communities of Defendants liable for such conduct.

12. At all times material herein, Defendants John Does I-X and Jane Does I-X (collectively "John Does") were officers, agents, and employees of Sheriff Arpaio, MCSO, Thomas, and/or MCAO, acting within the scope of their employment and under color of law. These Defendants engaged in wrongful conduct that allowed, caused, and/or contributed to cause the violations of Plaintiffs' rights. Their actions and/or inactions constitute actions of Sheriff Arpaio, MCSO, Thomas, and/or MCAO. Sheriff Arpaio, MCSO, Thomas, and/or the MCAO are vicariously and directly liable for their wrongful conduct.

13. The true names, capacities, and relationships, whether individual, corporate, partnership, or otherwise, of all John and Jane Doe Defendants, Black Corporations, and White Partnerships, are unknown at the time of the filing of this Complaint, and are being designated

4

pursuant to Ariz. R. Civ. P. § 10(f) and applicable federal and state law. Plaintiffs further allege that all of the fictitiously named Defendants were jointly responsible for the actions, events, and circumstances underlying this lawsuit, and that they proximately caused the damages stated in this Complaint. Plaintiffs will amend the Complaint to name the unidentified individuals once they have learned, through discovery, the identities and acts, omissions, roles, and/or responsibilities of such Defendants sufficient for Plaintiffs to discover the claims against them.

## FACTUAL BASIS FOR CLAIMS FOR RELIEF

### Introduction

14. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

15. On the night of October 18, 2007, unmarked, dark vehicles (at least one with Mexico license plates) arrived at the homes of Plaintiffs Michael Lacey and Jim Larkin, Executive Editor and Chief Executive Officer, respectively, of Village Voice Media, LLC, owners of *The Phoenix New Times*.

16. Both men were handcuffed and taken to jail by members of Sheriff Arpaio's elite "Selective Enforcement Unit"—based on a minor misdemeanor charge—for publishing a column in their newspaper earlier in the day, entitled "Breathtaking Abuse of the Constitution." The article revealed Defendants' subversion of the grand jury process and the unprecedented attempt to subpoena reporters' notes and the identity and reading habits of any citizen who looked at *The New Times*.

17. *The New Times* was targeted because, as MCSO documents now reveal, it was labeled an "Anti-Arpaio newspaper" by Arpaio and his staff.

18. When Plaintiffs' criticism of these Defendants became too much for Defendants to tolerate, Defendants flexed their political muscle in the form of a conspiracy. They abused

5

their governmental authority by attacking the press, punishing free speech, demeaning the role and function of an impartial prosecutor and an independent judiciary, perverting the grand jury process, and serving notice to citizens who read news online that neither their identities nor their reading habits are safe from the reach of vindictive government officials and their confederates.

19. Citizens have a right to read online newspapers in privacy. Those readers place their trust in newspaper reporters and editors to protect their privacy and speak the truth. But Defendants perverted the law and abused their public positions to attack this newspaper, its reporters, and the privacy rights of thousands of its readers.

20. Defendants' acts and omissions, individually and in concert, leading up to and culminating in Plaintiffs' arrest and jailing, violated Plaintiffs' constitutional and Arizona law rights, threatened the privacy and trust of those who read the news online, and trampled upon two of the most fundamental freedoms in this Country: Free Speech and a Free Press.

### Summary of Facts

21. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

22. Sheriff Arpaio is not tolerant of criticism or questioning. The few that dare to criticize him become targets for retribution by Arpaio and his agents.

23. The history of this dispute (and Defendants' animus toward Plaintiffs) began in the early 1990s, when *The New Times* published its first article critical of Sheriff Arpaio. *The New Times*, thus, became a target for attack by Arpaio.

24. The issue came to a head in July 2004, when *The New Times* investigated the personal, irregular, and questionable commercial land transactions of Sheriff Arpaio,[1] and

---

[1] *See* "Sheriff Joe's Real Estate Game," July 1, 2004 and "Stick it to 'Em!," July 8, 2004.

1  asked how Sheriff Arpaio could afford to invest more than $690,000 cash in commercial real
2  estate, based on an annual salary of $72,000 and a small federal pension.

3      25.    The newspaper's investigation revealed that Sheriff Arpaio had redacted
4  information from the County Recorder's public records about his commercial landholdings
5  (but not his home address), by using a little-known Arizona statute to remove pertinent
6  information about his deeds, mortgages, affidavits of value, and conveyances of title.

7      26.    Arpaio said the need to hide the truth about his commercial real estate
8  investments arose from his concern about purported "death threats." The Sheriff used this
9  feign to hide his commercial investments from public scrutiny. But, tellingly, he left his home
10 address available in the public domain, published on numerous public internet websites.

11     27.    *The New Times'* investigation of the Sheriff's commercial holdings culminated in
12 a July 8, 2004 article written by the paper's widely-respected investigative reporter, John
13 Dougherty. The article questioned the Sheriff's motives for hiding his commercial investments
14 from inspection and pointed out the obvious—it made no sense to remove information about
15 his personal commercial holdings from public records because of "death threats," but not his
16 home address, which was included in the final paragraph of the article based upon data
17 obtained from public websites.

18     28.    Sheriff Arpaio was hiding his significant commercial real estate holdings because
19 he could not or would not explain how he could legitimately afford those investments.

20     29.    No law prohibited the publication of the Sheriff's home address in print or
21 broadcast material. But, a never-before used Arizona statute made it illegal to publish the
22 Sheriff's address on the "world wide web," if, and only if, such publication "posed an
23 imminent and serious threat" to the Sheriff or his immediate family, *and* if it was "reasonably
24 apparent" to Dougherty and *The New Times* that "making the information available on the

web" created a "serious and imminent" threat to the safety of the Sheriff or his immediate family.

30. So, while there was nothing even arguably wrong with the article in its print form, Arpaio alleged that the newspaper violated the statute when the article was automatically uploaded to its electronic form on the internet.

31. There was no evidence that Arpaio was then, or ever, under any credible threat of "imminent harm," as a result of the publication of his home address on *The New Times* web site. But, the publication of his home address on the internet provided the Sheriff a means for retribution against these critics.

32. While the Sheriff's vengeance toward *The New Times* could no longer be restrained or contained, he needed a prosecutorial ally that would help him punish this newspaper for daring to scrutinize his questionable real estate holdings.

33. In 2004, Andrew Thomas was elected and took office in 2005 as the new Maricopa County Attorney. He quickly became a political ally of Arpaio. Using the full force of his—and his new ally's—governmental muscle, Arpaio recruited his new and compliant County Attorney to initiate the prosecution, persecution, and intimidation of *The New Times*, its reporters, its editors, and publishers.

34. It was and should have been obvious to Thomas that there was no "case" to "investigate" here. The newspaper had simply reported "truthful, lawfully obtained, publicly available personal identifying information [and this is] precisely the kind of speech the First Amendment protects." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). The Sheriff's home address was available on government web sites and "once the government places personal identifying information in the public domain, reliance must rest on the judgment of those who decide what to publish or broadcast." *The Florida Star v. B.J.F.*, 491 U.S. 524, 535 (1989).

8

35. And, even a cursory investigation would have revealed that the only "death threats" to Arpaio were "made-for-TV" contrivances by the Sheriff's public relations officers.[2]

36. In fact, Arpaio has continued, to this day, to publicize and publish his home address to citizens and the public at large. For example, just last month, Arpaio mailed out Partisan Nomination Petitions, asking citizens to re-elect him for Sheriff and publicizing his home address on the Petition.

37. Arpaio had his first meeting with Thomas in January 2005, immediately after Thomas took office. And at that first meeting, Arpaio discussed his opposition to *The New Times* and his desire to punish this newspaper. Thomas' staff investigated the case at the time, but had concerns, which they memorialized in internal documents. For one, they were concerned that there was no evidence of an "imminent and serious threat" to Arpaio.

38. Only then did Arpaio request an investigation, in April 2005— *nearly 10 months after Dougherty's article was published.*

39. Thomas' office conducted another formal evaluation of the case in May 2005, this time preparing an Incident Review Memo summarizing the weaknesses of the case, including that there was a significant delay in Arpaio reporting the incident, nothing but conjured evidence to show that Sheriff Arpaio ever really feared for his safety, and that the Sheriff's personal information was widely available to the public on the internet and in public records.

---

[2] Recently, for example, Arpaio widely publicized that he was under threat from Mexican nationals, members of Los Zetas, a smuggling gang, and Elias Bermudez, an immigration activist and political rival of Arpaio. Over the course of a six-month period, Arpaio spent an estimated $500,000 to "protect him" from such "threats." But, it turns out, there were never any real or credible threats, at all. The sole informant was discredited and vanished; yet, the case remains open and Arpaio continues to investigate. The story was chronicled in an April 25, 2008 article on *azcentral.com*.

DB04/811373.0002/363337.2

40. But, the Memo also noted that it was a "high-profile" case, that Sheriff Arpaio was demanding that the case be charged, and that there would be "problems" between the MCSO and MCAO if Thomas did not do what Arpaio told him to do.

41. The MCAO Incident Review Board declined prosecution in an August 9, 2005 meeting.

42. Ignoring the opinion of his professional advisors, Thomas wanted to help Arpaio attack *The New Times* because the newspaper had now begun criticizing Thomas' own ethical and office irregularities. But, Thomas also knew that his office could not ethically pursue this case due to a "conflict of interest." That conflict was *The New Times*' increasingly inquisitive and critical articles about Thomas.[3] And Thomas also knew that his MCAO Incident Review Board had declined prosecution.

43. So, Thomas sent the case to the Carter Olson at the Pinal County Attorney's Office, for further investigation and prosecution, citing an unspecified "conflict of interest."

44. Immediately, Arpaio and his MCSO put pressure on the Pinal County Attorney's Office to prosecute the case against the newspaper and its reporters. Carter Olson was reluctant to do so, questioning the constitutionality of the statute at issue and noting the obvious issues that undermined the case, including (*inter alia*) the lack of evidence of "imminent threat" to Arpaio and the concerns with the First Amendment rights of the newspaper and its reporters. Olson's professional reluctance involved the same problems as those documented by the MCAO Incident Review committee.

45. But Arpaio does not like being told "No," and he is never one to permit Arizona laws or the Constitution to intrude on his vengeance. So, he used his considerable political power to push for prosecution, despite its obvious lack of merit. Arpaio and his MCSO staff

---

[3] Thomas has stated: "I still did not feel that it was appropriate for our office to directly prosecute the matter, because of the appearance of the conflict of interest."

10

engaged in a heavy-handed letter and memoranda writing campaign to attempt to "convince" the Pinal County Attorney to prosecute the case, and made repeated attempts to meet and conference with the Pinal County Attorney by phone and in person to persuade him to begin a formal investigation and prosecution against this irritating "Anti-Arpaio" newspaper and its inquisitive reporters.

46.  Of course, unlike Thomas, the Pinal County Attorney's Office did not share the Defendants' passion for political revenge, nor a fear of Arpaio's political power; the Office refused to be used in the persecution. Over the course of two years, Pinal County did not issue a single investigative subpoena or empanel a grand jury.

47.  Arpaio openly expressed his frustration and anger with the Pinal County Attorney's lack of investigation and prosecution of the newspaper and its reporters.

48.  In 2007, Pinal County Attorney, Carter Olson, was appointed to the judicial bench. He was replaced by James Walsh, who shortly thereafter announced a conflict with MCAO. In light of that announced conflict, *The New Times* matter was returned to Thomas and his MCAO.

49.  Caught between Thomas' already announced and quite obvious "conflict," and Arpaio's insistence upon punishing this newspaper and its reporters for its criticism, Thomas and Arpaio decided to retain Thomas' friend, former employer, financial benefactor, campaign finance manager, and a civil attorney, Dennis Wilenchik, to investigate and pursue a criminal case against *The New Times* and its reporters.

50.  Wilenchik was hired by Thomas and Arpaio. They now owned their own "Independent" Special Deputy Maricopa County Attorney.

51.  Prosecutors have inherent legal and ethical duties to be independent; Wilenchik was not, and both Thomas and Arpaio knew that.

11

52. Because *The New Times* had published a myriad of articles critical of Wilenchik,[4] Thomas and Arpaio knew that Wilenchik suffered from the very same "conflict of interest" that he did when he actively sought appointment of Wilenchik as Special Prosecutor in this matter.[5] Thomas and Arpaio knew they were hiring an attack ally—not an "Independent" prosecutor untainted by benefactors to please and grudges to settle.

53. In addition, the ties among the three—Arpaio, Thomas, and Wilenchik—wove a tangled web of financial, personal, and political connivances. For example, and as *The New Times* published, Wilenchik once hired County Attorney candidate Thomas as an "associate" in his law firm, although, upon information and belief, Thomas was not actually hired to perform legal work for Wilenchik or his firm's clients. Thomas took his salary from Wilenchik, but spent his days campaigning for County Attorney.

54. The arrangement was merely a disguised campaign contribution that paid the designed dividends for Thomas, Wilenchik, and Arpaio: Thomas won his Maricopa County Attorney election, Wilenchik was paid off with an enormous attorneys' fee annuity from

---

[4] For example, in "Doubting Thomas," June 15, 2006, John Dougherty questioned the ethical conduct of both Thomas and Wilenchik. He questioned hundreds of thousands of dollars in fees paid to Wilenchik's law firm by Maricopa County, a "firm that employed Andrew Thomas immediately before his election as county attorney." Dougherty opined that it appeared Thomas was using his office to "steer public contracts to his previous employer" and questioned what work, if any, Thomas had performed for Wilenchik's firm while running for County Attorney. In "Bully Pulpit," June 29, 2006, Dougherty pointed out how Thomas had "not only steered a lot of business to his old firm, he has hired his old boss (Wilenchik) to harass Sheriff Joe Arpaio's chief political rival." He also stated a strong suspicion that Wilenchik had paid Thomas "a fat salary in exchange for little work during the months leading up to his election which, if true, would constitute an unlawful campaign contribution."

[5] *See* Minutes of the Maricopa County Board of Supervisors, Special Session, July 11, 2007. After being told by the Board's Chief Counsel that "the County Attorney's Office is unable to advise the Sheriff's Office related to the [*New Times*] matter as the County Attorney has a conflict…," Supervisor Stapley advised his colleagues that, "he had personally spoken to Maricopa County Attorney Andrew Thomas [and been told by Thomas that] "this is an unusual case and situation that warrants the appointments of [Wilenchik and his law firm]."

12

Thomas' new Maricopa County Attorney's Office, and Arpaio gained an important political ally in Thomas and a zealous advocate in Wilenchik.

55.  Soon after taking office, Thomas and Arpaio began funneling civil work to Wilenchik. To date, Wilenchik has been paid more than $2,350,000 in attorneys' fees representing Arpaio and the County. And, Thomas and Arpaio have even used Wilenchik to serve as their own, personal counsel on a number of occasions (though Arpaio and Thomas were never charged for the work Wilenchik did as their personal counsel). Fees for Wilenchik's work on behalf of Thomas and Arpaio personally were built-in to his bills for County work.

56.  For example, Wilenchik was not representing any public body when, prior to becoming their "Independent" Special Prosecutor, he demanded a retraction from *The New Times*, and threatened to sue the newspaper on behalf of his personal client Thomas, after the newspaper published a parody piece critical of Thomas in *The New Times*. And Wilenchik was obviously not defending the people of Maricopa County when, prior to becoming "Independent" Special Prosecutor, he threatened to sue *The West Valley View* and *Phoenix Magazine* for personal defamation claims based on stories critical of his personal client, Arpaio.[6]

57.  By the time Thomas secured Wilenchik's appointment as his "Independent" Deputy Maricopa County Attorney, his friend and financial benefactor was already cashing in on their relationship.[7]

---

[6] *See* "Sheriff demands View retract headline," *West Valley View*, October 31, 2006; "First Things First," *Phoenix Magazine*, December 2007.

[7] When asked on October 20, 2007 how he could select his former boss, Wilenchik, as a Special Prosecutor in a case against *The New Times*, Thomas stated, "I think given the circumstances it was appropriate for him to so serve and that he had the confidence of the Sheriff who was the victim in this case." This, despite *The New Times* having been critical of both Thomas and Wilenchik, creating a "conflict" for both Wilenchik and Thomas, and Wilenchik's prior role as the alleged victim, Arpaio's, personal attorney. As Thomas put it,

13

58. Wilenchik's pre-existing malignant mindset against the newspaper and its reporters was made clear in an email Wilenchik authored *less than a week* before being named a Special Deputy Maricopa County Attorney. In the email, Wilenchik angrily railed against the newspaper and its reporter for having questioned, in print, his lucrative relationship with his former employee, Thomas:

> [W]henever they have no point they revert to this tired shit again. Like Napolitano never hired Lewis and Roca? Or her (sic) and Goddard never used me after I represented the former ag (sic)? Or Romley fired me from the cty (sic) list for doing so? They (*New Times*) are so full of it. I refused to speak with him (Dougherty).

59. Later, in the same email, Wilenchik summarized his feelings. "Birdcrap is what (*The New Times*) article should be called. But really noone (sic) reads his crap and he has no credibility."

60. Less than a week after authoring this angry email, Dennis Wilenchik would undertake his duties as an "Independent" Special Deputy Maricopa County Attorney, tasked by Arpaio and Thomas to investigate *The New Times* and its reporters.

61. Well before his "investigation," however, Wilenchik already had the result of his "Independent" investigation in sharp focus.

### The Abusive Wilenchik Investigation

62. Wilenchik took on his new role as a criminal prosecutor with all the zeal and ruthlessness that Arpaio and Thomas required, expected, and had paid for. Armed with daunting prosecutorial power and the approval and support of Arpaio and Thomas, Wilenchik engaged in a series of inappropriate, unethical, and unlawful acts that violated the Constitutional and Arizona law rights of the newspaper, its reporters, and those that read *The New Times.*

---

"*The New Times* has not been, let's say, a fan of mine." Nor, again, had the newspaper been a "fan" of Wilenchik's or Arpaio's either.

14

DB04/811373.0002/363337.2

63. Without ever appearing before any grand jury, Wilenchik began issuing broad and invasive subpoenas against *The New Times*, its reporters, its editors, and its readers.

64. On August 24, 2007, Wilenchik authored and approved two subpoenas, which demanded that the newspaper and its reporters reveal confidential sources and produce extensive records on nearly four years' worth of reporters' and editors' notebooks, memoranda, and documents, for *any story that was critical of Sheriff Arpaio*.

65. The subpoenas also sought detailed information on *hundreds of thousands of private citizens* who had visited *The New Times*' website since 2004, including internet cookies and browsing information on every individual who looked at any Arpaio story, review, listing, or advertisement.

66. These unprecedented subpoenas sought the reading and purchasing habits of private citizens and was clearly aimed at interfering with and/or destroying the business revenues of the newspaper.

67. Professor James Weinstein of the Sandra Day O'Connor College of Law at Arizona State University characterized the subpoenas as "grossly, shockingly, breathtakingly overbroad." He said this was quite clearly a "case of harassment of the press."

68. The subpoenas were issued as part of the investigation into *The New Times* case, without any formal charges or indictments pending, and without notice to or the approval of a Court or grand jury. Wilenchik has publicly acknowledged the subpoenas were issues as part of the "investigative phase" of the case, before appearing before the grand jury.

69. On September 20, 2007, *The New Times* published "Below the Belt," by Paul Rubin, another decorated local reporter. The article criticized Wilenchik's extra-judicial conduct in defending Sheriff Arpaio and others in a defamation suit brought by Buckeye Police Chief Dan Saban. Rubin's story relied solely on interviews and public records. It made no

DB04/811373.0002/363337.2

reference—none—to any grand jury investigation, nor did it contain the Sheriff's home address.

70. Yet, less than 24 hours after Rubin's story appeared in *The New Times*, Wilenchik issued a grand jury subpoena to Rubin, seeking "all documents, records, and files" associated with the writing and editing of the Saban story, as well as "conversations and meetings relating to its publication."

71. Again, Rubin's only "misstep" was in criticizing Arpaio and Wilenchik. His story was not even remotely relevant to the matter Wilenchik had been hired to pursue (a 2004 story by a different reporter). Lacey and Larkin, in the column disclosing the corruption of the investigation that led to their arrest, succinctly summarized what was all too clear: "It is impossible to view Rubin's subpoena as anything other than what it was: an act of vengeance by Wilenchik." Wilenchik's subpoena was, once again, issued without notice to or the involvement of the Court or grand jury, without indictments or charges pending, and as part of Wilenchik's investigation of *The New Times*.

72. And it did not stop there. Wilenchik then made a crude, *ex parte* attempt on October 10, 2007, to influence or compromise Judge Anna Baca, who was presiding over the sitting County grand jury. He did so by recruiting a political intermediary, Carol Turoff, a former lay member of the committee charged with appointing Appellate Judges ***and the wife of a member of Thomas' senior management team***, Larry Turoff. Ms. Turoff was instructed by Wilenchik to call Judge Baca at home to attempt to arrange a private meeting with Wilenchik.

73. In an emergency closed hearing called October 11, 2007, Judge Baca called Wilenchik's attempt at initiating the *ex parte* communication "absolutely inappropriate." Specifically, Judge Baca's recital of the ethical infractions was that she had been (a) called at home, (b) late at night, (c) by a third party Wilenchik had engaged to make the call, (d) at the instigation of a "prosecutor" (Wilenchik) the Judge did not even know, (e) for the purpose of

16