```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF ARIZONA
 2                        _____

 3
     MICHAEL LACEY; JIM           )
 4   LARKIN; and PHOENIX NEW      )
     TIMES, LLC,                  )
 5                                )
                 Plaintiffs,      )
 6                                )
            vs.                   )   CIV 08-997-PHX-SRB
 7                                )   Phoenix, Arizona
     SHERIFF JOSEPH ARPAIO, et    )   July 24, 2008
 8   al.,                         )   9:02 a.m.
                                  )
 9               Defendants.      )
     _____)
10

11

12

13

14               REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                (Hearing re Motion to Dismiss)

16

17        BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE

18

19

20
     Official Court Reporter:
21
     David C. German, RMR, CRR
22   Official U.S. Court Reporter
     Sandra Day O'Connor U.S. Courthouse, Suite 312
23   401 West Washington Street, SPC-39
     Phoenix, Arizona 85003-2151
24   (602) 322-7251

25   PROCEEDINGS TAKEN BY STENOGRAPHIC COURT REPORTER
     TRANSCRIPT PREPARED BY COMPUTER-AIDED TRANSCRIPTION
```

**APPEARANCES:**

**FOR THE PLAINTIFFS:**

      Stinson, Morrison, Hecker, LLP
      Attorneys at Law
      1850 North Central Avenue
      Suite 2100
      Phoenix, Arizona 85004-4584
      By:  Michael C. Manning, Esq.
          John T. White, Esq.

**FOR DEFENDANTS THOMAS AND MARICOPA COUNTY ATTORNEY'S OFFICE:**

      Schmitt, Schneck, Smyth & Herrod, PC
      Attorneys at Law
      1221 East Osborn Road
      Suite 105
      Phoenix, Arizona 85014-5540
      By:  Timothy J. Casey, Esq.

**FOR DEFENDANTS ARPAIO AND MARICOPA COUNTY SHERIFF'S OFFICE:**

      Jones, Skelton & Hochuli, PLC
      Attorneys at Law
      2901 North Central Avenue, Suite 800
      Phoenix, Arizona 85012
      By:  Eileen Dennis GilBride, Esq.
          Joseph John Popolizio, Esq.

**FOR DEFENDANTS WILENCHIK AND BARTNESS:**

      Zwillinger, Georgelos & Greek, PC
      Attorneys at Law
      2425 East Camelback Road
      Suite 600
      Phoenix, Arizona 85016
      By:  Scott H. Zwillinger, Esq.
          Laura A. Freeman, Esq.

**Phoenix, Arizona**
**July 24, 2008**

1

2

3        (Proceedings convened at 9:02 a.m.)

4        Good morning, ladies and gentlemen.  Please sit down.

5        THE DEPUTY CLERK:  Civil Case 08-997, Michael Lacey        09:04:09

6   and others versus Joseph Arpaio and others.  Time set for

7   hearing regarding defendants' motions to dismiss.

8        Counsel, please announce your presence for the record.

9        MR. MANNING:  Good morning, Your Honor.  On behalf of

10  *The New Times*, John White and Mike Manning.        09:04:23

11        THE COURT:  Good morning.

12        MR. CASEY:  Your Honor, good morning.  Tim Casey on

13  behalf of the defendants Maricopa County Attorney Andrew Thomas

14  and his spouse Ann and also for the Maricopa County Attorney's

15  Office.        09:04:37

16        MS. GILBRIDE:  Good morning, Your Honor.  Eileen

17  Dennis GilBride and Joe Popolizio for the Arpaio defendants and

18  Maricopa County Sheriff's Office.

19        MR. ZWILLINGER:  Good morning, Your Honor.  Scott

20  Zwillinger and Laura Ann Freeman on behalf of Dennis Wilenchik        09:04:49

21  and Becky Bartness.

22        THE COURT:  Good morning.

23        We have three motions pending, and contrary to the way

24  we did it yesterday, Mr. Casey, when we had three motions and

25  you were here, we're not going to argue them separately.        09:05:02

1   There's a substantial overlap in these motions and I thought

2   that it would be best to hear from the three defense counsel

3   first, then hear from plaintiffs' counsel once and then allow

4   defense counsel a few minutes each for any rebuttal argument.

5   We have about an hour set aside to do this so that would be, if     09:05:2(

6   we're trying to be fair to everybody, 10, 10, 10, and 30, but,

7   Mr. Manning, feel free to be briefer than that.

8            So I don't have any particular order in which I want

9   you to make the arguments but I would ask you to focus on the

10  claims that give rise to federal jurisdiction, because if those    09:05:46

11  claims are dismissed, this Court is not, at this stage of the

12  litigation, going to be exercising any supplemental

13  jurisdiction on state claims.

14           And then the other -- on the state side, the other

15  thing I would like some argument on is the issue of the           09:06:05

16  sufficiency of the notice of claim.

17           So however you wish to proceed.

18           MR. CASEY:  Thank you, Your Honor.  Tim Casey.

19           I'm going to -- first of all, on behalf of my clients,

20  Thomas and his spouse and the Maricopa County Attorney's          09:06:23

21  Office, you know, we've raised several grounds, some of which

22  you've noted:  the notice of claim; the nonjural status of the

23  County Attorney's Office; the punitive damage claim;

24  racketeering; and, obviously, the absolute immunity.

25           Because of the time limitation, I'm going to have some     09:06:37

1    of the other counsel address some of the other issues you have

2    mentioned and I'm going to focus on the absolute immunity for

3    Mr. Thomas, because I respectfully submit that's the most

4    important thing that I think the Court is going to decide in

5    this case, at least as to Mr. Thomas.                          09:06:53

6            The issue, obviously, is, Judge, whether or not

7    Mr. Thomas has absolute immunity for his judgment and selection

8    of Mr. Wilenchik as a special prosecutor, and the basic

9    argument, as I understand it, is Mr. Manning and his client

10   says it's administrative and ministerial because Mr. Wilenchik  09:07:16

11   was in an investigative stage before probable cause was ever

12   determined.

13           And what we've come back to you and shared with you

14   and have the law in support of is that you don't look at the

15   person who does it just because they're a prosecutor and        09:07:30

16   elected official.  You look at the function.

17           May I use the easel real quick?  Because I think --

18           THE COURT:  Yes.

19           MR. CASEY:  -- it would help me and perhaps even the

20   Court, and I'm going to do it over here so that --              09:07:41

21           THE COURT:  Just keep your voice up.

22           MR. CASEY:  Yes.

23           Basically, what the argument the plaintiff has -- and

24   this is a short time line.  Right here, what I'm just going to

25   call step one, is Mr. Thomas' judgment and selection of         09:07:57

1  prosecutors.  And he selected more than one special prosecutor.

2  He selected Judge French and two other people and Mr. Wilenchik

3  in Mr. French's office.  New Times is not challenging that.

4  They're just challenging the issue about Mr. Wilenchik.

5      The argument you get in response to our motion saying          09:08:16

6  there's no absolute immunity is that, here, on the time line,

7  stage two, I'm going to call this PC, probable cause

8  determination.

9      And you know from your time on the state bench that

10  there are two ways -- there are two ways, Your Honor, of          09:08:32

11  someone being charged with a crime.  You go to the grand jury

12  and you prove to them ex parte, essentially, that there is

13  probable cause that a crime has been committed and the jury can

14  issue an indictment.  The next way you can do that is a

15  prosecutor can do a direct complaint filed with the court,        09:08:53

16  either a county court, a commissioner, or a justice court, and

17  in an adversarial process where there's a defense lawyer and

18  the accused has a right to be there, you then argue before the

19  Court whether or not there's probable cause to determine that a

20  crime has been committed.                                          09:09:13

21      When you look at *The New Times* response to our motion,

22  they basically say Thomas doesn't get absolute immunity because

23  between points one and point two there was no probable cause

24  ever determined that a crime was committed by a grand jury and

25  that this was at a complete investigatory stage and therefore     09:09:32

1  absolute immunity doesn't apply to the selection.

2          And here's why that's wrong and here's what they

3  miss, and I think it's understandable, because we're civil

4  lawyers.

5          You look at the function of the office and -- well,                    09:09:45

6  actually, the function of the selection decision.  The key

7  thing is, between points one and two it is intimately and

8  closely associated with the judicial phase of the criminal

9  process.  That's the lofty language the Supreme Court uses.

10          What does it really mean?                                             09:10:06

11          Well, the plaintiffs, I think, would like to tell you

12  that you're never involved in the judicial phase until there's

13  a probable cause determination, until there's a judge somehow

14  in your presence, and that's not true.

15          Let me point out to you all the reasons why                          09:10:17

16  Mr. Thomas' selection and his judgment on it warrants absolute

17  immunity.

18          First of all, the cases that we provided to you

19  demonstrate that every prosecutor, whether you're internal to

20  an office or you're a special prosecutor, private lawyer that's 09:10:35

21  been retained, like Mr. Wilenchik was, you have under our

22  Supreme Court, our state Supreme Court rules, ethical

23  obligations.

24          In fact, in the decision we cited to you, the

25  *Villalpando v. Reagan* case at 121 Pacific 3d 172, Footnote 10, 09:10:49

1  cites the case of *State versus Polan* that makes it very clear.

2  A prosecutor at all times, at all stages acts in a

3  semi-judicial capacity and is required to follow principle

4  alone, without bias or prejudice.

5          Ethical Rules 3.8 and .5 say that even before you get          09:11:16

6  to the probable cause determination, either before the grand

7  jury or a direct indictment, that prosecutor has to make his or

8  her independent determination of whether there's probable cause

9  even to bother a judge or bother a grand jury.

10          What else means that they're in a judicial role?          09:11:35

11          Before you ever get to probable cause, and that's what

12  they hang their hat on, no probable cause, you can't have

13  absolute immunity, before you ever get to probable cause the

14  special prosecutor in this case has the ability to subpoena

15  witnesses, to subpoena duces tecum documents.          09:11:52

16          Just as I as a civil officer of this court can issue a

17  subpoena and sign my own name to it and command a third party

18  to produce documents, Mr. Wilenchik or anyone can do that.

19  That's the way it's been for 20 years.  He can also go to the

20  clerk of the county court and the subpoenas -- we know          09:12:13

21  subpoenas were issued in this case because that's what *New*

22  *Times* complains about, these overbroad subpoenas, et cetera,

23  and we'll avoid the merits of it, but that is part of the

24  judicial process where the special prosecutor has to exercise

25  his judgment and has to be experienced and has to have the          09:12:31

UNITED STATES DISTRICT COURT

1  temperament and ability to do these things.

2          But that's one element of how it's part of the

3  judicial process.

4          What else can he do?

5          Before there's ever probable cause, a special            09:12:42

6  prosecutor can take witness testimony before a grand jury.  He

7  can do that for any number of reasons.  To protect a witness's

8  testimony.  You see it very often in organized crime or

9  conspiracy types of matters.  But he can do that without

10 probable cause ever being determined.                          09:13:00

11         What else can he do?

12         He can get search warrants.  A judge has to do that.

13 He can get wiretaps.

14         So what does that all have to do with this?  Probable

15 cause is not what -- is not the magic marking that the          09:13:13

16 plaintiff says it is.

17         We back up now.

18         The County Attorney is the only one in this state that

19 has the ability in the county to select an independent

20 prosecutor.  That prosecutor's decisions cannot be made by      09:13:30

21 legislators, the board of supervisors, or the county attorney

22 David Smith or presiding judge or any judge.  It has to be done

23 by statute by that person.

24         Why?  Because it necessarily requires that that

25 person, the County Attorney, whether it's here or elsewhere, in 09:13:49

1  Pima County, exercised their judgment in how to select properly

2  the staffing for that at whatever stage it may be.  They have

3  to have the right experience, qualifications, temperament,

4  ability to get along with witnesses, with the crime victim, all

5  of those things.  That's why it's tied in there.        09:14:08

6          Now --

7          THE COURT:  Mr. Casey, if you have anything you want

8  to really say --

9          MR. CASEY:  Yeah.

10         THE COURT:  -- to me, your time is not just up but   09:14:17

11 over.

12         MR. CASEY:  Okay.  And I apologize for this.

13         The final thing is, what's dispositive on this are two

14 decisions.

15         The *Eldridge* decision out of the Sixth Circuit that is   09:14:25

16 factually very similar to this one that says -- it says and

17 stands for the proposition that the county prosecutor

18 appointing the independent prosecutors have absolute immunity

19 for that decision.

20         The other decision that I wanted to point out to you   09:14:42

21 is the *Roper* case from the Southern District of New York.  It's

22 an unpublished decision, but a prosecutor actually had a

23 special prosecutor investigate a political opponent in a

24 special prosecutor standpoint.  That was covered.

25         Finally, the problem with the plaintiffs' argument, in   09:14:59

1    closing, is this, is that if you allow a colorable

2    constitutional claim to be made by *The New Times*, just because

3    they're the media or something, it literally is going to open

4    up chaos and allow the floodgates.

5         Because we all know that if, in fact, that claim          09:15:16

6    exists there's no difference between that and a claim that

7    someone could make if they were, for example, an illegal

8    immigrant, because Mr. Thomas' views on illegal immigration and

9    those sort of things are well known.  An illegal immigrant

10   could easily make a colorable constitutional claim that he was   09:15:35

11   unduly prosecuted harshly by the most severe, toughest

12   prosecutor in the office.  Why?  Because of his national

13   origin.  And, therefore, his constitutional rights were

14   violated.

15        And out of the forty-some-thousand that are prosecuted     09:15:50

16   every year, every inmate or prisoner could come up with some

17   colorable constitutional claim that somehow Mr. Thomas selected

18   someone either from his office or outside to prosecute them in

19   a constitutionally impermissible manner.

20        We respectfully submit he has absolute immunity.          09:16:08

21   That's what it's intended for.

22        Thank you for your patience, Your Honor.

23        THE COURT:  Thank you, Mr. Casey.

24        Mr. Zwillinger.

25        MR. ZWILLINGER:  Thank you, Your Honor.                   09:16:18

1      I, too, am going to focus on absolute immunity because

2 I agree it is the most important part of our motion in regard

3 to Mr. Wilenchik.

4      First, I wanted to talk very briefly about some of

5 the overarching concerns that make absolute immunity so                    09:16:36

6 important.

7      The first of that is absolute immunity does not apply

8 and is not so commonly applied that it's the norm because of

9 respect for the office of the prosecutor or because of respect

10 for individual prosecutors.  It applies because it is a                    09:16:52

11 recognition by the courts that in order for the criminal

12 justice system to work effectively we have to make a decision

13 that prosecutors, even prosecutors who may be overzealous and

14 make errors, cannot constantly be barraged by civil suits.  It

15 is a recognition that the system has to weigh out at the cost            09:17:13

16 of only civil litigation.

17      Now, that decision has been made by our Supreme Court

18 and the Circuit Courts as a first recognition that there are

19 other safeguards that protect defendants.

20      THE COURT:  Well, hold on a second, because the                     09:17:29

21 allegations of the complaint with respect to your client

22 include not just his investigation and the subpoenas issued in

23 connection with the grand jury investigation as to whether or

24 not *The New Times* committed a crime by publishing the Sheriff's

25 address but also include allegations that subsequent to the            09:17:58

1   publication of the subpoenas in the newspaper that your client,

2   in a nonprosecutorial role, directed police officers, in this

3   case sheriff's deputies, to conduct an arrest for purposes

4   other than the legitimate purposes of an arrest and under

5   circumstances that were designed to cause a particular trauma          09:18:32

6   to the arrestees and were certainly not justified by the

7   gravity of the potential crime that was committed by

8   publishing.

9           I know that there are factual disputes, but let's just

10  assume that Mr. Wilenchik stepped out of his role as special          09:18:54

11  prosecutor and instead tried and successfully influenced police

12  officers to make an inappropriate arrest in an inappropriate

13  fashion, in the middle of the night, whatever the allegations

14  are.  Could he have absolute immunity for that?

15          MR. ZWILLINGER:  Absolutely, Your Honor.  No pun              09:19:20

16  intended.  And the reason is -- well, first off, the *Moore* case

17  that the Supreme Court recently decided addresses that point

18  and --

19          THE COURT:  Okay.  But that has to do with whether or

20  not that's a constitutional violation.  That didn't have             09:19:36

21  anything to do with absolute prosecutorial immunity.  And

22  that's -- I mean, that's a different argument.  But that was my

23  question.  Wouldn't -- I mean, if he steps into an

24  investigatory role, if he starts to perform a police function,

25  his absolute immunity goes away and he may have qualified            09:19:56

1    immunity.

2            MR. ZWILLINGER:  I agree with you that a strictly

3    investigatory act is outside the immunity, but even if you

4    assume that the plaintiffs are correct, and we have to, we're

5    here on a motion to dismiss, that Mr. Wilenchik ordered or              09:20:09

6    influenced the sheriff's deputies to arrest, that's one of the

7    ways that a criminal proceeding can be initiated, and the

8    courts have determined that initiation of criminal proceedings

9    are subject to absolute immunity.

10           And as far as the intent and the conspiracies that are          09:20:25

11   alleged in the complaint, the Ninth Circuit has told us that

12   those allegations, those possibilities, are removed from the

13   immunity analysis, that we have to look simply at the act.  If

14   you assume that Mr. Wilenchik ordered the arrest or influenced,

15   it's still just the initiation of criminal proceedings, which          09:20:43

16   is protected by absolute immunity.

17           I would also suggest to the Court that the statutes

18   about how arrests occur in Arizona make that argument an

19   impossibility.  The police -- we're not really here talking

20   about the arrest.  Plaintiffs' complaint acknowledges the             09:21:00

21   commission of a misdemeanor.  We're talking about how the

22   arrest was effectuated.  The complaint is that this should have

23   been a sign-and-release situation when the plaintiffs were

24   taken to jail, but the statutes say that the decision of how to

25   effectuate an arrest is determined by the peace officer.              09:21:19

1          So, yes, it would still be covered by absolute

2   immunity, but there's also, I guess, a legal nullity to the

3   argument.  It simply can't be because the statutes say that it

4   was the sheriff's deputies that have that discretion.

5          Now, the immunity analysis applies to Mr. Wilenchik's      09:21:37

6   actions completely.  It's a functional test that the Court

7   needs to apply, again, because it's not out of respect for the

8   individual.  This application of immunity here is in some sense

9   not merely about Mr. Wilenchik, it's not merely about this

10  case.  It's about all the other cases that could potentially     09:21:58

11  come after this, and Mr. Casey spoke briefly to that.  And so

12  that is another reason that the intent and the allegations of

13  conspiracy are removed from the analysis.

14         Here, what we have is -- I will acknowledge that it is

15  a tough area.  There's certain areas that are absolutely         09:22:16

16  entitled to absolute immunity, appearance in this courtroom,

17  and there are certain areas that are surely not entitled to

18  immunity because they're investigatory.

19         Some of the cases talk about things where prosecutors

20  sign affidavits and effectively become witnesses and then,       09:22:31

21  therefore, they're not entitled to immunity.  This is that

22  tougher area.  Because the courts have said that some

23  activities that are investigatory are still entitled to

24  immunity because they're part of the judicial process, and

25  they're part of the judicial process when they're actions taken  09:22:52

1   by the prosecutor to do things such as determine whether or not

2   to bring those criminal proceedings in the first place.

3        The decisions that I've cited in my brief talk about

4   if a prosecutor has immunity whether or not to bring criminal

5   proceedings, he has to have immunity on the actions in order to

6   make that determination; otherwise, you're forcing the

7   prosecutor to act without information, and that is obviously

8   not what we want.

9        So the determination really comes down to was

10  Mr. Wilenchik acting as a police officer or was he acting as a

11  prosecutor?

12       The distinction in the cases that I've cited in my

13  brief point to is police officers typically engage in unfocused

14  investigations to determine has a crime been committed, who

15  committed that crime, and what crime was committed?

16  Prosecutors typically engage in more focused investigations,

17  focused on an individual for specific activities in violation

18  of one or two specific statutes.

19       And it's the latter situation that we have here.

20  Mr. Wilenchik was focused on these plaintiffs for a specific

21  act:  Publishing Sheriff Arpaio's home address on the Internet

22  in violation of a particular statute.  Those are the acts of a

23  prosecutor and entitle him to immunity.

24       Now, the plaintiffs made argument in response to that

25  that we've said in our complaint that these are investigatory

1  actions, but I would suggest to you that if all that was needed

2  was the hanging a label on the actions of a prosecutor as

3  investigatory, there would be no absolute immunity.  Every

4  lawsuit would say the prosecutor acted investigatory.

5          And the *Twombly* case from the Supreme Court tells us        09:24:42

6  that even on a motion to dismiss when you have to take the

7  plaintiff's allegations as true it still cannot just turn on

8  labels.  You still have to look at the substance of the

9  allegations.

10         And when you do that and you see that, again, it is        09:24:56

11  just Mr. Wilenchik focused on an individual for violation of a

12  specific statute, those are the acts of a prosecutor and

13  entitle him to immunity.

14         THE COURT:  Thank you, Mr. Zwillinger.

15         MR. ZWILLINGER:  Thank you, Your Honor.        09:25:10

16         THE COURT:  Miss GilBride.

17         MS. GILBRIDE:  Thank you, Your Honor.

18         I'm going to focus on the probable cause issue, and

19  since neither co-counsel discussed it I will talk about the

20  notice of claims issue.        09:25:29

21         If the allegations in the complaint show that there

22  was probable cause to arrest for publishing the grand jury

23  subpoena, then most of the federal claims are out, except for

24  the RICO claim, which is a little bit different analysis.  And

25  when you look at the complaint, really, there are no other        09:25:46

1  facts that are alleged, no other conduct that can be

2  constitutional or civil rights violations or even a tort, other

3  than the arrest, when it comes to Sheriff Arpaio.

4          THE COURT:  Well, was Sheriff Arpaio even alleged to

5  have been involved in the arrest?                           09:26:06

6          MS. GILBRIDE:  Not personally, no.  It's -- really,

7  it was his -- I suppose it was his deputies, but, yes, he was

8  not involved --

9          THE COURT:  I mean, I don't understand how he could

10  have 1983 liability for the acts of his deputies if he was    09:26:17

11  not --

12          MS. GILBRIDE:  Personally involved.

13          THE COURT:  -- personally involved, supervising it,

14  directing it.

15          MS. GILBRIDE:  That's correct.  And they allege sort  09:26:31

16  of conclusorily that there was a failure to train, a failure to

17  adopt constitutional policies, but there are no facts in the

18  complaint to show that.

19          And to resolve the probable -- so that is the one

20  reason -- and you're right -- why Sheriff Arpaio should be out  09:26:47

21  on motion to dismiss.

22          I won't deal with the nonjural entity issue but that's

23  another reason why the Sheriff's Office itself would be out on

24  a motion to dismiss, but to resolve the probable cause issue

25  all you have to do is look at the complaint, paragraphs 74     09:27:02

1    through 80.  They admit consciously, which is their word, or

2    knowingly publishing the contents of the grand jury subpoena.

3    That's all you need for probable cause.

4            And, frankly, they don't point to an allegation in

5    their complaint where they say their publication was not          09:27:18

6    knowing.

7            So there is no reason to believe there was not

8    probable cause, even from the complaint, to arrest them.

9            Again, as co-counsel pointed out, they can't get

10   around these facts that they've alleged simply by alleging        09:27:36

11   there was no probable cause.  They have to have facts to show

12   that there was no probable cause.  That's the *Twombly* case.

13           So this argument takes care of Count 3, the Monell

14   claim; Count 4, the Fourth Amendment claim; Count 5, the

15   conspiracy to violate constitutional rights claim; and Count 6,   09:27:53

16   the false arrest, imprisonment and malicious prosecution claim.

17           Briefly, I will say if the Court finds that there's

18   some kind of constitutional violation here, which there isn't,

19   or an allegation of one, Sheriff Arpaio is still entitled to

20   qualified immunity because there's no clearly established right    09:28:16

21   to be free from arrest when you knowingly publish the contents

22   of a grand jury subpoena.  There just isn't.  There's no First

23   Amendment right to do that.  There's no, oh, gee, I thought the

24   prosecutor was -- had bad motives.  That does not allow you to

25   publish a grand jury subpoena.  They had a state remedy if they    09:28:33

1   thought the subpoena was overbroad.  They've used that state

2   remedy.  They should have stuck with it and not published the

3   subpoena.

4           I'd like to say a word about their conspiracy theory.

5           One drawback to allowing plaintiffs to argue against          09:28:47

6   these three motions all at once is it allows them to do exactly

7   what they did in their complaint and in their responses to all

8   the motions to dismiss, and that is to sort of mishmash

9   everybody together and say everybody did bad things, they had

10  bad motives, and therefore we should all go to trial.          09:29:06

11          I would encourage you to look at the complaint, Your

12  Honor, claim -- I believe it's Number 5 where it says the

13  conspiracy that they are alleging is a conspiracy to violate

14  constitutional rights.

15          If there's no constitutional violation, it's out, and          09:29:24

16  it is out.

17          The conspiracy itself is not actionable unless there

18  is a constitutional violation or some kind of tort here, and

19  there isn't.

20          I'd like to say a word about the sufficiency of the          09:29:37

21  notice of claim, because I know we're short on time.

22          The statute requires plaintiffs to state facts

23  underlying their claim and to separately state facts underlying

24  their damages amount.  They didn't do that.  They have a --

25          THE COURT:  Seven and a half million dollars for Lacey          09:29:57

1  and seven and a half for Larkin?

2          MS. GILBRIDE:  Yes, Your Honor.  $15 million.  And all

3  they --

4          THE COURT:  But I asked that specifically.  I mean,

5  did they even break out a difference between Larkin and Lacey?          09:30:07

6          MS. GILBRIDE:  Not that I know of, and it's been a

7  while since I've actually read the notice, but I believe they

8  just claimed $15 million flat, because, the notice says, it's

9  on the low amount or the low side of the amount that

10  Mr. Wilenchik asked Judge Baca for in contempt sanctions when          09:30:26

11  they published the grand jury subpoenas.

12          That is not even a measure of their damages.  It's

13  just a, ha-ha, you asked for that amount against us so we're

14  going to ask for that amount against you.  It doesn't even

15  purport to be their own damages.  It doesn't say anything about          09:30:44

16  what injuries they suffered, other than the fact that they were

17  subject to an investigation, which is not improper; they were

18  arrested with probable cause, which is not improper; and the

19  notice of claims says absolutely nothing about their injuries.

20          And that distinguishes this case from the case they          09:31:06

21  cited in their supplemental citation of authority, *Jones versus*

22  *Cochise*, which came out not that long ago as a state case.

23          And in *Jones versus Cochise* the plaintiff was injured

24  because he was hit as he was a pedestrian, he was hit by the

25  defendant's car, and the plaintiffs went on about his injuries          09:31:22

1   and this and that.  They didn't break out the fact that he had

2   so many lost wages or so much for loss of consortium, but they

3   did talk about the plaintiff's injury.

4           Here, there's no discussion whatsoever of the

5   plaintiffs' injury.  It's just a you asked for this amount so          09:31:39

6   we're going to ask for that amount type of thing.  And that is

7   insufficient under *Deer Valley* and under the statute.

8           Unless the Court has any additional questions, I will

9   leave it at that.

10          THE COURT:  Thank you, Miss GilBride.                          09:31:53

11          Mr. Manning.

12          MR. MANNING:  Thank you, Your Honor.

13          I will try to be brief and not take the entire 30

14   minutes.

15          THE COURT:  Would you start, though, by telling me in         09:32:11

16   a narrative way separately what the claims are against Arpaio

17   versus Thomas versus Wilenchik, because as I was asking

18   earlier, I didn't read anything that indicated that Sheriff

19   Arpaio was involved in the arrest.

20          MR. MANNING:  I will, Your Honor.  And --                      09:32:41

21          THE COURT:  Nor do I have any reason to think that

22   County Attorney Thomas was involved in the arrest.  I know that

23   there are allegations that Mr. Wilenchik was involved in the

24   arrest.  What I read about Arpaio is that because of his

25   political motivations or because he considers *The New Times* a       09:33:06

1  political enemy or he's mad at them because they don't like

2  him, or something to that effect, he asked County Attorney

3  Thomas to investigate this publication, something that I don't

4  think can be a constitutional violation.

5        But beyond Sheriff Arpaio asking that the                    09:33:27

6  investigation be conducted I'm not sure what is alleged that he

7  actually did, what involvement he had as the Sheriff in any of

8  these activities.  You say things like he appointed the special

9  prosecutor, but we know that he didn't --

10        MR. MANNING:  Encouraged.  Encouraged.                      09:33:51

11        THE COURT:  He may have encouraged it but he certainly

12  didn't appoint a special prosecutor.

13        MR. MANNING:  Correct.

14        THE COURT:  And similarly, I know that you suggest

15  that Mr. Thomas had involvement in picking a special prosecutor  09:34:01

16  because he wanted to appease his political allies and perhaps

17  he doesn't like the publication either, but not that he had

18  anything to do with the arrest.

19        And so I -- I'm not clear and I don't think your

20  response is because, as Miss GilBride pointed out, there's lots  09:34:25

21  of references to defendants in the plural, and 1983 liability

22  has to do almost always, with some exceptions, with individual

23  conduct.

24        MR. MANNING:  Individual or entity conduct.  Yes.  And

25  we --                                                            09:34:46

1          THE COURT:  Well, entity conduct is quite limited.

2          MR. MANNING:  Yes, Your Honor.  We've alleged both the

3   entity, MCAO and MCSO, acting through Mr. Arpaio or Mr. Thomas,

4   engaged in these -- in this conduct which we allege to have

5   violated federal law.                                        09:35:09

6          THE COURT:  But there isn't entity liability unless it

7   can be shown that the individual's actions were pursuant to an

8   official policy or custom of the municipality or other

9   political subdivision.

10         MR. MANNING:  Which we have alleged, with respect to   09:35:30

11  both MCAO and MCSO in this particular instance, in this

12  particular case.

13         But I will answer -- talk with -- you asked me about

14  the individual --

15         THE COURT:  Yes.                                       09:35:43

16         MR. MANNING:  -- conduct.

17         The individual conduct of Sheriff Arpaio is alleged.

18  Now, I think you're right that it's not alleged with the

19  precision that you probably and the defense would like to have

20  seen with respect to Sheriff Arpaio made the decision on or    09:35:56

21  about such and such a date to have these guys arrested, and

22  that is true.  And if that -- if that is a concern of the

23  Court, we certainly would ask permission to amend, because we

24  can make those allegations now and we can make them on more

25  than information and belief.                                  09:36:17

```
 1          That said --

 2          THE COURT:  I'm looking at the current complaint.

 3          MR. MANNING:  Correct.

 4          THE COURT:  It doesn't seem to me that it specifically

 5    says that Arpaio had anything to do with anything other than      09:36:26

 6    for political reasons urging an investigation of -- a criminal

 7    investigation of The New Times' activities because of the

 8    publication of his home address.

 9          MR. MANNING:  Well, actually, it does, Your Honor,

10    inasmuch as it says defendants.  Now, we didn't break out -- as  09:36:46

11    counsel has indicated, we didn't break out names on particular

12    paragraphs.

13          THE COURT:  And I think that for 1983 liability you

14    have to, because you don't get defendants lumped together in

15    1983 liability because it's individual liability, except if --   09:37:01

16    except for Monell liability.

17          MR. MANNING:  Which, Your Honor, we can do that with

18    respect to an amended complaint, but talking as of today, as of

19    this complaint, we did lump all of those defendants together

20    with respect to some of that conduct.                            09:37:23

21          But I would ask the Court to consider the Hydrick case

22    in connection with the pleading at this stage, and Hydrick, a

23    Ninth Circuit case, I think, from last year, a few years ago,

24    talked about the analysis on a qualified immunity argument

25    motion to dismiss that this is a notice pleading state and that  09:37:42
```

1   notice -- federal -- notice pleading was appropriate and the

2   plaintiffs could plead short statements of fact with respect to

3   these defendants and that that was appropriate at this stage,

4   at this motion to dismiss stage.

5          We think what we did is appropriate, and if the Court          09:38:02

6   disagrees with that we'd ask for permission to amend our

7   complaint to break out those defendants where we have some

8   information, where we have some evidence with respect to

9   individual participation by Sheriff Arpaio and Mr. Thomas.

10          THE COURT:  So what did Mr. Thomas do other than hire          09:38:20

11  Mr. Wilenchik?

12          MR. MANNING:  Well, what Mr. Thomas did, in addition

13  to hiring Mr. Wilenchik, is continue to promote this

14  investigation.

15          THE COURT:  But did he have anything to do with the          09:38:31

16  arrest?

17          MR. MANNING:  Your Honor, not that we know of.  I will

18  say at this point we don't know at this stage what he had to do

19  with this arrest or not.  We don't know yet what happened in

20  those private counsels between Sheriff Arpaio and the Wilenchik          09:38:46

21  team.  We know from comments made by Mr. French publicly, and

22  we've alleged some of those --

23          THE COURT:  Well, we actually seem to know a lot

24  because we've read a whole lot about it in the newspaper.

25          MR. MANNING:  Well, true, but I'm focusing on what --          09:39:05

1        THE COURT:  Written by people that were directly

2   involved as opposed to reported on.  I mean, we read that, too.

3   But I think we've all read things written by Mr. French,

4   Mr. Wilenchik.  I don't remember if we read anything by

5   Mr. Thomas.                                          09:39:2(

6        MR. MANNING:  I don't recall.  But we have alleged

7   that there were meetings in coordination of the investigation

8   and ultimately the arrest of these two gentlemen in the dead of

9   night in October.

10       So we know someone from Mr. Thomas' office and the   09:39:3(

11   Sheriff's Office participated in the decision, the

12   investigation, after they were told by the professional staff

13   that there was no case here to pursue.

14       THE COURT:  But if it wasn't Mr. Thomas himself, then

15   that doesn't give rise to 1983 liability.           09:39:53

16       MR. MANNING:  But again, Your Honor, how is plaintiff

17   at this stage of the case to know that, particularly in a

18   conspiracy case or case like this where they kept their counsel

19   very quiet and very secret?  It puts a plaintiff in a terrible

20   burden here and Rule 11 sanctions perhaps to make allegations   09:40:09

21   with respect to individual involvement where we can't tell yet.

22   That's why *Hydrick,* I think, said what it said, to district

23   court judges and to counsel, that you make a short, plain

24   statement of the case and if those are sufficient for liability

25   we get to conduct some discovery.                   09:40:33

1          Your Honor --

2          THE COURT:  How can Mr. Thomas be liable under 1983

3    even for the motives you attribute to him:  Investigate the

4    possible violation of a criminal statute by publishing a public

5    official's home address?                                    09:40:53

6          MR. MANNING:  Mr. Thomas had been told by his

7    professional staff -- we know this; we've seen this -- his

8    professional staff that there's no case here, this case should

9    not be pursued, it's a nonstarter.

10          THE COURT:  Can't he investigate it anyway?          09:41:07

11          MR. MANNING:  But if he's -- that's an absolute

12    immunity issue.  I just want to make a note there, Your Honor.

13    The investigation here did not --

14          THE COURT:  To the grand jury.

15          MR. MANNING:  There was no grand jury ever impaneled.  09:41:18

16    No grand jury.  And the district attorney -- the county

17    attorney admitted this to Judge Baca that there was no grand

18    jury impaneled for this matter.  That's very important, Your

19    Honor.  No grand jury was ever impaneled.  What he did was --

20          THE COURT:  Well, weren't the subpoenas returnable to  09:41:39

21    a specific grand jury?

22          MR. MANNING:  First of all, the subpoenas --

23          THE COURT:  I know the subpoenas were issued by

24    Mr. Wilenchik and I know that you allege that there were

25    procedural errors in the issuance of those subpoenas because of  09:41:51

1  some failure to comply with a statute, but weren't the

2  subpoenas that were issued returnable to a specific session of

3  a specific grand jury?

4        MR. MANNING:  If they were, Your Honor, there was no

5  grand jury impaneled for this matter, and the county attorney        09:42:11

6  admitted that to Judge Baca.  We saw the transcript.

7        THE COURT:  There's always a grand jury impaneled.

8        MR. MANNING:  There's a grand jury impaneled but not

9  for this particular case.  Yes, there are three or four grand

10  juries constantly, perpetually impaneled, but not for *The New*        09:42:26

11  *Times* case.  When Judge Baca looked at the file, she said, my

12  gosh, there's nothing in here.  And the County Attorney's

13  Office admitted this was very preliminary, there was no grand

14  jury impaneled for this matter.  That is an admission in court

15  with respect to that grand jury.        09:42:45

16        THE COURT:  Okay.  So that's the absolute immunity

17  issue.

18        MR. MANNING:  Yes.

19        THE COURT:  But how can Mr. Thomas have committed a

20  constitutional violation by agreeing with his alleged friend        09:42:53

21  Sheriff Arpaio, okay, you're upset about this, I'll look into

22  it, I may be conflicted out so I'll get a special prosecutor to

23  do it, and that's all he did?

24        MR. MANNING:  That's not all he did.  He worked with

25  Sheriff Arpaio and Mr. Wilenchik to have Mr. Wilenchik        09:43:17

1  appointed as a special prosecutor knowing he suffered from the

2  same conflict Mr. Thomas did and knowing he was Mr. Arpaio's

3  personal attorney, knowing there wasn't a case there,

4  encouraging the case to go forward and allowing Mr. Wilenchik

5  to pursue the case with utterly no training and no supervision.          09:43:36

6  That's 1983 liability.  He did not supervise, he did not train

7  Mr. Wilenchik.  Mr. Wilenchik issued those grand jury subpoenas

8  either because he knew he was doing it incorrectly and

9  improperly or because he was told to.  I don't -- or wasn't

10 trained to do it properly.                                               09:43:56

11         These grand jury subpoenas were an absolute nullity

12 under state law.

13         And, once again, with respect to Mr. Thomas' liability

14 in connection with the 1983 case, it was his job to supervise

15 and train Mr. Wilenchik, even if he had not been hopelessly           09:44:12

16 conflicted, just as Mr. Thomas was.

17         And, you know, Your Honor, we're not focusing on

18 Mr. Thomas' liability strictly because of the appointment of

19 Mr. Wilenchik, though I think that's enough.  It is also

20 because he failed to train and failed to supervise him.               09:44:28

21         Now, when things went badly and he fired

22 Mr. Wilenchik, he said on the one hand he was on his own, he

23 was completely independent, but on the other hand he fired him

24 and he said things went terribly wrong here.

25         So Mr. Thomas' liability arises from failure to train,        09:44:45

1  failure to supervise in appointing a man he knew to be

2  hopelessly conflicted with the same kind of conflict Mr. Thomas

3  had to pursue a case he was told was no good.  This case was

4  pursued for one reason and one reason only:  To punish these

5  detractors.                                                    09:45:05

6            THE COURT:  Okay.  So what -- other than attempting --

7  other than influencing the arrest of Lacey and Larkin, what did

8  Mr. Wilenchik do?  Let's assume that he's a poorly-trained

9  special prosecutor, as you've suggested, but he's going about

10 doing his special prosecutor investigation and trying to find   09:45:36

11 out if *The New Times* violated state statute by publishing

12 Arpaio's home address.  How can there be any liability for

13 that?

14            MR. MANNING:  That's not all he did.

15            THE COURT:  Putting aside the arrest, because that's a 09:45:57

16 separate thing.

17            MR. MANNING:  Right.  And I was going there.

18            I think one of the answers, I mean, in addition to

19 pursuing a case he absolutely knew he was absolutely conflicted

20 from pursuing, put that aside for a minute --                   09:46:10

21            THE COURT:  That's not a constitutional violation.

22            MR. MANNING:  Well --

23            THE COURT:  There might be all kinds of other problems

24 with it but I don't know where the constitution would come in.

25            MR. MANNING:  Your Honor, in the context of the entire 09:46:24

1    story, I think it does play into the constitutional violation,

2    but let's focus instead on one particular act in addition or

3    aside from the arrest, aside from the fact that he was pursuing

4    a case he knew he was too conflicted to pursue, and that is,

5    issuance of those grand jury subpoenas.                    09:46:42

6           Your Honor, we've alleged this and we'll prove it.  We

7    now have the transcript in front of Judge Baca.  There was no

8    grand jury convened for this case, specifically for this case.

9    You're quite right that there are always three, but there was

10   nothing specifically for this case.  Mr. Wilenchik and his team   09:47:00

11   sent out subpoenas, issued subpoenas which he either knew or

12   absolutely should have known were hopelessly irregular.

13          And it wasn't just a technical violation, Your Honor.

14   The subpoenas did not meet the definition of a grand jury

15   subpoena by Arizona law.  They were a nullity.             09:47:21

16          Here's another thing that we allege, Your Honor.

17          THE COURT:  That might get them out of the

18   misdemeanor.

19          MR. MANNING:  But it also is important with respect to

20   this liability, because, Your Honor, I mean, this man either   09:47:31

21   knew he was doing this improperly or wasn't trained

22   sufficiently enough to know, but it was -- those were

23   hopelessly irregular and improper grand jury subpoenas.  They

24   weren't grand jury subpoenas at all.

25          Here's another thing we've alleged.                 09:47:51

1          THE COURT:  They were subpoenas -- were they subpoenas

2    just to *The New Times* or were they also subpoenas to Larkin and

3    Lacey?

4          MR. MANNING:  Well, there was -- they were to Larkin

5    and Lacey as well, I think, Your Honor.  I don't want to --          09:48:02

6          THE COURT:  Okay.  We'll figure that out later.

7    There's too much paper here.

8          MR. MANNING:  Frankly, I don't know, so I don't want

9    to mislead the Court.

10          But here's another aspect of this which I think is          09:48:12

11    really impactful with respect to your question, and that is, on

12    the same day Mr. Wilenchik also issued improper grand jury

13    subpoenas to Paul Rubin of *The New Times*, and that was in

14    response to a story he wrote called, I think, Below the Belt.

15    That was a story about Mr. Wilenchik's representation of          09:48:39

16    Mr. Arpaio in the Dan Saban trial; had utterly nothing to do

17    with any publication of a grand jury subpoena or publication of

18    Mr. Arpaio's address.

19          If there's one made-for-TV incident in connection with

20    this case that exposes all three of these main players here, it          09:48:59

21    perhaps is the subpoena to Paul Rubin.  His story had nothing

22    to do, never even mentioned the publication of Mr. Arpaio's

23    home address, and they -- and Mr. Wilenchik does a grand jury

24    subpoena on Mr. Rubin for all his notes and all his files with

25    respect to that story on Dan Saban, the Dan Saban trial.          09:49:23

1          So, Your Honor, if you pick out one piece of the

2    puzzle alone and you inspect it alone, perhaps the Court gets

3    uncomfortable with respect to the over-arching 1983 claims,

4    conspiracy claims and RICO claims, but --

5          THE COURT:  I do because I don't think 1983 claims are        09:49:45

6    usually over-arching.  I think they're usually individual.

7          MR. MANNING:  I'm not talking -- I don't mean

8    over-arching in terms of people.  I'm talking in terms of the

9    specific individuals and what they did and when they did it,

10   and they all played a central role in this individually.        09:50:03

11   Sheriff Arpaio did.  Mr. Thomas did.  Mr. Wilenchik did.  And

12   that's what we've alleged.

13         And true, we've said defendants, plural, thinking that

14   might be sufficient.  If it wasn't, we'd like to amend to make

15   it sufficient with respect to individual allegations with        09:50:19

16   respect to the conduct we think makes up the 1983 and RICO

17   violations here.

18         THE COURT:  Could we talk for a minute about the

19   notice -- wait.  Before we get to the notice of claim,

20   Mr. Wilenchik is alleged to have directed or instructed or        09:50:37

21   ordered Maricopa County Sheriff's Deputies to effect arrests of

22   Larkin and Lacey under particularly egregious circumstances

23   for, at best, a misdemeanor, but -- and they did it, the

24   Sheriff's deputies, aren't they the ones, then, if there was

25   something wrong with the way they effectuated the arrests the        09:51:17

```
 1   ones that committed the constitutional violation as opposed to
 2   the person who didn't have authority to compel their action
 3   encouraging them to do so?
 4         MR. MANNING:  I think they're all culpable here, Your
 5   Honor, and I think --                                       09:51:32
 6         THE COURT:  Well, Mr. Wilenchik wasn't there.  He
 7   didn't say, "You're under arrest."  He didn't drive up in the
 8   middle of the night.  He just told people to arrest them,
 9   people that didn't answer to him.
10         MR. MANNING:  Well, actually, they -- we have alleged   09:51:46
11   that they did answer to him in the meetings that they had to
12   direct this case, direct this investigation, but aside from
13   that, Your Honor, I think the pleading, the complaint makes it
14   clear that Mr. Wilenchik is perhaps the most culpable with
15   respect to that particular incident, the arrest.  Mr. Wilenchik  09:52:06
16   knew when he sent those people out to arrest Larkin and Lacey
17   that they were being arrested for publishing a grand jury
18   subpoena that wasn't really a grand jury subpoena.
19         I want to really emphasize here, Your Honor,
20   Mr. Wilenchik knew that he had issued -- we've called them faux  09:52:27
21   grand jury subpoenas, and though they were returnable it's no
22   different than me writing one out and handing it to Your Honor,
23   a grand jury subpoena, saying return this to the grand jury.
24         I mean, there was -- this was an absolute utter
25   violation of state law.  He knew these were not proper grand     09:52:48
```

1  jury subpoenas.

2        So directing these officers to go out and arrest these

3  guys based on what he knew to be an utter lack of probable

4  cause and on grand jury subpoenas that weren't really grand

5  jury subpoenas is pretty egregious misconduct by a prosecutor,          09:53:06

6  particularly acting in his investigatory capacity.

7        THE COURT:  Okay.  Let's talk about the notice of

8  claim.  Don't you at least have to say Mr. Larkin was

9  humiliated, embarrassed and he suffered horrible anxiety when

10 he had to spend the night in the jail and Mr. Larkin was, you          09:53:28

11 know, scared out of his wits because people arrested him in

12 the dead of night in alleged unmarked cars, or whatever they

13 were, and he was hauled off to jail and had to spend time in

14 wherever they had to spend time before they got released the

15 next day?  Don't you have to at least say they suffered          09:53:55

16 something?

17       MR. MANNING:  I believe we did, Your Honor.  I

18 believe the notice of claim does that.  And I think the *Backus*

19 case --

20       THE COURT:  I mean, it has to talk about the basis          09:54:09

21 for the liability and then it has to talk about the damages.

22 It can't just say I was hit by a car and I want $15 million.

23 You have to say I was hit by a car and it hurt me.

24       MR. MANNING:  Your Honor, I think that our notice of

25 claim does do that.  It says we were arrested and hauled off to          09:54:32

1   jail, we were deprived of our liberty because of the content of

2   our speech and thrown into jail.

3        Now, does the notice of claim statute require us to

4   actually say, "I was worried, I was -- I had a sick daughter

5   and I was really anxious about this"?  No.                          09:54:50

6        I think the *Backus* case --

7        THE COURT:  Well, the thing is, is that under 1983 you

8   don't need any damages for a constitutional violation, but

9   under state law claims you do.  There's no -- you know, one

10  dollar, nominal damages.  So to say I was deprived of my          09:55:13

11  liberty, I mean, there are -- there could actually be a

12  situation where somebody wants to get arrested, wants that

13  deprivation of liberty to make some point and they're not

14  damaged at all, they actually accomplished what they wanted to

15  accomplish.  There's no presumption that you were damaged by      09:55:36

16  the fact that you got arrested and hauled off to jail.

17       Isn't that what the notice of claim statute is

18  supposed to say?  I mean, just to say, for Larkin and Lacey, we

19  want $15 million, for what?

20       MR. MANNING:  Your Honor, I think the *Backus* case is       09:55:59

21  instructive here, the recent case by Division One of the Court

22  of Appeals.

23       THE COURT:  I hope it is because we keep getting these

24  things all the time on all of these supplemental state law

25  claims and everybody just says *Deer Valley, Deer Valley, Deer*   09:56:13

1  *Valley* and different judges of this court are making different

2  decisions as to what the sufficiency is, so -- I haven't read

3  *Backus* yet so I hope it's helpful.

4          MR. MANNING:  I think it will be helpful to the Court

5  on this case.  It's a personal injury case and I think -- the          09:56:28

6  same counsel represented the County, I think, in that case as

7  is here today, saying to the Court of Appeals it wasn't enough

8  for them to say they were just injured -- and I don't remember

9  the number, $250,000, whatever it might be, but *Backus* was

10  instructive inasmuch as it said, look, on personal injury cases          09:56:45

11  who knows?  It's just not subject to any sort of mathematical

12  precision like a contract case.

13          But, more importantly, it said to the government

14  entities in this state before you make such a motion again

15  consider your own responsibilities as a government entity to          09:57:04

16  ask for more information if you need it.

17          That's the purpose of this notice of claims statute,

18  which is, frankly, pretty good.  It probably prevents a lot of

19  lawsuits from being filed and clogging our courts.

20          But it says to the County, if you are unsure after you          09:57:19

21  get this notice of claim about the damages issue, ask the

22  aggrieved party.  Because you have that good faith.  This

23  can't be -- I don't think the statute can be considered a trap

24  door for plaintiffs, some of whom aren't adequately represented

25  by counsel, that you've got to say when I was taken in the dead          09:57:38

1  of night in handcuffs and lost my liberty and thrown into jail

2  for free speech, I worried about my wife, she had doctor's

3  appointment the next morning.

4         THE COURT:  No, I don't think it has to be that

5  specific either, but doesn't it at least have to say I was          09:57:56

6  humiliated and I was anxious and I was worried about all those

7  spider bites that everybody else is complaining about in the

8  jail?

9         MR. MANNING:  I think *Backus* is instructive in this

10  case with respect to this issue, because what it says to the      09:58:11

11  County is before you can set some sort of trap door because

12  they didn't use magic words about spider bites and discomfort,

13  you have a good faith duty to ask the aggrieved party.  In this

14  case, the aggrieved party is represented by counsel.  It's been

15  around for a while.                                                09:58:29

16         But, you know, Your Honor, there are hundreds of

17  citizens, thousands, that make these notice of claims and they

18  don't know magic words.

19         So I think *Backus* --

20         THE COURT:  They probably don't ask for $15 million        09:58:37

21  either.

22         MR. MANNING:  Agreed, Your Honor.  You don't know what

23  those numbers are like in those notice of claims.  You don't

24  know.  And it's something to perhaps jump start some

25  discussions to get something settled.  We don't want the Court    09:58:49

1  to look poorly on the notice of claim because it asks for a big

2  number.  They asked Judge Baca for $90 million against us.  You

3  know, it's a request.

4        THE COURT:  That probably would have gotten *The New*

5  *Times* out of the Sheriff's hair.                                    09:59:07

6        MR. MANNING:  That certainly would have, and out of

7  business to boot.

8        But, Your Honor, I want to also just ensure that what

9  we're alleging here is this combination of actors acted against

10 our clients because of the content of their speech, of their     09:59:24

11 First Amendment speech.  All of them, we allege --

12       THE COURT:  See, I have a problem when you sum up that

13 way when we don't have any indication -- because the main

14 thrust is that they were punished for publishing the grand jury

15 subpoena, the main thrust of this complaint, and if Arpaio had    09:59:44

16 nothing to do with that then he's not liable, with arresting

17 them for their exercise of their rights to free speech, as you

18 have alleged.  If Thomas didn't have anything to do with the

19 arrest, then he isn't liable for doing that either.  Wilenchik

20 is the only one who's specifically alleged to have done           10:00:12

21 something to get the arrest effectuated.

22       MR. MANNING:  But, Your Honor, the arrest was the

23 culmination of the conspiracy.  Acts in furtherance of that

24 conspiracy are acts in violation of their constitutional

25 rights.  Forget conspiracy.  Any actor that participates in       10:00:33

1  that over-arching scheme to investigate and punish these people

2  because of their political speech stands to answer for that.

3        THE COURT:  But did Sheriff Arpaio want to punish them

4  for anything except publishing his home address?

5        MR. MANNING:  Absolutely, Your Honor.  Absolutely.     10:00:56

6  We've alleged that.  He wanted to punish them because they had

7  been so critical of him and exposing --

8        THE COURT:  Maybe I should ask it differently.  Is

9  there any allegation that he wanted to punish them because they

10  published the grand jury subpoena?                           10:01:09

11        MR. MANNING:  Yes, for that and for everything else

12  that they'd written about him.  Yes.  Particularly yes with

13  respect to the grand jury subpoenas.  We can now allege he

14  ranted and raved about that, about publishing his -- we haven't

15  alleged it in here but what's developed since.  Yes.  He ranted  10:01:28

16  and raved about publishing the grand jury subpoena, as did

17  others in his office.

18        But his role, Thomas' role, Wilenchik's role, if you

19  look at it as simply as you can break it down, was to make sure

20  that this paper got punished for being critical of them, and    10:01:49

21  the fact that they published a grand jury subpoena, alleged

22  grand jury subpoena, was great fodder for the culmination of

23  that conspiracy.  But it wasn't just the arrest.  It was the

24  entire investigation, which was done almost admittedly because

25  *The New Times* had been critical or too critical of these three  10:02:14

1  public figures.

2          THE COURT:  Thank you, Mr. Manning.

3          MR. MANNING:  Just -- am I done?

4          THE COURT:  We're done.

5          MR. MANNING:  Okay.                              10:02:25

6          THE COURT:  Mr. Casey, you can have two minutes, not a

7  second more, if you wish.

8          MR. CASEY:  Yes, ma'am.

9          Judge, what we just heard today is *The New Times*'

10 proposal for a new type of 1983 liability.  We've got -- is it   10:02:38

11 *Monell* or *Montell*?

12         THE COURT:  *Monell*.

13         MR. CASEY:  *Monell*.

14         THE COURT:  No T, although your pleadings always have

15 a T in there.                                            10:02:48

16         MR. CASEY:  I am so sorry, Your Honor.

17         Direct individual liability.  Now we've got a

18 conspiracy theory.  *Mowbray*, the Fifth Circuit decision, covers

19 exactly it.  If *New Times* is right, all you've got to allege is

20 a conspiracy scheme and you avoid all absolute liability.  10:03:05

21         THE COURT:  Immunity.

22         MR. CASEY:  Absolute immunity.  I apologize.

23         It doesn't exist.  Whether Mr. Thomas is a claimed

24 defendant, he selected Wilenchik, period.  Mr. Manning said

25 he's not involved in the arrest.  And then for the first time  10:03:21

1   today, although it's not alleged --

2          THE COURT:  He failed to train and supervise him.

3          MR. CASEY:  Failed to train and supervise.

4          Then how do you have any individual outside

5   prosecutor -- how do you avoid the conflict?  Because all the

6   case law that we cited to you says that once you declare a

7   conflict and you put someone out you cannot be involved in

8   that, period.  So all you gotta do is allege a lack of a policy

9   and therefore you avoid absolute immunity.

10         Finally, they discussed an alleged subpoena.  The

11  alleged subpoena is Exhibit A to the Wilenchik/Bartness motion

12  to dismiss.  There is a grand jury impaneled and you don't have

13  to have -- you don't ever impanel a single grand jury, usually,

14  for a particular case.  They exist for four-to-six week time

15  periods, and there are multiple of them, as I understand it,

16  and this subpoena issued to *The New Times* has a cause number

17  and it says In the Matter of the Appearance or Attendance

18  Before the Grand Jury, and again, the cause number is number

19  43 --

20         THE COURT:  You've used up your two minutes.

21         MR. CASEY:  Okay.

22         THE COURT:  Thank you for showing me where the grand

23  jury subpoena was.

24         MR. CASEY:  Thank you.

25         THE COURT:  And it is to *The New Times* Media, LLC.

```
 1            Mr. Wilenchik.  Same thing.  Two minutes.
 2            I'm sorry.  Mr. Zwillinger.
 3            MR. ZWILLINGER:  Thank you, Your Honor.
 4            Very quickly, I just want to speak very briefly about
 5   qualified immunity.                                              10:04:48
 6            Even if we assume that Mr. Wilenchik is not entitled
 7   to absolute immunity related to the arrest, which, as I said
 8   earlier, I think he does, he's still entitled to qualified
 9   immunity.
10            What we did not hear from Mr. Manning today and what   10:05:02
11   we did not see in his brief is any acknowledgement of the
12   Supreme Court's decision in Moore.  In order to overcome
13   qualified immunity, he has to show that Mr. Wilenchik violated
14   clearly established law.
15            The clearly established law of this country is, and    10:05:15
16   has been for 50 years as the Supreme Court confirmed this
17   April, is that if someone commits a misdemeanor, however minor,
18   they can be taken to jail and it does not violate the
19   constitution.
20            And so even if you assume that he's not entitled to    10:05:28
21   absolute immunity and that he has some -- there's some issues
22   about his involvement in the arrest, despite our state statue,
23   he's still entitled to qualified immunity because the arrest
24   was proper because they admittedly committed a misdemeanor
25   by --                                                           10:05:45
```

1          THE COURT:  Do you think that Supreme Court case

2    applies to arresting somebody in their home in the middle of

3    the night without a warrant for a misdemeanor?

4          MR. ZWILLINGER:  As far as the constitution is

5    concerned, yes, it does.                                    10:05:57

6          Now, it may not address state law claims, which are

7    obviously a different calculus, but to the constitution it

8    does.

9          The other thing to point out is that this wasn't just

10   a violation of a state statute for a misdemeanor, it was also  10:06:10

11   an order by Judge Baca -- there was a request, and we've

12   attached the transcript to our motion as well, to set aside the

13   grand jury secrecy, and Judge Baca was very clear that:

14   "You're not going to do that today.  I will consider that at

15   another time, but that's not going to occur here."  And yet  10:06:26

16   they still went ahead and published it.

17          So we have a violation of the grand jury secrecy and

18   we have a violation of a court order.

19          THE COURT:  I don't think Mr. Wilenchik had authority

20   to enforce a court order.                                    10:06:36

21          MR. ZWILLINGER:  I agree, Your Honor, but if we're

22   talking about challenging the sufficiency of the arrest, the

23   argument of Mr. Manning would go to that and would go down to

24   the state court to do that before Judge Baca, not to just take

25   it upon themselves to do it and then bring, you know, a civil  10:06:50

1  rights action when they're arrested for committing a

2  misdemeanor.

3          THE COURT:  Thank you, Mr. Zwillinger.

4          MR. ZWILLINGER:  Thank you.

5          THE COURT:  Miss GilBride?                          10:06:59

6          MS. GILBRIDE:  Thank you, Your Honor.

7          I'd like to just clear up a couple points.

8          First of all, the complaint does not base the claim

9  against Sheriff Arpaio on the manner in which the arrest was

10 effectuated.  The effective allegations of the complaint are  10:07:15

11 paragraphs 85, 86, 134, and 142, and they allege that the

12 arrest was without probable cause, not that it was an

13 unreasonable search or seizure.

14         So the probable cause is what takes care of the

15 allegations against Sheriff Arpaio.                          10:07:39

16         Second, I was going to mention the transcript in front

17 of Judge Baca.  Again, it's an exhibit to Wilenchik's motion to

18 dismiss.  I'd like you to look at pages 12 and 13 of that

19 transcript.  That's where she advises plaintiffs not to

20 disclose anything about these happenings and they went ahead   10:08:00

21 and did it anyway.  That again goes to the probable cause that

22 they knew that they were disclosing.

23         Third, counsel, on the *Deer Valley* issue, the notice

24 of claim, they suggest that what the cases are saying is

25 defendants should ask plaintiffs for more information if they   10:08:18

1  need it.

2          Well, the *Jones versus Cochise* case says if you do

3  that you are going to waive your defense to lack of compliance

4  with the notice of claim.

5          So that is not what the *Backus* and *Johnson* cases say.          10:08:36

6  What they say is -- in those cases there were some injuries

7  alleged, but what they say is you don't have to go farther and

8  parse it out.  I believe that's what they say.  But there is a

9  conflict among those cases that you cannot go ahead and ask the

10 plaintiff "let's go ahead and engage in negotiations" because          10:08:53

11 then you have waived your affirmative defense.

12         I think the Court is well aware of the issues against

13 Arpaio so I won't add anything else.

14         THE COURT:  Thank you very much.

15         It's ordered taking these motions under advisement.          10:09:05

16         MR. MANNING:  Your Honor, may I just give you the cite

17 for *Backus*?  I'm afraid we -- we didn't file a supplemental --

18         THE COURT:  It's not in the papers?  Okay.

19         MR. MANNING:  It just came out last week.

20         It's 2008 Westlaw 2764601.          10:09:19

21         THE COURT:  Say that one again.  2008 Westlaw --

22         MR. MANNING:  2764601.

23         THE COURT:  Thank you.

24         Court is in recess until 10:30.

25         (Proceedings recessed at 10:09 a.m.)          10:09:36



1                        C E R T I F I C A T E

2

3

4        I, DAVID C. GERMAN, Official Court Reporter, do hereby

5    certify that I am duly appointed and qualified to act as

6    Official Court Reporter for the United States District Court

7    for the District of Arizona.

8        I FURTHER CERTIFY that the proceedings and testimony

9    reported by me on the date specified herein regarding the

10   afore-captioned matter are contained fully and accurately in

11   the notes taken by me upon said matter; that the same were

12   transcribed by me with the aid of a computer; and that the

13   foregoing is a true and correct transcript of the same, all

14   done to the best of my skill and ability.

15

16

17       DATED at Phoenix, Arizona, this 8th day of August, 2008.

18

19

20                       s/David C. German
                          DAVID C. GERMAN, RMR, CRR
21

22

23

24

25