Michael C. Manning (#016255)
Leslie E. O'Hara (#005923)
John T. White (#022091)
**STINSON MORRISON HECKER LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
(602) 279-1600
Fax: (602) 240-6925
Email: mmanning@stinson.com
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| MICHAEL LACEY; JIM LARKIN; and PHOENIX NEW TIMES, LLC, | No. CV 08-00997-PHX-SRB |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| v. | (Jury Trial Demanded) |
| MARICOPA COUNTY; SHERIFF JOSEPH ARPAIO and AVA ARPAIO, husband and wife; DENNIS WILENCHIK and BECKY BARTNESS, husband and wife; and JOHN DOES I-X; JANE DOES I-X; BLACK CORPORATIONS I-V; and WHITE PARTNERSHIPS, I-V, | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Phoenix New Times, LLC, Michael Lacey, and Jim Larkin, for their Complaint against Defendants, hereby allege as follows:

**JURISDICTIONAL ALLEGATIONS**

1.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983; the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution; 18 U.S.C. § 1961, *et seq.*; and A.R.S. § 13-2301, *et seq.* and other pendent state common and statutory laws.

2.     Plaintiffs have satisfied the provisions of A.R.S. § 12-821.01 by serving upon Defendants a Notice of Claim more than sixty (60) days prior to the date of the filing of this Complaint.  Defendants have not responded to the Notice of Claim.

3.     This Court has jurisdiction of Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1988.  Additionally, this Court has jurisdiction over Plaintiffs' state and federal claims pursuant to Article 6, Section 14 of the Arizona Constitution.

4.     Venue is proper in this Court pursuant to A.R.S. § 12-401, as the parties are residents of Maricopa County, Arizona, and the events underlying this lawsuit occurred in Maricopa County.  Plaintiffs expressly reserve the right, however, to timely change venue pursuant to A.R.S. §12-406, § 12-408, and/or other applicable law, because (*inter alia*) Maricopa County divisions, entities, officers, employees, and/or agents are parties to this lawsuit.

**GENERAL ALLEGATIONS**

5.     Plaintiffs reallege and incorporate, by this reference, their claims, facts, and allegations in the paragraphs above, as if set forth fully herein.

6.     At all times material herein, Plaintiffs Michael Lacey and Jim Larkin were individuals, residing in Maricopa County, Arizona, and officers, executives, editors, and/or owners of the Phoenix New Times, LLC, a Delaware company, authorized to do and doing business in Maricopa County, Arizona (collectively, "Plaintiffs," "*The New Times*," or "the newspaper").

7.     Defendant Maricopa County (the "County") is a public entity, formed and designated as such pursuant to Title 11, of the Arizona Revised Statutes, and (as such) it and its officers and divisions are subject to civil suit and may be held independently or vicariously

DB04/811373.0002/810849.2

liable for the wrongful conduct of its divisions, agents, officers, and employees, including (*inter alia*) the individual members of the Maricopa County Board of Supervisors, the officers and employees of its divisions, Sheriff Joseph Arpaio, Andrew Thomas, Special Prosecutor Dennis Wilenchik, and the Maricopa County Sheriff's Office and Maricopa County Attorney's Office.

8.     At all times material herein, Defendant Joseph Arpaio ("Arpaio" or "Sheriff Arpaio") was the duly-elected Sheriff of Maricopa County and the head of the Maricopa County Sheriff's Office ("MCSO"), with ultimate authority and responsibility for the MCSO and the actions of its officers and agents, and with the authority and responsibility to establish policy, practices, customs, procedures, protocols, and training for the MCSO.  His actions and/or inactions constitute actions of the MCSO and the MCSO is vicariously and directly liable for his wrongful conduct, as alleged herein.  Sheriff Arpaio is named herein in both his official and individual capacities.  As the elected Sheriff, Sheriff Arpaio has official, vicarious, direct, individual, and/or supervisory liability for the MCSO and its officers, agents, and employees.

9.     At all times material herein, Andrew Thomas ("Thomas" or "County Attorney") was the duly-elected Maricopa County Attorney and the head of the Maricopa County Attorney's Office ("MCAO"), with ultimate authority and responsibility for the MCAO and the actions of its officers and agents, and with the authority and responsibility to establish policy, practices, customs, procedures, protocols, and training for the MCAO and Maricopa County.  His actions and/or inactions constitute actions of Maricopa County and Maricopa County is vicariously and directly liable for his wrongful conduct, as alleged herein.

10.     At all times material herein, Defendant Dennis Wilenchik ("Wilenchik") was an agent and employee of the Sheriff, MCSO, Thomas, MCAO and/or Maricopa County, who, at the time of the events complained of herein, was acting within the course and scope of his

employment by the Sheriff, MCSO, Thomas, MCAO, and/or Maricopa County and under color of law.  Wilenchik engaged in wrongful conduct that allowed, caused, and/or contributed to cause the violations of Plaintiffs' rights.  His actions and/or inactions constitute actions of the Sheriff Arpaio, MCSO, Thomas, MCAO, and/or Maricopa County.  The Sheriff, MCSO, Thomas, MCAO, and/or Maricopa County are vicariously and directly liable for his wrongful conduct, as alleged herein.

11.    The Defendants designated herein as Ava Arpaio and Becky Bartness, are the spouses of the respective Defendants and are so designated because the wrongful conduct of the Defendants was engaged in for the benefit of their marital communities, thereby rendering the spouses and marital communities of Defendants liable for such conduct.

12.    At all times material herein, Defendants John Does I-X and Jane Does I-X (collectively "John Does") were officers, agents, and employees of the Sheriff Arpaio, MCSO, Thomas, MCAO and/or Maricopa County, acting within the scope of their employment and under color of law.  These Defendants engaged in wrongful conduct that allowed, caused, and/or contributed to cause the violations of Plaintiffs' rights.  Their actions and/or inactions constitute actions of the Sheriff Arpaio, MCSO, Thomas, MCAO, and/or Maricopa County. The Sheriff Arpaio, MCSO, Thomas, MCAO, and/or Maricopa County are vicariously and directly liable for their wrongful conduct.

13.    The true names, capacities, and relationships, whether individual, corporate, partnership, or otherwise of all John and Jane Doe Defendants, Black Corporations, and White Partnerships, are unknown at the time of the filing of this Complaint, and are being designated pursuant to Ariz. R. Civ. P. § 10(f) and applicable federal and state law.  Plaintiffs further allege that all of the fictitiously named Defendants were jointly responsible for the actions, events, and circumstances underlying this lawsuit, and that they proximately caused the damages stated in this Complaint.  Plaintiffs will amend the Complaint to name the

4

unidentified individuals once they have learned, through discovery, the identities and acts, omissions, roles, and/or responsibilities of such Defendants sufficient for Plaintiffs to discover the claims against them.

### FACTUAL BASIS FOR CLAIMS FOR RELIEF

### Introduction

14.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

15.     This is a case about Defendants' abuse of governmental powers to attack the newspaper, its reports and owners because of the content of their speech and the substance of their political message that was unfavorable to Defendants.

16.     Defendants' actions to selectively and maliciously prosecute Plaintiffs because of the content of their speech was unconstitutional and in violation of Plaintiffs' rights to free speech, to be free from malicious and selective prosecution, to be free from false arrest, to due process, and to equal protection, which are guaranteed by the United States Constitution.

17.     Defendants singled-out and prosecuted Plaintiffs because of the content of their protected speech,  treated them differently than others similarly situated, and maliciously prosecuted and arrested them, but not others.

18.     At issue in this lawsuit are the damages and harm Plaintiffs have suffered as the result of Defendants' efforts to persecute and punish Plaintiffs and chill their free speech, efforts which began in 2005 and culminated in Plaintiffs' arrests and jailings on the night of October 18, 2007, and ultimately concluded when County Attorney Thomas terminated the prosecution days later.

19.     It is well-established that government officials cannot misuse their offices or power to improperly regulate the content of speech or to selectively prosecute citizens because they present a view hostile to the government officials.  Yet, that is exactly what Arpaio set out

to do here, along with the help of his allies, Dennis Wilenchik and Andrew Thomas.  Maricopa County is responsible for their conduct and for its own conduct in permitting and ratifying their conduct by appointing Wilenchik and failing to act to remedy problems in the prosecutorial and investigative process within its supervision and control.

20.     Defendants have admitted that their motivation was improper and unconstitutional: Plaintiffs were targeted and treated differently from others and other sources of information, here, because of the content of their speech and its unfavorable criticism of Defendants.  For example, Sheriff Arpaio's representative and Director of Legal Affairs, Ron Lebowitz, explained why *The New Times* was being singled-out for prosecution and not other outlets who engaged in the same conduct:

> Unlike *The New Times* web cite, the three (3) other web cites raised by others as examples are neutral.  In other words, none of these other web cites are or have ever been historically anti-Arpaio, especially in the consistent and invariable way that *New Times* has been since 1993.  None of the other web cites have openly revealed the intent or purpose to destroy the Sheriff's career as an elected official, using all the vigor it could muster.

[November 28, 2005 Memo at MCAO00919 (attached as Ex. 1).]  "None of the other web cites, historically, have resorted to writing articles against the Sheriff, using language that is inflammatory, insulting, vituperative, and the like," said the Sheriff's representative.  [*Id.* at MCAO00919.]

21.     From the inception of Arpaio's push to prosecute Plaintiffs, until the culminating events that led to the outrageous issuance of improper subpoenas by Wilenchik, and the appointment of Wilenchik by the County and Thomas, the arrests and jailings of Plaintiffs and the ultimate dismissal of the prosecution, the attack on Plaintiffs was made because of the content of their speech and the nature of their unfavorable political opposition to Defendants.

22.     The constitution does not permit Defendants to target citizens for prosecution because the citizens are critical of them.

…

DB04/811373.0002/810849.2

## Summary of Background Facts

23.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

24.     On the night of October 18, 2007, unmarked, dark vehicles (at least one with Mexico license plates) arrived at the homes of Plaintiffs Michael Lacey and Jim Larkin, Executive Editor and Chief Executive Officer, respectively, of Village Voice Media, LLC, owners of The Phoenix New Times.

25.     Arpaio's top-aide, Chief Hendershott, claims to have personally ordered the arrests.  Other witnesses, including lawyers from Wilenchik's office, claim that the arrests were made after consultation with Wilenchik and lawyers from his office.  Still, other evidence suggests that the arrests came at the request of the prosecutor or Thomas himself.

26.     Both men were handcuffed and taken to jail by members of Sheriff Arpaio's elite "Selective Enforcement Unit"—based on a minor misdemeanor charge—for publishing a column in their newspaper earlier in the day, entitled "Breathtaking Abuse of the Constitution."  The article revealed Defendants' subversion of the grand jury process and the unprecedented attempt to subpoena reporters' notes and the identity and reading habits of any citizen who looked at *The New Times*.

27.     The mid-night arrests and jailings were the culminating event in Defendants' efforts to punish Plaintiffs for their political speech in opposition to Defendants.

28.     *The New Times* was targeted and singled-out from others because it was labeled an "Anti-Arpaio newspaper" by Arpaio and his staff.

29.     When Plaintiffs' fair criticism of these Defendants became too much for Defendants to tolerate, Defendants flexed their political muscle in the form of a conspiracy. They abused their governmental authority by attacking the press, punishing free speech, demeaning the role and function of an impartial prosecutor and an independent judiciary,

7

perverting the grand jury process, and serving notice to citizens who read news online that neither their identities nor their reading habits are safe from the reach of vindictive government officials and their confederates.

30.    Citizens have a right to read online newspapers in privacy.  Those readers place their trust in newspaper reporters and editors to protect their privacy and speak the truth.  But Defendants perverted the law and abused their public positions to attack this newspaper, its reporters, and the privacy rights of thousands of its readers.

31.    Defendants' acts and omissions, individually and in concert, leading up to and culminating in Plaintiffs' arrest and jailing, violated Plaintiffs' constitutional and Arizona law rights, threatened the privacy and trust of those who read the news online, and trampled upon two of our Country's most fundamental freedoms in this Country:  Free Speech and a Free Press.

32.    Arpaio is not tolerant of criticism or questioning.  The few that dare to criticize become targets for retribution by Arpaio and his agents, even where his motivation and memos are grossly improper.

33.    The history of this dispute began in the early 1990's, when *The New Times* published its first article critical of Sheriff Arpaio.  *The New Times*, thus, became a target for attack by Arpaio because of its anti-Arpaio content.

34.    The issue came to a head in July 2004, when *The New Times* investigated the personal, irregular, and questionable commercial land transactions of Sheriff Arpaio,[1] and asked how Sheriff Arpaio could afford to invest more than $690,000 cash in commercial real estate, based on an annual salary of $72,000 and a small federal pension.

---

[1] *See* "Sheriff Joe's Real Estate Game," July 1, 2004 and "Stick it to "Em!," July 8, 2004.

DB04/811373.0002/810849.2

35.   The newspaper's investigation revealed that Sheriff Arpaio had redacted information from the County Recorder's public records about his commercial landholdings (but not his home address), by using a little-known Arizona statute to remove pertinent information about his deeds, mortgages, affidavits of value, and conveyances of title.

36.   Arpaio said the need to hide the truth about his commercial real estate investments arose from his concern about purported "death threats."  The Sheriff used this feign to hide his commercial investments from public scrutiny.  But, tellingly, he left his home address available in the public domain, published on numerous public internet websites.

37.   *The New Time*s' investigation of the Sheriff's commercial holdings culminated in a July 8, 2004 article written by the newspaper's widely-respected investigative reporter, John Dougherty.  The article questioned the Sheriff's motives for hiding his commercial investments from inspection and pointed out the obvious—it made no sense to remove information about his personal commercial holdings from public records because of "death threats," but not his home address, which was included in the final paragraph of the article based upon data obtained from public websites.

38.   Sheriff Arpaio was hiding his significant commercial real estate holdings because he could not or would not explain how he could legitimately afford those investments.

39.   No law prohibited the publication of the Sheriff's home address in print or broadcast material.  But, an obscure and never-before used Arizona statute made it illegal to publish the Sheriff's address on the "world wide web," if, and only if, such publication "posed an imminent and serious threat" to the Sheriff or his immediate family, *and* if it was "reasonably apparent" to Dougherty and *The New Times* that "making the information available on the web" created a "serious and imminent" threat to the safety of the Sheriff or his immediate family.

DB04/811373.0002/810849.2

40. So, while there was nothing even arguably wrong with the article in its print form, Arpaio alleged that the newspaper violated the statute when the article was automatically uploaded to its electronic form on the internet.

41. There was no evidence that Arpaio was then, or ever, under any credible threat of "imminent harm" as a result of the publication of his home address on *The New Times* web site. After all, his home address and personal infromation was widely available on other websites prior to the article. But, the publication of his home address on the internet by the anti-Arpaio newspaper provided the Sheriff a means for retribution against one of his strongest critics.

42. While the Sheriff's vengeance toward *The New Times* could no longer be restrained or contained, he needed a prosecutorial ally that would help him punish this newspaper for daring to scrutinize his questionable real estate holdings.

43. Arpaio admitted to detectives that he did not request an investigation for many months after the newspaper's article because he was afraid that then County Attorney Rick Romley would decline to prosecute and that he preferred to wait until "Andrew Payton Thomas" took office in 2005.[2] Arpaio knew that Thomas would be his prosecutorial ally.

44. In 2004, Andrew Thomas was elected and took office in 2005 as the new Maricopa County Attorney. He quickly became a political ally of Arpaio. Using the full force of his—and his new ally's—governmental muscle, Arpaio recruited his new and compliant County Attorney to initiate the prosecution, persecution, and intimidation of *The New Times*, its reporters, its editors, and publishers.

---

[2]     In a Memorandum submitted on behalf of the Sheriff, the Sheriff's Legal Affairs Director describes how the Sheriff "decided to wait until the newly elected Maricopa County Attorney (Andrew Payton Thomas) entered office in early 2005" to pursue the case, and described that Arpaio had raised the issue of prosecution of *The New Times* and Dougherty in his "first post-election meeting with Mr. Thomas (in February 2005)."

10

45.   It was and should have been obvious to Thomas that there was no "case" to "investigate" here.  The newspaper had simply reported "truthful, lawfully obtained, publicly available personal identifying information [and this is] precisely the kind of speech the First Amendment protects."  *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001).  The Sheriff's home address was available on government web sites and "once the government places personal identifying information in the public domain, reliance must rest on the judgment of those who decide what to publish or broadcast."  *The Florida Star v. B.J.F.*, 491 U.S. 524, 535 (1989).

46.   And, even a cursory investigation would have revealed that the only "death threats" to Arpaio were "made-for-TV" contrivances by the Sheriff's public relations officers.[3]

47.   Arpaio, himself, obviously did not feel any "imminent" threat from the newspaper's article, because he was content to wait for many months before requesting any investigation.

48.   In fact, Arpaio has continued, to this day, to publicize and publish his home address to citizens and the public at large.  For example, just last month, Arpaio mailed out Partisan Nomination Petitions, asking citizens to re-elect him for Sheriff and publicizing his home address on the Petition.

49.   Arpaio's representatives have also admitted that *The New Times*' publication of his address was nothing new.  For example, the Sheriff's appointed legal representative and Director of Legal Affairs for the MCSO, Ron Lebowitz, wrote in an email to Pinal County Attorney Carter Olson:  "You will note that Dougherty [*The New Times* reporter] tries to hang his hat on the fact that other web cites contain the Sheriff's address.  ***We know that is true…***"

---

[3]   Recently, for example, Arpaio widely publicized that he was under threat from Mexican nationals, members of Los Zetas, a smuggling gang, and Elias Bermudez, an immigration activist and political rival of Arpaio.  Over the course of a six-month period, Arpaio spent an estimated $500,000 to "protect him" from such "threats."  But, it turns out, there were never any real or credible threats, at all.  The sole informant was discredited and vanished; yet, the case remains open and Arpaio continues to investigate.  The story was chronicled in an April 25, 2008 article on *azcentral.com*.

DB04/811373.0002/810849.2

50.   On June 20, 2005, an investigator for the County Attorney's Office, J. Stolze, provided a supplemental report on his investigation into the allegations that *The New Times* had violated the law by publishing the Sheriff's home address in its newspaper.  Stolze made several notable findings.  First, at the request of the Deputy County Attorney, he checked websites for any personal information about Sheriff Arpaio and "located numerous documents that contain Sheriff Arpaio's personal residence address."  Stolze had previously authored a Memorandum on April 15, 2005, identifying at least five documents that contained personal information about Arpaio and his wife.  In addition, Stolze noted that the Sheriff Arpaio had not reported feeling threatened after the publication of his address by *The New Times* and, instead, had waited months until a new County Attorney was elected and nearly 10 months before requesting a prosecution.  Stolze reported that Sheriff Arpaio did not even report the incident to another prosecuting agency, because he felt that the new County Attorney should be the one to handle the case.

51.   Arpaio had his first official meeting with Thomas in February 2005, immediately after Thomas took office.  And at that first meeting, Arpaio discussed his opposition to *The New Times* and his desire to punish the newspaper.  Thomas' staff investigated the case at the time, but had concerns, which they memorialized in internal documents.

52.   Ultimately, Arpaio finally requested an investigation in April 2005— *nearly 10 months after Dougherty's article was published.*

53.   Thomas' office conducted another formal evaluation of the case in May 2005, this time preparing an Incident Review Memo summarizing the weaknesses of the case, including that there was a significant delay in Arpaio reporting the incident, nothing but conjured evidence to show that Sheriff Arpaio ever really feared for his safety, and that the Sheriff's personal information was widely available to the public on the internet and in public records.

12

54.    But, the Memo also noted that it was a "high-profile" case, that Sheriff Arpaio was demanding that the case be charged, and that there would be "problems" between the MCSO and MCAO if Thomas did not do what Arpaio told him to do.

55.    The MCAO Incident Review Board declined prosecution in an August 9, 2005 meeting.

56.    Thomas wanted to help Arpaio attack *The New Times* because the newspaper had now begun criticizing Thomas' own ethical and office irregularities.  But, Thomas also knew that his office could not ethically pursue this case due to a "conflict of interest."  That conflict was *The New Times*' increasingly inquisitive and critical articles about Thomas.[4]

57.    So, Thomas cited a "conflict" and referred the case to Carter Olson at the Pinal County Attorney's Office, for further investigation."

58.    Immediately, Arpaio and his MCSO began to put pressure on the Pinal County Attorney's Office to prosecute the case against the newspaper and its reporters.  Carter Olson was reluctant to do so, questioning the constitutionality of the statute at issue and noting the obvious issues that undermined the case, including (*inter alia*) the lack of evidence of "imminent threat" to Arpaio and the concerns with the First Amendment rights of the newspaper and its reporters.  Olson's professional reluctance involved the same problems as those documented by the MCAO Incident Review committee.

59.    But Arpaio does not like being told "no" and he is never one to permit Arizona laws or the Constitution to intrude on his vengeance.  So, he used his considerable political power to push for prosecution, despite its obvious lack of merit.  Arpaio and his MCSO staff engaged in a heavy-handed letter and memoranda writing campaign to attempt to "convince" the Pinal County Attorney to prosecute the case, and made repeated attempts to meet and

---

[4] Thomas has stated:  "I still did not feel that it was appropriate for our office to directly prosecute the matter, because of the appearance of the conflict of interest."

DB04/811373.0002/810849.2

conference with the Pinal County Attorney by phone and in person to persuade him to begin a formal investigation and prosecution against this irritating "Anti-Arpaio" newspaper and its inquisitive reporters.

60.    Of course, unlike Thomas, the Pinal County Attorney's Office did not share the Defendants' passion for political revenge, nor a fear of Arpaio's political power; the Office refused to be used in the persecution.  In over two years, Pinal County did not issue a single investigative subpoena or empanel a grand jury.

61.    At one point, the Pinal County Attorney tried to appease the Sheriff by reaching an attempted compromise, requesting that the newspaper simply remove the Sheriff's home address from its website version of the article.  The Sheriff would call the effort "intolerable" and demanded nothing short of full prosecution.

62.    Sheriff Arpaio grew increasingly angry at the Pinal County Attorney's failure to prosecute *The New Times* and its reporters, John Dougherty.  In a Memorandum to Carter Olson on January 23, 2006, the Sheriff's Director of Legal Affairs, Ron Lebowitz, wrote:

> Eleven months have passed since Sheriff Arpaio approached the then newly inaugurated Maricopa County Attorney [Andrew Thomas] regarding the July 8, 2004 events involving John Dougherty [and *The New Times*].  During this time period (and since to this date) Sheriff and Mrs. Arpaio's vigorous determination to see John Dougherty brought to justice has been constant.  ***The Sheriff and Mrs. Arpaio remain resolved to fully cooperate in any such prosecution, but have become increasingly concerned about the present posture of the Dougherty investigation, i.e., its statues and the prospect of further movement.*** (emphasis supplied).

63.    By June 28, 2006, the Sheriff could no longer tolerate any attorney who was unwilling to accede to his demands that and his deadlines for the matter to be prosecuted.  In another Memorandum to Pinal County Attorney Olson on behalf of the Sheriff, Mr. Lebowitz wrote, "the Sheriff gave you a 10 day deadline on which to take action and, even though you promised thereafter to proceed against *New Times*, nothing further has occurred.  It may now appear that you have honored the Sheriff's May 23, 2006 deadline more in the breach than in

the observance.  This is intolerable."  In the same Memo, he later wrote, "The Sheriff demands action and action right now."

64.     Arpaio continued to openly expressed his frustration and anger with the Pinal County Attorney's lack of investigation and prosecution of a newspaper and its reporters who were so critical of him.

65.     In 2007, Pinal County Attorney Carter Olson was appointed to the judicial bench. He was replaced by James Walsh, who shortly thereafter announced a conflict with MCAO.  In light of that announced conflict, *The New Times* matter was returned to Thomas and his MCAO.

66.     Caught between Thomas' already announced and quite obvious "conflict," and Arpaio's insistence upon punishing this newspaper and its reporters for its criticism, Thomas and Arpaio decided to retain Thomas' friend, former employer, financial benefactor, campaign finance manager, and a civil attorney, Dennis Wilenchik, to investigate and pursue a criminal case against *The New Times* and its reporters.

67.     Wilenchik was hired by Thomas and Arpaio and approved by the County. Defendants now owned their own "Independent" Special Deputy Maricopa County Attorney.

68.     County Attorney Thomas requested that Dennis Wilenchik "assume prosecutorial responsibility for the above-referenced case," on June 26, 2007

69.     Prosecutors have inherent legal and ethical duties to be independent; Wilenchik was not, and both Thomas and Arpaio knew that, even though Thomas requested that Wilenchik assume all of the powers and responsibilities of the MCAO with respect to the matter.

DB04/811373.0002/810849.2

70.     Because *The New Times* had published myriad articles critical of Wilenchik,[5] Thomas and Arpaio knew that Wilenchik suffered from the very same "conflict of interest" that he did when he actively sought appointment of Wilenchik as Special Prosecutor in this matter.[6]   Thomas and Arpaio knew they were hiring an attack ally—not an "Independent" prosecutor untainted by benefactors to please and grudges to settle.   The County knew or should have shown how tainted the appointment was.

71.     In addition, the ties among the three—Arpaio, Thomas, and Wilenchik—wove a tangled web of financial, personal, and political connivances.   For example, and as *The New Time*s published, Wilenchik once hired County Attorney candidate Thomas as an "associate" in his law firm, although, upon information and belief, Thomas was not actually hired to perform legal work for Wilenchik or his firm's clients.   Thomas took his salary from Wilenchik, but spent his days campaigning for County Attorney.

72.     The arrangement was merely a disguised campaign contribution that paid the designed dividends for Thomas, Wilenchik, and Arpaio:   Thomas won his Maricopa County Attorney election, Wilenchik was paid off with an enormous attorneys' fee annuity from

---

[5] For example, in "Doubting Thomas," June 15, 2006, John Dougherty questioned the ethical conduct of both Thomas and Wilenchik.   He questioned hundreds of thousands of dollars in fees paid to Wilenchik's law firm by Maricopa County, a "firm that employed Andrew Thomas immediately before his election as county attorney."   Dougherty opined that it appeared Thomas was using his office to "steer public contracts to his previous employer" and questioned what work, if any, Thomas had performed for Wilenchik's firm while running for County Attorney.   In "Bully Pulpit," June 29, 2006, Dougherty pointed out how Thomas had "not only steered a lot of business to his old firm, he has hired his old boss (Wilenchik) to harass Sheriff Joe Arpaio's chief political rival."   He also stated a strong suspicion that Wilenchik had paid Thomas "a fat salary in exchange for little work during the months leading up to his election which, if true, would constitute an unlawful campaign contribution."

[6] *See* Minutes of the Maricopa County Board of Supervisors, Special Session, July 11, 2007.   After being told by the Board's Chief Counsel that "the County Attorney's Office is unable to advise the Sheriff's Office related to the [*New Times*] matter as the County Attorney has a conflict…," Supervisor Stapley advised his colleagues that, "he had personally spoken to Maricopa County Attorney Andrew Thomas [and been told by Thomas that] "this is an unusual case and situation that warrants the appointments of [Wilenchik and his law firm]."

Thomas' new Maricopa County Attorney's Office, and Arpaio gained an important political ally in Thomas and a zealous advocate in Wilenchik.

73.    Soon after taking office, Thomas and Arpaio began funneling civil work to Wilenchik.   To date, Wilenchik has been paid more than $2,350,000 in attorneys' fees representing Arpaio and the County.   And, Thomas and Arpaio have even used Wilenchik to serve as their own, personal counsel on a number of occasions (though Arpaio and Thomas were never charged for the work Wilenchik did as their personal counsel).   Fees for Wilenchik's work on behalf of Thomas and Arpaio were built-in to his bills for County work.

74.    For example, Wilenchik was not representing any public body when, prior to becoming their "Independent" Special Prosecutor, he demanded a retraction from *The New Times*, and threatened to sue the newspaper on behalf of his personal client Thomas, after the newspaper published a parody piece critical of Thomas in *The New Times*.   And Wilenchik was obviously not defending the people of Maricopa County when, prior to becoming "Independent" Special Prosecutor, he threatened to sue  *The West Valley View* and *Phoenix Magazine* for personal defamation claims based on stories critical of his personal client, Arpaio.[7]

75.    By the time Thomas secured Wilenchik's appointment as his "Independent" Deputy Maricopa County Attorney, his friend and financial benefactor was already cashing in on their relationship.[8]

---

[7] *See* "Sheriff demands View retract headline," *West Valley View*, October 31, 2006; "First Things First," *Phoenix Magazine*, December 2007.

[8] When asked on October 20, 2007 how he could select his former boss, Wilenchik, as a Special Prosecutor in a case against *The New Times*, Thomas stated, "I think given the circumstances it was appropriate for him to so serve and that he had the confidence of the Sheriff who was the victim in this case."  This, despite *The New Times* having been critical of both Thomas and Wilenchik, creating a "conflict" for both Wilenchik and Thomas, and Wilenchik's prior role as the alleged victim, Arpaio's, personal attorney.  As Thomas put it, "*The New Times* has not been, let's say, a fan of mine."  Nor, again, had the newspaper been a "fan" of Wilenchik's or Arpaio's either.

DB04/811373.0002/810849.2

76.    Wilenchik's pre-existing malignant mindset against the newspaper and its reporters was made clear in an email Wilenchik authored *less than a week* before being named a Special Deputy Maricopa County Attorney.  In the email, Wilenchik angrily railed against the newspaper and its reporter for having questioned, in print, his lucrative relationship with his former employee, Thomas:

> [W]henever they have no point they revert to this tired shit again.    Like Napolitano never hired Lewis and Roca? Or her (sic) and Goddard never used me after I represented the former ag (sic)? Or Romley fired me from the cty (sic) list for doing so? They (*The New Times*) are so full of it.  I refused to speak with him (Dougherty).

77.    Later, in the same email, Wilenchik summarized his feelings.  "Birdcrap is what (*The New Times*) article should be called.  But really noone (sic) reads his (Dougherty's) crap and he has no credibility."

78.    Less than a week after authoring this angry email, Dennis Wilenchik would undertake his duties as an "Independent" Special Deputy Maricopa County Attorney, tasked by Arpaio and Thomas to fully prosecute *The New Times* and its reporters.

79.    Well before his "investigation," however, Wilenchik already had the result of his "Independent" investigation in sharp focus.

### The Abusive Wilenchik Investigation

80.    Wilenchik took on his new role as a criminal prosecutor with all the zeal and ruthlessness that Arpaio and Thomas required, expected, and had paid for.    Armed with daunting prosecutorial power and the approval and support of Arpaio and Thomas, Wilenchik engaged in a series of inappropriate, unethical, and unlawful acts that violated the Constitutional and Arizona law rights of the newspaper, its reporters, and those that read The *New Times.*

18

81.     Without ever appearing before any grand jury or obtaining proper approval, Wilenchik began issuing broad, invasive, and invalid subpoenas against *The New Times*, its reporters, its editors, and its readers.

82.     On August 24, 2007, Wilenchik authored and approved two subpoenas, which demanded that the newspaper and its reporters reveal confidential sources and produce extensive records on nearly four years' worth of reporters' and editors' notebooks, memoranda, and documents, based on content: ***Any story that was critical of Sheriff Arpaio***.

83.     The subpoenas also sought detailed information on ***hundreds of thousands of private citizens*** who had visited *The New Times*' website since 2004, including internet cookies and browsing information on every individual who looked at any story, review, listing, or advertisement.

84.     These unprecedented and invalid subpoenas sought the reading and purchasing habits of private citizens and was clearly aimed at interfering with and/or destroying the business revenues of the newspaper.

85.     Professor James Weinstein of the Sandra Day O'Connor College of Law at Arizona State University characterized the subpoenas as "grossly, shockingly, breathtakingly overbroad."  He said this was quite clearly a "case of harassment of the press."  He is not alone in his views.  Even scholars at the Goldwater Institute agreed that the subpoenas were highly offensive and unconstitutional.

86.     The subpoenas were issued as part of the investigation into *The New Times* case, without any formal charges or indictments pending, and without notice to or the approval of a Court or grand jury.  Wilenchik has publicly acknowledged the subpoenas were issues as part of the "investigative phase" of the case, before ever appearing before the grand jury.

87.     On September 20, 2007, *The New Times* published "Below the Belt," by Paul Rubin, another decorated local reporter.  The article criticized Wilenchik's extra-judicial

19

conduct in defending Sheriff Arpaio and others in a defamation suit brought by Buckeye Police Chief Dan Saban.  Rubin's story relied solely on interviews and public records.  It made no reference—none—to any grand jury investigation, nor did it contain the Sheriff's home address.

88.     Yet, less than 24 hours after Rubin's story appeared in *The New Times*, Wilenchik issued a grand jury subpoena to Rubin, seeking "all documents, records, and files" associated with the writing and editing of the Saban story, as well as "conversations and meetings relating to its publication."

89.     Again, Rubin's only "misstep" was in criticizing Arpaio and Wilenchik.  His story was not even remotely relevant to the matter Wilenchik had been hired to pursue (a 2004 story by a different reporter).  Lacey and Larkin, in the column disclosing the corruption of the investigation that led to their arrest, succinctly summarized what was all too clear:  "It is impossible to view Rubin's subpoena as anything other than what it was: an act of vengeance by Wilenchik."  Wilenchik's subpoena was, once again, issued without notice to or the involvement of the Court or grand jury, without indictments or charges pending, and as part of Wilenchik's investigation of *The New Times*.

90.     And it did not stop there.  Wilenchik then made a crude, *ex parte* attempt on October 10, 2007, to influence or compromise Judge Anna Baca, who was presiding over the sitting County grand jury.  He did so by recruiting a political intermediary, Carol Turoff, a former lay member of the committee charged with appointing Appellate Judges ***and the wife of a member of Thomas' senior management team***, Larry Turoff.  Ms. Turoff was instructed by Wilenchik to call Judge Baca at home to attempt to arrange a private meeting with Wilenchik.

91.     In an emergency closed hearing called October 11, 2007, Judge Baca called Wilenchik's attempt at initiating the *ex parte* communication "absolutely inappropriate." Specifically, Judge Baca's recital of the ethical infractions was that she had been (a) called at

1   home, (b) late at night, (c) by a third party Wilenchik had engaged to make the call, (d) at the

2   instigation of a "prosecutor" (Wilenchik) the Judge did not even know, (e) for the purpose of

3   soliciting *ex parte* communications between the Judge and Wilenchik, and (f) whilst Wilenchik

4   had motions in *The New Times* matter and a judicial disqualification matter Against Judge

5   Timothy J. Ryan pending before Judge Baca.

6          92.     Greatly concerned about the invalid, abusive, and intrusive subpoenas, the

7   clandestine attempt to compromise the presiding Judge, and the patently inappropriate abuse of

8   governmental power, Plaintiffs made a conscious decision to assert their First Amendment

9   rights and responsibilities to *The New Times'* readers by publishing information about the

10  abusive prosecution and subpoenas.

11         93.     In their October 18, 2007, edition, the newspaper printed the demands of the

12  "grand jury" subpoenas, revealing the unprecedented attempt to obtain the identity and reading

13  habits of its readers.

14         94.     The publication of those rogue subpoenas was a selfless exercise of free press

15  and the freedom to express political speech in opposition to facially improper government

16  oppression.

17         95.     The newspaper's concerns were justified.   Wilenchik's subpoenas, were

18  obviously unreasonable, facially unconstitutional affronts to freedom of speech and freedom of

19  the press, and improper under both Arizona law and our Constitution.

20         96.     For example, in her final Order of November 28, 2007, Judge Anna Baca found a

21  compelling case of grand jury abuse at the hands of Wilenchik.  No grand jury had approved

22  the Wilenchik subpoenas—Wilenchik had acted as a one-man grand jury.  County prosecutors,

23  the Judge ruled, have no common law powers to subpoena witnesses or documents in Arizona

24  (citing *Gershon v. Broomfield*, 131 Ariz. 507, 642 P.2d 852 (1982)).  A prosecutor seeking

25  grand jury evidence by subpoena must either secure the prior permission of the grand jury or

26

21

must notify the grand jury foreperson and the presiding criminal judge within 10 days of issuing a subpoena unilaterally.  Wilenchik did neither.  The grand jury was nothing more than an empty prop to Dennis Wilenchik and his "investigation."

97.     Publishing the terms of a grand jury subpoena is a minor misdemeanor.  The statute was designed primarily to "[protect] witnesses, targets of investigation and others from negative publicity."[9]  It was not designed to insulate, from public disclosure by a newspaper, the unethical and unlawful behavior of a prosecutor and Sheriff who are misusing their authority to attack the newspaper, its reporters, its readers' right to privacy, and Constitutional freedoms.  And it was certainly not designed to shield a prosecutor, Sheriff, or detective from conducting an unconstitutional investigation without the involvement of the grand jury process or the Court.  Wilenchik's investigatory subpoenas were not grand jury subpoenas at all; they were issued improperly and illegally without notice to, the approval of, or involvement by the grand jury or Court.

98.     *The New Times* published the demands of the Wilenchik subpoenas, and questioned the motives and actions of Arpaio, Thomas, and Wilenchik in pursuing its harassing investigation of the newspaper, despite the concerns of attorneys like Carter Olson and others, the obvious lack of merit to the claims, and the impact on Plaintiffs' constitutional and Arizona law rights.

### The Conspiracy Culminated:  Late-Night Raids and Arrests by Arpaio's "Selective Enforcement Unit"

99.     On October 18, 2007—the same date Plaintiffs published the article revealing the subpoenas—Wilenchik filed a Motion in the Court for an Order to Show Cause.

---

[9] *See Samaritan Health System v. Sup.  Ct.*, 182 Ariz. 219 (Ct. App. 1994).

22

100.    The Motion demanded that Judge Baca hold *The New Times* in contempt, issue arrest warrants for Mr. Lacey, Mr. Larkin, and three of their lawyers, and fine the newspaper what could amount to a bankrupting $90 million.

101.    The requested fine was a blatant attempt to use prosecutorial power to target and ruin the business enterprises of *The New Times*, a newspaper that had been labeled an "Anti-Arpaio" paper for publishing articles critical of Arpaio, Thomas, and Wilenchik.

102.    But, the ire of these public officials, whose feelings were too wounded by this "misbehaving" newspaper, could not await the Court's ruling on Wilenchik's Motion.

103.    That same night, October 18, 2007, Defendants dispatched Arpaio's aptly named "Selective Enforcement Unit" in unmarked, black vehicles to arrest Plaintiffs and take them to jail.

104.    There was no probable cause for the arrests and, certainly, no justification for them.  They were done in furtherance of Defendants' improper motive to punish their political opponents for critical speech.

105.    Misdemeanor violations that do not threaten lives are usually handled by the issuance of citations, not by commando raids, arrests, handcuffs, and jail cells in the dead of night.

106.    Responsible prosecutors know these circumstances would never—never—justify such conduct.[10]  Some lawyers in Wilenchik's office have even claimed that they told that to MCSO officials and even began to draft the citation.  Yet, that is exactly how these Defendants

---

[10] Thomas referred to the jailing of Mr. Larkin and Mr. Lacey as "very disturbing"—noting that there had been "serious missteps taken" in the matter.  He expressed no contrition for having actively facilitated the appointment of an ethically and legally conflicted Dennis Wilenchik to act as Arpaio's personal prosecutor.  Nor did he admit the slightest understanding of a sentiment expressed nearly a century ago that encapsulates the corrupt moorings of his conduct in this case, to the letter.  "A county attorney has no right to turn a defendant over to his enemies, after first having armed them with the entire power of the state to be used as they see fit in his prosecution."  *Hartgraves v. State*, 114 P. 343, 346 (Okla. 1911).

DB04/811373.0002/810849.2

chose to proceed.  They threw their journalistic opposition into jail in an attempt to silence Plaintiffs' criticism of their abusive public practices, criticism that is both fundamental to and fundamentally protected by the Constitution.  The arrests and jailings were the crowing event in a long-effort and prosecution by Defendants, motivated by improper purposes.

107.   The public outcry after the arrests quickly forced Thomas to "fire" Wilenchik from further County criminal cases (but not civil cases, where he continues to collect tax dollars representing the County and Sheriff through the good offices of his former employee, Thomas).

108.   The ethically corrupt and dangerous actions for which Thomas was later forced to fire Wilenchik were not, as Thomas sheepishly urged, a bolt from the blue.  They were the perfectly foreseeable consequence of Arpaio's vengeance toward the newspaper and Thomas and Wilenchik's glaring conflicts of interest.  What Thomas could not foresee when he secured the appointment of Wilenchik was that *The New Times* would courageously resist Wilenchik's tactics, the public and the press would become enraged with this blatant assault on a free press, and Thomas would be forced to fire Wilenchik and abandon an investigation that he was told should never have been undertaken in the first place.

109.   Thomas eagerly disavowed knowledge or authorization of Wilenchik's actions in his October 20 news conference, instead claiming he was merely acting in an administrative capacity:

> There is a right way and a wrong way to bring prosecution, and to hold people accountable for their offenses.  And what happened here was the wrong way.  I do not condone it, I do not defend it.  And so it ends today.

110.   Of course Arpaio, too, disavowed advance knowledge of the subpoenas and denied that he ordered the arrests, even though Wilenchik has publicly claimed the arrests were

24

1   conducted, authorized, approved, and/or directed by Arpaio and/or his aides, including Chief

2   Hendershott.

3          111.   Wilenchik also denied ordering the arrests, and claimed that his issuance of

4   subpoenas outside the grand jury process was inadvertent and accidental, although his office

5   filed a Motion asking for such relief earlier in the day and Wilenchik's staff admits that they

6   advised the Sheriff with respect to the arrests.   And Wilenchik's former partner, William

7   French, disagreed and later confirmed that Wilenchik did indeed authorize and advise Arpaio

8   to conduct the arrests by the "Selective Enforcement Unit"—the same arrests Wilenchik

9   specifically sought in his Order to Show Cause Motion filed hours before the arrests occurred.

10         112.   The investigation, pursuit, and arrests of *The New Times* was unjustified and

11  unwarranted.   It was the product of an improper conspiracy among Thomas, Wilenchik, and

12  Arpaio.

13         113.   All of the Defendants are responsible for violating Plaintiffs' rights as alleged

14  herein.

15         114.   Arpaio is the Sheriff who persistently and improperly pushed for this political

16  persecution of a newspaper that criticized him too often and was asking too many questions

17  about his curious cash real estate transactions.   His Office pressured attorneys to pursue the

18  matter, despite obvious problems with the case and concerns about the legality of an

19  investigation or criminal charge.   He applied unfair pressure and demands upon prosecutorial

20  bodies, abusing the power of his office and influence, to investigate, prosecute, arrest, and jail

21  Plaintiffs for improper and unconstitutional motives and to treat Plaintiffs differently than

22  others based on the content of their speech and their conduct in political opposition to him.   He

23  waited to request an investigation or push for an improper investigation and prosecution until

24  he could secure a willing political ally in Thomas and he advocated and pushed for the hiring

25  of his friend, ally, and personal counsel, Dennis Wilenchik, as Special "Independent" Deputy

26

25

1   County Attorney and lead investigator.   And he and/or his Office and top officials and

2   "Selective Enforcement Unit" ordered and/or made the late-night arrests and jailings.

3   115.   Wilenchik was the "Independent" Special Deputy Maricopa County Attorney

4   who so eagerly did the bidding of Thomas and the Sheriff in their attempt to punish and

5   financially ruin a newspaper that was too often critical of him too.   He filed odious papers in

6   Court and issued unlawful subpoenas during the investigatory stage of the case, when no

7   charges had been filed, no indictments issued, and without any involvement by a grand jury or

8   approval from a court and/or Thomas.   He advised and counseled Arpaio to conduct the late

9   night arrests and jailings and/or ordered that the arrests occur and/or permitted them to occur.

10  He targeted the newspaper's readers and attempted to put the newspaper out of business

11  through selective, malicious, and improper means and methods of investigation and

12  prosecution.

13  116.   Thomas is the elected County Attorney and an official policymaker of Maricopa

14  County, who actively sought and recommended to Maricopa County the appointment of

15  Wilenchik to prosecute this annoying newspaper, in a highly questionable case, under a

16  facially inapplicable statute, with no reasonable likelihood of conviction—a case he knew was

17  contaminated by the same "conflict of interest" for both he and Wilenchik and a case that he

18  knew was being pushed for improper means and motives by his ally, Arpaio.   He claims to

19  have had no administrative oversight of the case, yet failed to properly supervise Wilenchik,

20  failed to ensure he was properly trained and capable of handling a criminal investigation, and

21  failed to provide him with training and supervision necessary to ensure that the criminal

22  investigation was conducted constitutionally and in conformance with Arizona and federal law.

23  His actions are actions of the County.

24  117.   The County is responsible for its own failures to recognize and put an end to the

25  abuses it was or should have been aware of, and for the irresponsible, reckless, negligent, and

26

1  unconstitutional conduct of its agents, officers, divisions, and employees, as alleged herein.

2  The County failed to provide proper oversight, training, supervision, and policies and

3  procedures with respect to investigations and prosecutions by its officers, officials, agents,

4  employees, and policymakers.  And it ratified and/or approved the appointment of a special

5  prosecutor in Wilenchik that it knew or should have known was improper and inappropriate.

6    118.    Thus, all of these Defendants share responsibility for the violations of Arizona

7  and federal law in this case, and for the assault on the constitutional rights of Plaintiffs and on

8  the rights of *The New Times*' officers, reporters, and readers.

**Defendants' Pattern and Practice of Misusing Their Power**
**to Punish & Suppress Political Opposition Through Investigation, Arrests, and**
**Prosecution**

11    119.    Of course, this is not the first time these Defendants have abused their authority

12  for unconstitutional and improper motives and in order to obtain financial, political, and other

13  benefits and retaliate against their political opponents.  In fact, they have a custom, pattern, and

14  practice of doing so.

15    120.    For example, the Sheriff once authorized deputies to conduct surveillance on two

16  men, Tom Bearup and Ernest Hancock, who expressed interest in running against him,

17  including tapping their phones, tailing them, and searching their trash.  The Sheriff's Office

18  labeled them a "threat" to the Sheriff—even tapping the phones of a campaign aide to Bearup,

19  Jim Cozzolino.  Eventually, Mr. Cozzolino was arrested and served time in jail under highly-

20  suspect circumstances.  When he was released, he sued the Sheriff's Office for violating his

21  constitutional rights, a lawsuit the Sheriff's Office quickly settled.

22    121.    Arpaio has also targeted others in the press who criticize or oppose him.  For

23  example, the same night that Plaintiffs were arrested and jailed, Arpaio dispatched his

24  "Selective Enforcement Unit" to issue *The New Times* reporter Ray Stern—in the middle of the

25  night—with a citation for disorderly conduct, simply for arguing with MCSO's lawyer,

26

27

Michele Iafrate, earlier in the day about whether or not he was permitted **to photograph public records**. The MCAO initially denied knowing about the citation or the matter. But, the charges have not been dropped and the case against Mr. Stern continues to date. And Mr. Stern is not alone. Other reporters and newspapers, including (among others and without limitation) the *The West Valley View*, *The Arizona Republic*, and Channel 12 have been targeted or stonewalled by Arpaio for seeking public records and publishing stories that were critical of him.

122. Christy Fritz, too, was a target of Defendants' political retaliation. Two weeks before the November 2006 election, Sheriff's deputies arrived at her home and confiscated her computers, utility bills, emails, and financial records. But Fritz was neither a drug dealer nor a criminal; she was simply a graphic designer. Her problem: She worked for a Democrat, Jackie Thrasher. Ms. Thrasher was running against Jim Weiers, the father of a Maricopa County Sheriff's Deputy and an Arpaio ally. Ms. Thrasher had been endorsed by the Arizona Conference of Police and Sheriffs, but not Sheriff Arpaio. When one of her campaign mailers showed a corrections officer talking with her in front of a MCSO car, Mr. Weiers complained. So, Arpaio launched an investigation that included hours of interviews and resulted in three raids on the homes of the corrections officer in the picture, the corrections officer's mother, and Christy Fritz. Despite the issuance of three search warrants and the seizure of four computers, no charges were ever filed.

123. Indeed, for these Defendants, no political opponent is beyond the reach of their power. Their targets have ranged from the ACLU to members of the judiciary. In October 2007, they used Wilenchik to attack a Superior Court Judge, the Honorable Timothy Ryan. Judge Ryan, the County's Associate Presiding Criminal Judge, and other members of the bench had been attempting to instill standards that would require law enforcement to prove that aliens are, in fact, illegal, before they are denied bail under new laws. But, that constitutional

28

protection is contrary to Arpaio's and Thomas' popular political stance on immigration issues. As a result, Thomas and Wilenchik unleashed an outrageous political attack on Judge Ryan and attempted to disqualify every single judge in the Maricopa County Superior Court.

124.    These and many other incidents (among others and without limitation) show that Defendants' actions against *The New Times* in this case were more than the aberrational consequence of simple neglect; they were the product of a long-standing pattern and practice of the abuse of power against dissenting voices—of intentional, punitive, and retaliatory conduct against the newspaper, its reporters and its readers, for their own benefit and gain.

## COUNT I

### (Negligence – All Defendants)

125.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

126.    Defendants have both a statutory and common law duties of care to Plaintiffs and all citizens, including those citizens who read *The New Times*, when performing the functions of their positions.  Defendants also owe a duty of care to Plaintiffs with respect to conducting criminal investigations and prosecutions.

127.    Defendants are also legally responsible for the management of the criminal investigation system in Maricopa County, and the establishment and implementation of policies, procedures, and protocols that govern the investigation, processing, handling, and management of criminal investigations and prosecutions in their control.  Their responsibility includes making certain that such policies, procedures, and protocols satisfy all federal and state standards.

128.    Defendants Arpaio and Maricopa County are legally responsible for the screening, hiring, training, retaining, and supervision of all employees and agents who have responsibility for the investigation, processing, handling, and management of criminal investigations and prosecutions in their control.  This responsibility includes making certain

29

that such screening, hiring, training, retaining, and supervision of such employees and agents satisfy all federal and state standards.

129.   Defendants breached their duties owed to Plaintiffs, as alleged herein this Complaint, by (*inter alia*), failing to conduct the duties of their positions with reasonable care; failing to and the establish and implement proper policies, procedures, and protocols governing the investigation, processing, handling, and management of criminal investigations and prosecutions in their control; failing to appoint a neutral, "independent" special prosecutor and/or one who did not have an obvious conflict; and failing to properly screen, hire, train, retain, and supervise employees and agents who have responsibility for the investigation, processing, handling, and management of criminal investigations and prosecutions in their control.

130.   Defendants' breaches of their duties owed to Plaintiffs caused Plaintiffs to suffer harm in an amount to be proven at trial.

## COUNT II

### (Gross-Negligence—All Defendants)

131.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

132.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

133.   Defendants have both a statutory and common law duties of care to Plaintiffs and all citizens when performing the functions of their positions.  Defendants also owe a duty of care to Plaintiffs with respect to conducting criminal investigations.

134.   Defendants are also legally responsible for the management of the criminal investigation system in Maricopa County, and the establishment and implementation of policies, procedures, and protocols that govern the investigation, processing, handling, and management of criminal investigations and prosecutions in their control.  Their responsibility includes making certain that such policies, procedures, and protocols satisfy all federal and

DB04/811373.0002/810849.2

state standards.

135.   Defendants Arpaio and Maricopa County are legally responsible for the screening, hiring, training, retaining, and supervision of all employees and agents who have responsibility for the investigation, processing, handling, and management of criminal investigations and prosecutions in their control.  This responsibility includes making certain that such screening, hiring, training, retaining, and supervision of such employees and agents satisfy all federal and state standards.

136.   Defendants were grossly negligent in breaching their duties owed to Plaintiffs, as alleged herein this Complaint, by (*inter alia*), failing to conduct the duties of their positions with reasonable care; failing to and the establish and implement proper policies, procedures, and protocols governing the investigation, processing, handling, and management of criminal investigations and prosecutions in their control; and failing to properly screen, hire, train, retain, and supervise employees and agents who have responsibility for the investigation, processing, handling, and management of criminal investigations and prosecutions in their control.

137.   Defendants' breached their duties with actual or constructive knowledge that their acts and/or omissions would result in harm to Plaintiffs.

138.   Defendants' gross negligence caused Plaintiffs to suffer harm in an amount to be proven at trial.

## COUNT III

**(Violations of 42 U.S.C. § 1983:  Unconstitutional Policies, Customs, and Failure to Train—Arpaio and Maricopa County)**

139.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

140.   Sheriff Arpaio is an official policy maker for the MCSO and Maricopa County. Sheriff Arpaio has the authority and responsibility to establish policy for the MCSO and Maricopa County, and to properly supervise and train the officers, agents, and employees of

31

the MCSO.  His actions are the actions of the County and his office.

141.   Thomas is a policy maker for the MCAO and Maricopa County.  He has the authority and responsibility to establish policy for the MCAO and Maricopa County, and to properly supervise and train the officers, agents, and employees of the MCAO.  His actions are the actions of the MCAO and Maricopa County.

142.   Sheriff Arpaio and Andrew Thomas were acting under color of law at all times material hereto.

143.   Sheriff Arpaio is named in his official capacity, as well as his individual capacity, pursuant to 42 U.S.C. § 1983 supervisory and direct liability, for their conduct as alleged herein.

144.   Sheriff Arpaio and Maricopa County have oversight and supervisory responsibility over the investigation, processing, handling, and management of criminal investigations and prosecutions in their control, and the proper screening, hiring, training, retaining, and supervision of the officers, employees, and agents investigating, processing, handling, and managing such criminal investigations and prosecutions.

145.   Sheriff Arpaio and Maricopa County violated Plaintiffs' constitutional rights and were deliberately and callously indifferent to Plaintiffs and the readers of *The New Times* in training (or failing to train) their officers, agents, and employees in (among other things and without limitation): The appropriate, lawful and constitutional policies, procedures, and protocols for investigating, processing, handling, and managing of criminal investigations and prosecutions in their control;  adopting policies and procedures to ensure due process and equal protection for those subject to investigation and prosecution; and for the selection, appointment, approval, training, and oversight of appointed special prosecutors, like Wilenchik.

146.   Sheriff Arpaio and/or Maricopa County were deliberately and callously indifferent to Plaintiffs and readers of *The New Times* through fostering, encouraging and knowingly accepting formal and informal policies, procedures, practices, or customs

32

condoning indifference to the rights of the subjects of criminal investigations and prosecutions under their control.

147.   Sheriff Arpaio and/or Maricopa County knew and should have known that unconstitutional policies, practices, customs, and training existed with respect to the screening, hiring, training, retaining, and supervision officers, employees, and agents who have responsibility for the investigation, processing, handling, and management of criminal investigations and prosecutions in their control, yet failed to properly address them and/or failed to establish and implement appropriate policies, procedures, protocols, and training to remedy them.

148.   Sheriff Arpaio and/or Maricopa County permitted the implementation of inappropriate, unconstitutional, *de facto* policies which:  Authorized, approved, condoned, and/or ratified unconstitutional criminal investigatory and prosecutory practices, and failed to adequately train and supervise their personnel in these and other relevant areas.

149.   The wrongful conduct of these Defendants alleged herein this Complaint constitutes violations of Title 42 U.S.C. § 1983, in that they deprived Plaintiffs of the rights, privileges, and immunities secured to them by the Constitution and laws of the United States and their wrongful conduct was the moving force behind the violations of Plaintiffs' rights by their agents, employees, officers, and personnel.

150.   The wrongful conduct of Defendants alleged herein constitutes violations of the United States Constitution, Amendments I, IV, V, and XIV, in that Plaintiffs were subjected to false imprisonment and arrest, malicious and selective prosecution, retaliatory conduct from law enforcement, and were investigated/prosecuted, arrested, and jailed without proper cause, with an unconstitutional motive, and without equal protection or due process in an attempt to chill Plaintiffs' free speech and criticism and intrude upon the privacy rights of all private citizens who read *The New Times*.

151.   As the direct and proximate result of Defendants' wrongful conduct, Plaintiffs' constitutional rights were violated and they have suffered harm and have been injured.

152.   The acts and omissions of Sheriff Arpaio acting in his individual capacity for supervisory liability, as alleged herein, was malicious or reckless in disregard of the rights of Plaintiffs.

153.   Punitive damages in an amount to be determined by a jury should be awarded against Sheriff Arpaio under § 1983 to punish them for wrongdoing and to prevent him and others from acting in a similar manner in the future.

## COUNT IV

**(Violations of 42 U.S.C. § 1983:  Free Speech and Free Press, Law Enforcement Retaliatory Conduct, False Arrest and Imprisonment, Malicious and Selective Prosecution, and Abuse of Process – All Defendants)**

154.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

155.   At all times material hereto, Sheriff Arpaio, Andrew Thomas, and Dennis Wilenchik were acting under color of law and in their capacity as officials and agents for Maricopa County.

156.   The wrongful conduct of Defendants alleged herein this Complaint constitutes violations of the United States Constitution, Amendments I, IV, V, and XIV, in that Plaintiffs were deprived of privileges and immunities guaranteed to all citizens of the United States, were subjected to false imprisonment and arrest, malicious and selective prosecution, retaliatory conduct from law enforcement, and were investigated/prosecuted, arrested, and jailed without proper cause, with an unconstitutional motive, and without equal protection or due process in an attempt to chill Plaintiffs' free speech and criticism and intrude upon the privacy rights of all private citizens who read *The New Times*.

157.   As the direct and proximate result of Defendants' wrongful conduct, Plaintiffs' constitutional rights were violated and they have suffered harm and have been injured.

158.   The wrongful conduct of these Defendants alleged herein this Complaint was undertaken with malice and/or with improper and unconstitutional motives in an attempt to

deter speech and conduct protected by the Constitution. Plaintiffs were investigated, prosecuted, arrested, and/or jailed by Defendants for improper unconstitutional motives, were treated differently than others similarly situated, were subjected to improper abuse of process and power for improper motives, and were arrested and jailed without proper or probable cause.

159.    Plaintiffs were subjected to Defendants' wrongful and unconstitutional conduct in a particularly egregious, conscience-shocking manner.

160.    The acts and omissions of Defendants Arpaio and Wilenchik, acting in their individual capacities and under color of law, were malicious, punitive, in reckless disregard of Plaintiffs' rights and the rights of all those private citizens who read speech and criticism and intrude upon the privacy rights of all private citizens who read *The New Times*, and/or in an effort to intentionally deter conduct and speech protected by the Constitution.

161.    As a result, punitive damages in an amount to be determined by a jury should be awarded against Arpaio and Wilenchik to punish them for wrongdoing and to prevent them and others from acting in a similar manner in the future.

## COUNT V

### (Conspiracy to Commit Violations of 42 U.S.C. § 1983-Arpaio and Wilenchik)

162.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

163.    The wrongful conduct of these Defendants as alleged herein were undertaken pursuant to an agreement or meeting of the minds among these Defendants to act in concert violate Plaintiffs' constitutional rights, silence Plaintiffs' criticism of them, chill free speech, invade the privacy of those private citizens who read *The New Times*, and interfere with and financially ruin Plaintiffs' business.

164.    These Defendants' acts and/or omissions as alleged herein to pursue and conduct a criminal investigation and prosecution of *The New Times*, including (without limitation) the arrests and jailings, were undertaken pursuant to a conspiracy among Defendants to violate

35

Plaintiffs' constitutional rights.

165.   As a direct and proximate cause of Defendants' conspiracy, Plaintiffs' constitutional rights were violated.

166.   The acts and omissions of Arpaio and Wilenchik in furtherance of their conspiracy, acting in their individual capacities and under color of law, were malicious and/or in reckless disregard of Plaintiffs' rights and the rights of all those private citizens who speech and criticism and intrude upon the privacy rights of all private citizens who read *The New Times*.

167.   As a result, punitive damages in an amount to be determined by a jury should be awarded against them to punish them for wrongdoing and to prevent them and others from acting in a similar manner in the future.

## COUNT VI

### (Violations of Arizona Law: False Arrest and Imprisonment, Malicious and Selective Prosecution, and Abuse of Process-All Defendants)

168.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

169.   The wrongful conduct of these Defendants alleged herein constitutes violations of Arizona law, in that Defendants unlawfully detained Plaintiffs without consent, without lawful authority, without valid legal process, and without probable or proper cause; unlawfully and maliciously initiated criminal proceedings against Plaintiffs without probable cause that terminated in Plaintiffs' favor and harmed Plaintiffs; and willfully used the judicial process and/or criminal proceedings against Plaintiffs for a punitive, improper, and ulterior purpose not proper in the regular conduct of such process and proceedings.

170.   As a direct and proximate result of Defendants' acts and omissions alleged herein, Plaintiffs have been damaged in an amount to be proven at trial.

171.   Defendants' acts and omissions herein were undertaken with malice, in bad faith, and with the requisite evil mind sufficient to warrant the imposition of punitive damage to

36

deter their conduct and that of others in the future.

## COUNT VII

### (Racketeering Violations under 18 U.S.C. § 1961, *et seq.* & A.R.S. § 13- 2301, *et seq.* – All Defendants)

172.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

173.   As set forth in detail in this Complaint, Defendants have engaged in a pattern of unlawful activity in order to obtain financial, political, and/or other gains that have resulted in harm and injury to Plaintiffs.

174.   Such a pattern of unlawful activity includes, but is not limited to a series of repeated disguised campaign contributions, malicious prosecutions and abuses of process, false imprisonments and arrests, asserting false claims, fraudulent schemes, practices, and artifices, and extortions under color of official right, which have occurred over at least the last several years, are ongoing, and will likely continue in the future.

175.   Defendants undertook such unlawful activity as an association-in-fact and/or an enterprise with a common purpose.  Each of the Defendants conducted or participated, directly and/or indirectly, in the conduct of the association-in-fact and/or enterprise.

176.   As a direct and proximate result of Defendants' pattern of unlawful activity as alleged herein, Plaintiffs have been injured and sustained monetary damages in an amount to be proven at trial.

177.   Defendants' acts and omissions as alleged herein constitute violations of 18 U.S.C. § 1861, et seq. and A.R.S. § 12-2301, et seq.

178.   Pursuant to 18 U.S.C. § 1964(c) and A.R.S. § 12-2314.01, Plaintiffs are entitled to an award of treble damages.

DB04/811373.0002/810849.2

179.   Pursuant to 18 U.S.C. § 1964(c) and A.R.S. § 13-2314.01, Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs.

**Jury Trial**

180.   Plaintiffs hereby request a trial by jury.

**Prayer for Relief**

WHEREFORE, Plaintiff prays for damages for judgment against Defendants as follows:

A.   General damages in an amount to be proven at trial;

B.   Punitive damages in an amount deemed just and reasonable against the individual Defendants as to the causes of action alleged herein;

C.   Costs and attorneys' fees against all Defendants as to the causes of action alleged under the Constitution and laws of the United States, pursuant to 42 U.S.C. § 1988;

D.   Treble damages and attorneys' fees against all Defendants as to the causes of action alleged under 18 U.S.C. § 1961, et seq. and A.R.S. § 13-2301, et seq.

E.   The costs of litigation;

F.   All remedies provided by 42 U.S.C. § 1983, 18 U.S.C. § 1961, et seq., and A.R.S. § 13-2301, et seq.; and

G.   Such other and further relief which may seem just and reasonable under the circumstances.

RESPECTFULLY SUBMITTED this 31st day of October, 2008.

**STINSON MORRISON HECKER LLP**

By:  /s/ John T. White
_____
Michael C. Manning
Leslie E. O'Hara
John T. White
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Attorneys for Plaintiffs

38

DB04/811373.0002/810849.2

I hereby certify that on October 31, 2008, I caused the foregoing document to be filed electronically with the Clerk of Court through ECF; and that ECF will send an e-notice of the electronic filing to:

The following ECF participants:

> Timothy J. Casey
> *Attorney for Defendants Maricopa County Attorneys Office, Andrew P. Thomas and Ann Thomas*
>
> William R. Jones, Jr.
> Joseph Popolizio
> Eileen Dennis GilBride
> *Attorneys for Defendants Sheriff Arpaio and Maricopa County Sheriff's Office*
>
> Scott Zwillinger
> Laura A. Freeman
> *Attorney for Defendants Dennis Wilenchik and Becky Bartness*

I hereby certify that on October 31, 2008 a courtesy copy was mailed to:

> Judge Susan R. Bolton

By:   /s/ Rachel V. Sanders