Michael C. Manning (#016255)
Larry J. Wulkan (#021404)
Stefan M. Palys (#024752)
**STINSON MORRISON HECKER LLP**
1850 North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Tel: (602) 279-1600
Fax: (602) 240-6925
Email: mmanning@stinson.com
          lwulkan@stinson.com
          spalys@stinson.com
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| MICHAEL LACEY; JIM LARKIN; and PHOENIX NEW TIMES, LLC, | No. CV 08-00997-PHX-SRB |
| | **SECOND AMENDED COMPLAINT** |
| Plaintiffs, | |
| v. | (Jury Trial Demanded) |
| MARICOPA COUNTY; SHERIFF JOSEPH ARPAIO and AVA ARPAIO, husband and wife; DENNIS WILENCHIK and BECKY BARTNESS, husband and wife; and JOHN DOES I-X; JANE DOES I-X; BLACK CORPORATIONS I-V; and WHITE PARTNERSHIPS, I-V, | |
| Defendants. | |

Plaintiffs Phoenix New Times, LLC, Michael Lacey, and Jim Larkin, for their Complaint against Defendants, hereby allege as follows:

## JURISDICTIONAL ALLEGATIONS

1.      Plaintiffs bring this action pursuant to 42 U.S.C. § 1983; the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution; 18 U.S.C. § 1961, *et seq.*; and A.R.S. § 13-2301, *et seq.* and other pendent state common and statutory laws.

2.      Plaintiffs have satisfied the provisions of A.R.S. § 12-821.01 by serving upon Defendants a Notice of Claim more than sixty (60) days prior to the date of the filing of this Complaint.  Defendants have not responded to the Notice of Claim.

3.      This Court has jurisdiction of Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1988.  Additionally, this Court has jurisdiction over Plaintiffs' state and federal claims pursuant to Article 6, Section 14 of the Arizona Constitution.

4.      Venue is proper in this Court pursuant to A.R.S. § 12-401, as the parties are residents of Maricopa County, Arizona, and the events underlying this lawsuit occurred in Maricopa County.  Plaintiffs expressly reserve the right, however, to timely change venue pursuant to A.R.S. §12-406, § 12-408, and/or other applicable law, because (*inter alia*) Maricopa County divisions, entities, officers, employees, and/or agents are parties to this lawsuit.

## GENERAL ALLEGATIONS

5.      Plaintiffs reallege and incorporate, by this reference, their claims, facts, and allegations in the paragraphs above, as if set forth fully herein.

6.      At all times material herein, Plaintiffs Michael Lacey and Jim Larkin were individuals, residing in Maricopa County, Arizona, and officers, executives, editors, and/or owners of the Phoenix New Times, LLC, a Delaware company, authorized to do and doing business in Maricopa County, Arizona (collectively, "Plaintiffs," "*The New Times*," or "the newspaper").

7.      Defendant Maricopa County (the "County") is a public entity, formed and designated as such pursuant to Title 11, of the Arizona Revised Statutes, and (as such) it and its officers and divisions are subject to civil suit and may be held independently or vicariously liable for the wrongful conduct of its divisions, agents, officers, and employees, including (*inter alia*) the individual members of the Maricopa County Board of Supervisors, the officers and employees of its divisions, Sheriff Joseph Arpaio,

Andrew Thomas, Special Prosecutor Dennis Wilenchik, and the Maricopa County Sheriff's Office and Maricopa County Attorney's Office.

8.     At all times material herein, Defendant Joseph Arpaio ("Arpaio" or "Sheriff Arpaio") was the duly-elected Sheriff of Maricopa County and the head of the Maricopa County Sheriff's Office ("MCSO"), with ultimate authority and responsibility for the MCSO and the actions of its officers and agents, and with the authority and responsibility to establish policy, practices, customs, procedures, protocols, and training for the MCSO.  His actions and/or inactions constitute actions of the MCSO and the MCSO is vicariously and directly liable for his wrongful conduct, as alleged herein. Sheriff Arpaio is named herein in both his official and individual capacities.  As the elected Sheriff, Sheriff Arpaio has official, vicarious, direct, individual, and/or supervisory liability for the MCSO and its officers, agents, and employees.

9.     At all times material herein, Andrew Thomas ("Thomas" or "County Attorney") was the duly-elected Maricopa County Attorney and the head of the Maricopa County Attorney's Office ("MCAO"), with ultimate authority and responsibility for the MCAO and the actions of its officers and agents, and with the authority and responsibility to establish policy, practices, customs, procedures, protocols, and training for the MCAO and Maricopa County.  His actions and/or inactions constitute actions of Maricopa County and Maricopa County is vicariously and directly liable for his wrongful conduct, as alleged herein.

10.     At all times material herein, Defendant Dennis Wilenchik ("Wilenchik") was an agent and employee of the Sheriff, MCSO, Thomas, MCAO and/or Maricopa County, who, at the time of the events complained of herein, was acting within the course and scope of his employment by the Sheriff, MCSO, Thomas, MCAO, and/or Maricopa County and under color of law.  Wilenchik engaged in wrongful conduct that allowed, caused, and/or contributed to cause the violations of Plaintiffs' rights.  His actions and/or inactions constitute actions of the Sheriff Arpaio, MCSO, Thomas,

MCAO, and/or Maricopa County.   The Sheriff, MCSO, Thomas, MCAO, and/or Maricopa County are vicariously and directly liable for his wrongful conduct, as alleged herein.

11.   The Defendants designated herein as Ava Arpaio and Becky Bartness, are the spouses of the respective Defendants and are so designated because the wrongful conduct of the Defendants was engaged in for the benefit of their marital communities, thereby rendering the spouses and marital communities of Defendants liable for such conduct.

12.   At all times material herein, Defendants John Does I-X and Jane Does I-X (collectively "John Does") were officers, agents, and employees of the Sheriff Arpaio, MCSO, Thomas, MCAO and/or Maricopa County, acting within the scope of their employment and under color of law.  These Defendants engaged in wrongful conduct that allowed, caused, and/or contributed to cause the violations of Plaintiffs' rights. Their actions and/or inactions constitute actions of the Sheriff Arpaio, MCSO, Thomas, MCAO, and/or Maricopa County.  The Sheriff Arpaio, MCSO, Thomas, MCAO, and/or Maricopa County are vicariously and directly liable for their wrongful conduct.

13.   The true names, capacities, and relationships, whether individual, corporate, partnership, or otherwise of all John and Jane Doe Defendants, Black Corporations, and White Partnerships, are unknown at the time of the filing of this Complaint, and are being designated pursuant to Ariz. R. Civ. P. § 10(f) and applicable federal and state law.   Plaintiffs further allege that all of the fictitiously named Defendants were jointly responsible for the actions, events, and circumstances underlying this lawsuit, and that they proximately caused the damages stated in this Complaint.  Plaintiffs will amend the Complaint to name the unidentified individuals once they have learned, through discovery, the identities and acts, omissions, roles, and/or responsibilities of such Defendants sufficient for Plaintiffs to discover the claims against them.

**FACTUAL BASIS FOR CLAIMS FOR RELIEF**

**Introduction**

14.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

15.     This is a case about Defendants' abuse of governmental powers to attack the newspaper, its reports and owners because of the content of their speech and the substance of their political message that was unfavorable to Defendants.

16.     Defendants' actions to selectively and maliciously prosecute Plaintiffs because of the content of their speech was unconstitutional and in violation of Plaintiffs' rights to free speech, to be free from malicious and selective prosecution, to be free from false arrest, to due process, and to equal protection, which are guaranteed by the United States Constitution.

17.     Defendants singled-out and prosecuted Plaintiffs because of the content of their protected speech, treated them differently than others similarly situated, and maliciously prosecuted and arrested them, but not others.

18.     At issue in this lawsuit are the damages and harm Plaintiffs have suffered as the result of Defendants' efforts to persecute and punish Plaintiffs and chill their free speech, efforts which began in 2005 and culminated in Plaintiffs' arrests and jailings on the night of October 18, 2007, and ultimately concluded when County Attorney Thomas terminated the prosecution days later.

19.     It is well-established that government officials cannot misuse their offices or power to improperly regulate the content of speech or to selectively prosecute citizens because they present a view hostile to the government officials.  Yet, that is exactly what Arpaio set out to do here, along with the help of his allies, Dennis Wilenchik and Andrew Thomas.  Maricopa County is responsible for their conduct and for its own conduct in permitting and ratifying their conduct by appointing Wilenchik

1  and failing to act to remedy problems in the prosecutorial and investigative process

2  within its supervision and control.

3      20.    Defendants have admitted that their motivation was improper and

4  unconstitutional: Plaintiffs were targeted and treated differently from others and other

5  sources of information, here, because of the content of their speech and its unfavorable

6  criticism of Defendants.  For example, Sheriff Arpaio's representative and Director of

7  Legal Affairs, Ron Lebowitz, explained why *The New Times* was being singled-out for

8  prosecution and not other outlets who engaged in the same conduct:

9        Unlike *The New Times* web cite, the three (3) other web cites raised by
   others as examples are neutral.  In other words, none of these other web
10 cites are or have ever been historically anti-Arpaio, especially in the
   consistent and invariable way that *New Times* has been since 1993.  None
11 of the other web cites have openly revealed the intent or purpose to
   destroy the Sheriff's career as an elected official, using all the vigor it
12 could muster.

13 [November 28, 2005, Memo at MCAO00919 (attached as Ex. 1).]  "None of the other

14 web cites, historically, have resorted to writing articles against the Sheriff, using

15 language that is inflammatory, insulting, vituperative, and the like," said the Sheriff's

16 representative.  [*Id.* at MCAO00919.]

17     21.    From the inception of Arpaio's push to prosecute Plaintiffs, until the

18 culminating events that led to the outrageous issuance of improper subpoenas by

19 Wilenchik, and the appointment of Wilenchik by the County and Thomas, the arrests

20 and jailings of Plaintiffs and the ultimate dismissal of the prosecution, the attack on

21 Plaintiffs was made because of the content of their speech and the nature of their

22 unfavorable political opposition to Defendants.

23     22.    The constitution does not permit Defendants to target citizens for

24 prosecution because the citizens are critical of them.

25                **Summary of Background Facts**

26     23.    Plaintiffs reallege and incorporate by reference the allegations set forth in

27 each of the preceding paragraphs of this Complaint.

28

24.     On the night of October 18, 2007, unmarked, dark vehicles (at least one with Mexico license plates) arrived at the homes of Plaintiffs Michael Lacey and Jim Larkin, Executive Editor and Chief Executive Officer, respectively, of Village Voice Media, LLC, owners of The Phoenix New Times.

25.     Arpaio's top-aide, Chief Hendershott, claims to have personally ordered the arrests.  Other witnesses, including lawyers from Wilenchik's office, claim that the arrests were made after consultation with Wilenchik and lawyers from his office.  Still, other evidence suggests that the arrests came at the request of the prosecutor or Thomas himself.

26.     Both men were handcuffed and taken to jail by members of Sheriff Arpaio's elite "Selective Enforcement Unit"—based on a minor misdemeanor charge— for publishing a column in their newspaper earlier in the day, entitled "Breathtaking Abuse of the Constitution."  The article revealed Defendants' subversion of the grand jury process and the unprecedented attempt to subpoena reporters' notes and the identity and reading habits of any citizen who looked at *The New Times*.

27.     The mid-night arrests and jailings were the culminating event in Defendants' efforts to punish Plaintiffs for their political speech in opposition to Defendants.

28.     *The New Times* was targeted and singled-out from others because it was labeled an "Anti-Arpaio newspaper" by Arpaio and his staff.

29.     When Plaintiffs' fair criticism of these Defendants became too much for Defendants to tolerate, Defendants flexed their political muscle in the form of a conspiracy.  They abused their governmental authority by attacking the press, punishing free speech, demeaning the role and function of an impartial prosecutor and an independent judiciary, perverting the grand jury process, and serving notice to citizens who read news online that neither their identities nor their reading habits are safe from the reach of vindictive government officials and their confederates.

30.     Citizens have a right to read online newspapers in privacy.  Those readers place their trust in newspaper reporters and editors to protect their privacy and speak the truth.  But Defendants perverted the law and abused their public positions to attack this newspaper, its reporters, and the privacy rights of thousands of its readers.

31.     Defendants' acts and omissions, individually and in concert, leading up to and culminating in Plaintiffs' arrest and jailing, violated Plaintiffs' constitutional and Arizona law rights, threatened the privacy and trust of those who read the news online, and trampled upon two of our Country's most fundamental freedoms in this Country: Free Speech and a Free Press.

32.     Arpaio is not tolerant of criticism or questioning.  The few that dare to criticize become targets for retribution by Arpaio and his agents, even where his motivation and memos are grossly improper.

33.     The history of this dispute began in the early 1990's, when *The New Times* published its first article critical of Sheriff Arpaio.  *The New Times*, thus, became a target for attack by Arpaio because of its anti-Arpaio content.

34.     The issue came to a head in July 2004, when *The New Times* investigated the personal, irregular, and questionable commercial land transactions of Sheriff Arpaio,[1] and asked how Sheriff Arpaio could afford to invest more than $690,000 cash in commercial real estate, based on an annual salary of $72,000 and a small federal pension.

35.     The newspaper's investigation revealed that Sheriff Arpaio had redacted information from the County Recorder's public records about his commercial landholdings (but not his home address), by using a little-known Arizona statute to remove pertinent information about his deeds, mortgages, affidavits of value, and conveyances of title.

---

[1] *See* "Sheriff Joe's Real Estate Game," July 1, 2004, and "Stick it to "Em!," July 8, 2004.

8

36.     Arpaio said the need to hide the truth about his commercial real estate investments arose from his concern about purported "death threats."  The Sheriff used this feign to hide his commercial investments from public scrutiny.  But, tellingly, he left his home address available in the public domain, published on numerous public internet websites.

37.     *The New Times*' investigation of the Sheriff's commercial holdings culminated in a July 8, 2004, article written by the newspaper's widely-respected investigative reporter, John Dougherty.  The article questioned the Sheriff's motives for hiding his commercial investments from inspection and pointed out the obvious—it made no sense to remove information about his personal commercial holdings from public records because of "death threats," but not his home address, which was included in the final paragraph of the article based upon data obtained from public websites.

38.     Sheriff Arpaio was hiding his significant commercial real estate holdings because he could not or would not explain how he could legitimately afford those investments.

39.     No law prohibited the publication of the Sheriff's home address in print or broadcast material.  But, an obscure and never-before used Arizona statute made it illegal to publish the Sheriff's address on the "world wide web," if, and only if, such publication "posed an imminent and serious threat" to the Sheriff or his immediate family, *and* if it was "reasonably apparent" to Dougherty and *The New Times* that "making the information available on the web" created a "serious and imminent" threat to the safety of the Sheriff or his immediate family.

40.     So, while there was nothing even arguably wrong with the article in its print form, Arpaio alleged that the newspaper violated the statute when the article was automatically uploaded to its electronic form on the internet.

41.     There was no evidence that Arpaio was then, or ever, under any credible threat of "imminent harm" as a result of the publication of his home address on *The New*

9

*Times* web site.   After all, his home address and personal information was widely available on other websites prior to the article.   But, the publication of his home address on the internet by the anti-Arpaio newspaper provided the Sheriff a means for retribution against one of his strongest critics.

42.   While the Sheriff's vengeance toward *The New Times* could no longer be restrained or contained, he needed a prosecutorial ally that would help him punish this newspaper for daring to scrutinize his questionable real estate holdings.

43.   Arpaio admitted to detectives that he did not request an investigation for many months after the newspaper's article because he was afraid that then County Attorney Rick Romley would decline to prosecute and that he preferred to wait until "Andrew Payton Thomas" took office in 2005.[2]   Arpaio knew that Thomas would be his prosecutorial ally.

44.   In 2004, Andrew Thomas was elected and took office in 2005 as the new Maricopa County Attorney.   He quickly became a political ally of Arpaio.   Using the full force of his—and his new ally's—governmental muscle, Arpaio recruited his new and compliant County Attorney to initiate the prosecution, persecution, and intimidation of *The New Times*, its reporters, its editors, and publishers.

45.   It was and should have been obvious to Thomas that there was no "case" to "investigate" here.   The newspaper had simply reported "truthful, lawfully obtained, publicly available personal identifying information [and this is] precisely the kind of speech the First Amendment protects." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). The Sheriff's home address was available on government web sites and "once the government places personal identifying information in the public domain, reliance must

_____

[2]   In a Memorandum submitted on behalf of the Sheriff, the Sheriff's Legal Affairs Director describes how the Sheriff "decided to wait until the newly elected Maricopa County Attorney (Andrew Payton Thomas) entered office in early 2005" to pursue the case, and described that Arpaio had raised the issue of prosecution of *The New Times* and Dougherty in his "first post-election meeting with Mr. Thomas (in February 2005)."

1   rest on the judgment of those who decide what to publish or broadcast." *The Florida*

2   *Star v. B.J.F.*, 491 U.S. 524, 535 (1989).

3       46.     And, even a cursory investigation would have revealed that the only

4   "death threats" to Arpaio were "made-for-TV" contrivances by the Sheriff's public

5   relations officers.[3]

6       47.     Arpaio, himself, obviously did not feel any "imminent" threat from the

7   newspaper's article, because he was content to wait for many months before requesting

8   any investigation.

9       48.     In fact, Arpaio has continued, to this day, to publicize and publish his

10  home address to citizens and the public at large.  For example, Arpaio mailed out

11  Partisan Nomination Petitions, asking citizens to re-elect him for Sheriff and publicizing

12  his home address on the Petition.

13      49.     Arpaio's representatives have also admitted that *The New Times*'

14  publication of his address was nothing new.  For example, the Sheriff's appointed legal

15  representative and Director of Legal Affairs for the MCSO, Ron Lebowitz, wrote in an

16  email to Pinal County Attorney Carter Olson:  "You will note that Dougherty [*The New*

17  *Times* reporter] tries to hang his hat on the fact that other web cites contain the Sheriff's

18  address.  ***We know that is true…***"

19      50.     On June 20, 2005, an investigator for the County Attorney's Office, J.

20  Stolze, provided a supplemental report on his investigation into the allegations that *The*

21  *New Times* had violated the law by publishing the Sheriff's home address in its

22  newspaper.  Stolze made several notable findings.  First, at the request of the Deputy

23  County Attorney, he checked websites for any personal information about Sheriff

24

25          [3]   Recently, for example, Arpaio widely publicized that he was under threat from
26  Mexican nationals, members of Los Zetas, a smuggling gang, and Elias Bermudez, an
    immigration activist and political rival of Arpaio.  Over the course of a six-month
27  period, Arpaio spent an estimated $500,000 to "protect him" from such "threats."  But,
    it turns out, there were never any real or credible threats, at all.  The sole informant was
28  discredited and vanished; yet, the case remains open and Arpaio continues to
    investigate.  The story was chronicled in an April 25, 2008, article on *azcentral.com*.

Arpaio and "located numerous documents that contain Sheriff Arpaio's personal residence address."  Stolze had previously authored a Memorandum on April 15, 2005, identifying at least five documents that contained personal information about Arpaio and his wife.  In addition, Stolze noted that the Sheriff Arpaio had not reported feeling threatened after the publication of his address by *The New Times* and, instead, had waited months until a new County Attorney was elected and nearly 10 months before requesting a prosecution.  Stolze reported that Sheriff Arpaio did not even report the incident to another prosecuting agency, because he felt that the new County Attorney should be the one to handle the case.

51.     Arpaio had his first official meeting with Thomas in February 2005, immediately after Thomas took office.  And at that first meeting, Arpaio discussed his opposition to *The New Times* and his desire to punish the newspaper.  Thomas' staff investigated the case at the time, but had concerns, which they memorialized in internal documents.

52.     Ultimately, Arpaio finally requested an investigation in April 2005— *nearly 10 months after Dougherty's article was published.*

53.     Thomas' office conducted another formal evaluation of the case in May 2005, this time preparing an Incident Review Memo summarizing the weaknesses of the case, including that there was a significant delay in Arpaio reporting the incident, nothing but conjured evidence to show that Sheriff Arpaio ever really feared for his safety, and that the Sheriff's personal information was widely available to the public on the internet and in public records.

54.     But, the Memo also noted that it was a "high-profile" case, that Sheriff Arpaio was demanding that the case be charged, and that there would be "problems" between the MCSO and MCAO if Thomas did not do what Arpaio told him to do.

55.     The MCAO Incident Review Board declined prosecution in an August 9, 2005, meeting.

56.   Thomas wanted to help Arpaio attack *The New Times* because the newspaper had now begun criticizing Thomas' own ethical and office irregularities. But, Thomas also knew that his office could not ethically pursue this case due to a "conflict of interest."   That conflict was *The New Times*' increasingly inquisitive and critical articles about Thomas.[4]

57.   So, Thomas cited a "conflict" and referred the case to Carter Olson at the Pinal County Attorney's Office, for further investigation."

58.   Immediately, Arpaio and his MCSO began to put pressure on the Pinal County Attorney's Office to prosecute the case against the newspaper and its reporters. Carter Olson was reluctant to do so, questioning the constitutionality of the statute at issue and noting the obvious issues that undermined the case, including (*inter alia*) the lack of evidence of "imminent threat" to Arpaio and the concerns with the First Amendment rights of the newspaper and its reporters.   Olson's professional reluctance involved the same problems as those documented by the MCAO Incident Review committee.

59.   But Arpaio does not like being told "no" and he is never one to permit Arizona laws or the Constitution to intrude on his vengeance.   So, he used his considerable political power to push for prosecution, despite its obvious lack of merit. Arpaio and his MCSO staff engaged in a heavy-handed letter and memoranda writing campaign to attempt to "convince" the Pinal County Attorney to prosecute the case, and made repeated attempts to meet and conference with the Pinal County Attorney by phone and in person to persuade him to begin a formal investigation and prosecution against this irritating "Anti-Arpaio" newspaper and its inquisitive reporters.

60.   Of course, unlike Thomas, the Pinal County Attorney's Office did not share the Defendants' passion for political revenge, nor a fear of Arpaio's political

---

[4] Thomas has stated:  "I still did not feel that it was appropriate for our office to directly prosecute the matter, because of the appearance of the conflict of interest."

power; the Office refused to be used in the persecution.  In over two years, Pinal County did not issue a single investigative subpoena or empanel a grand jury.

61.    At one point, the Pinal County Attorney tried to appease the Sheriff by reaching an attempted compromise, requesting that the newspaper simply remove the Sheriff's home address from its website version of the article.  The Sheriff would call the effort "intolerable" and demanded nothing short of full prosecution.

62.    Sheriff Arpaio grew increasingly angry at the Pinal County Attorney's failure to prosecute *The New Times* and its reporters, John Dougherty.   In a Memorandum to Carter Olson on January 23, 2006, the Sheriff's Director of Legal Affairs, Ron Lebowitz, wrote:

> Eleven months have passed since Sheriff Arpaio approached the then newly inaugurated Maricopa County Attorney [Andrew Thomas] regarding the July 8, 2004 events involving John Dougherty [and *The New Times*].  During this time period (and since to this date) Sheriff and Mrs. Arpaio's vigorous determination to see John Dougherty brought to justice has been constant. ***The Sheriff and Mrs. Arpaio remain resolved to fully cooperate in any such prosecution, but have become increasingly concerned about the present posture of the Dougherty investigation, i.e., its statues and the prospect of further movement.*** (emphasis supplied).

63.    By June 28, 2006, the Sheriff could no longer tolerate any attorney who was unwilling to accede to his demands that and his deadlines for the matter to be prosecuted.  In another Memorandum to Pinal County Attorney Olson on behalf of the Sheriff, Mr. Lebowitz wrote, "the Sheriff gave you a 10 day deadline on which to take action and, even though you promised thereafter to proceed against *New Times*, nothing further has occurred.  It may now appear that you have honored the Sheriff's May 23, 2006, deadline more in the breach than in the observance.  This is intolerable."  In the same Memo, he later wrote, "The Sheriff demands action and action right now."

64.    Arpaio continued to openly expressed his frustration and anger with the Pinal County Attorney's lack of investigation and prosecution of a newspaper and its reporters who were so critical of him.

65.    In 2007, Pinal County Attorney Carter Olson was appointed to the judicial bench.  He was replaced by James Walsh, who shortly thereafter announced a conflict with MCAO.  In light of that announced conflict, *The New Times* matter was returned to Thomas and his MCAO.

66.    Caught between Thomas' already announced and quite obvious "conflict," and Arpaio's insistence upon punishing this newspaper and its reporters for its criticism, Thomas and Arpaio decided to retain Thomas' friend, former employer, financial benefactor, campaign finance manager, and a civil attorney, Dennis Wilenchik, to investigate and pursue a criminal case against *The New Times* and its reporters.

67.    Wilenchik was hired by Thomas and Arpaio and approved by the County. Defendants now owned their own "Independent" Special Deputy Maricopa County Attorney.

68.    County Attorney Thomas requested that Dennis Wilenchik "assume prosecutorial responsibility for the above-referenced case," on June 26, 2007.

69.    Prosecutors have inherent legal and ethical duties to be independent; Wilenchik was not, and both Thomas and Arpaio knew that, even though Thomas requested that Wilenchik assume all of the powers and responsibilities of the MCAO with respect to the matter.

70.    Because *The New Times* had published myriad articles critical of Wilenchik,[5] Thomas and Arpaio knew that Wilenchik suffered from the very same "conflict of interest" that he did when he actively sought appointment of Wilenchik as

_____

[5]  For example, in "Doubting Thomas," June 15, 2006, John Dougherty questioned the ethical conduct of both Thomas and Wilenchik.  He questioned hundreds of thousands of dollars in fees paid to Wilenchik's law firm by Maricopa County, a "firm that employed Andrew Thomas immediately before his election as county attorney."  Dougherty opined that it appeared Thomas was using his office to "steer public contracts to his previous employer" and questioned what work, if any, Thomas had performed for Wilenchik's firm while running for County Attorney.  In "Bully Pulpit," June 29, 2006, Dougherty pointed out how Thomas had "not only steered a lot of business to his old firm, he has hired his old boss (Wilenchik) to harass Sheriff Joe Arpaio's chief political rival."  He also stated a strong suspicion that Wilenchik had paid Thomas "a fat salary in exchange for little work during the months leading up to his election which, if true, would constitute an unlawful campaign contribution."

Special Prosecutor in this matter.[6]  Thomas and Arpaio knew they were hiring an attack ally—not an "Independent" prosecutor untainted by benefactors to please and grudges to settle.  The County knew or should have shown how tainted the appointment was.

71.     In addition, the ties among the three—Arpaio, Thomas, and Wilenchik—wove a tangled web of financial, personal, and political connivances.  For example, and as *The New Time*s published, Wilenchik once hired County Attorney candidate Thomas as an "associate" in his law firm, although, upon information and belief, Thomas was not actually hired to perform legal work for Wilenchik or his firm's clients.  Thomas took his salary from Wilenchik, but spent his days campaigning for County Attorney.

72.     The arrangement was merely a disguised campaign contribution that paid the designed dividends for Thomas, Wilenchik, and Arpaio:  Thomas won his Maricopa County Attorney election, Wilenchik was paid off with an enormous attorneys' fee annuity from Thomas' new Maricopa County Attorney's Office, and Arpaio gained an important political ally in Thomas and a zealous advocate in Wilenchik.

73.     Soon after taking office, Thomas and Arpaio began funneling civil work to Wilenchik.  To date, Wilenchik has been paid more than $2,350,000 in attorneys' fees representing Arpaio and the County.  And, Thomas and Arpaio have even used Wilenchik to serve as their own, personal counsel on a number of occasions (though Arpaio and Thomas were never charged for the work Wilenchik did as their personal counsel).  Fees for Wilenchik's work on behalf of Thomas and Arpaio were built-in to his bills for County work.

---

[6] *See* Minutes of the Maricopa County Board of Supervisors, Special Session, July 11, 2007.  After being told by the Board's Chief Counsel that "the County Attorney's Office is unable to advise the Sheriff's Office related to the [*New Times*] matter as the County Attorney has a conflict…," Supervisor Stapley advised his colleagues that, "he had personally spoken to Maricopa County Attorney Andrew Thomas [and been told by Thomas that] "this is an unusual case and situation that warrants the appointments of [Wilenchik and his law firm]."

74.     For example, Wilenchik was not representing any public body when, prior to becoming their "Independent" Special Prosecutor, he demanded a retraction from *The New Times*, and threatened to sue the newspaper on behalf of his personal client Thomas, after the newspaper published a parody piece critical of Thomas in *The New Times*.  And Wilenchik was obviously not defending the people of Maricopa County when, prior to becoming "Independent" Special Prosecutor, he threatened to sue *The West Valley View* and *Phoenix Magazine* for personal defamation claims based on stories critical of his personal client, Arpaio.[7]

75.     By the time Thomas secured Wilenchik's appointment as his "Independent" Deputy Maricopa County Attorney, his friend and financial benefactor was already cashing in on their relationship.[8]

76.     Wilenchik's pre-existing malignant mindset against the newspaper and its reporters was made clear in an email Wilenchik authored *less than a week* before being named a Special Deputy Maricopa County Attorney.  In the email, Wilenchik angrily railed against the newspaper and its reporter for having questioned, in print, his lucrative relationship with his former employee, Thomas:

> [W]henever they have no point they revert to this tired shit again.  Like Napolitano never hired Lewis and Roca? Or her (sic) and Goddard never used me after I represented the former ag (sic)? Or Romley fired me from the cty (sic) list for doing so? They (*The New Times*) are so full of it.  I refused to speak with him (Dougherty).

---

[7] *See* "Sheriff demands View retract headline," *West Valley View*, October 31, 2006; "First Things First," *Phoenix Magazine*, December 2007.

[8] When asked on October 20, 2007, how he could select his former boss, Wilenchik, as a Special Prosecutor in a case against *The New Times*, Thomas stated, "I think given the circumstances it was appropriate for him to so serve and that he had the confidence of the Sheriff who was the victim in this case."  This, despite *The New Times* having been critical of both Thomas and Wilenchik, creating a "conflict" for both Wilenchik and Thomas, and Wilenchik's prior role as the alleged victim, Arpaio's, personal attorney.  As Thomas put it, "*The New Times* has not been, let's say, a fan of mine."  Nor, again, had the newspaper been a "fan" of Wilenchik's or Arpaio's either.

77.    Later, in the same email, Wilenchik summarized his feelings.  "Birdcrap is what (*The New Times*) article should be called.  But really noone (sic) reads his (Dougherty's) crap and he has no credibility."

78.    Less than a week after authoring this angry email, Dennis Wilenchik would undertake his duties as an "Independent" Special Deputy Maricopa County Attorney, tasked by Arpaio and Thomas to fully prosecute *The New Times* and its reporters.

79.    Well before his "investigation," however, Wilenchik already had the result of his "Independent" investigation in sharp focus.

**The Abusive Wilenchik Investigation**

80.    Wilenchik took on his new role as a criminal prosecutor with all the zeal and ruthlessness that Arpaio and Thomas required, expected, and had paid for.  Armed with daunting prosecutorial power and the approval and support of Arpaio and Thomas, Wilenchik engaged in a series of inappropriate, unethical, and unlawful acts that violated the Constitutional and Arizona law rights of the newspaper, its reporters, and those that read The *New Times*.

81.    Without ever appearing before any grand jury or obtaining proper approval, Wilenchik began issuing broad, invasive, and invalid subpoenas against *The New Times*, its reporters, its editors, and its readers.

82.    On August 24, 2007, Wilenchik authored and approved two subpoenas, which demanded that the newspaper and its reporters reveal confidential sources and produce extensive records on nearly four years' worth of reporters' and editors' notebooks, memoranda, and documents, based on content: ***Any story that was critical of Sheriff Arpaio***.

83.    The subpoenas also sought detailed information on ***hundreds of thousands of private citizens*** who had visited *The New Times*' website since 2004,

including internet cookies and browsing information on every individual who looked at any story, review, listing, or advertisement.

84.     These unprecedented and invalid subpoenas sought the reading and purchasing habits of private citizens and was clearly aimed at interfering with and/or destroying the business revenues of the newspaper.

85.     Professor James Weinstein of the Sandra Day O'Connor College of Law at Arizona State University characterized the subpoenas as "grossly, shockingly, breathtakingly overbroad."  He said this was quite clearly a "case of harassment of the press."  He is not alone in his views.  Even scholars at the Goldwater Institute agreed that the subpoenas were highly offensive and unconstitutional.

86.     The subpoenas were issued as part of the investigation into *The New Times* case, without any formal charges or indictments pending, and without notice to or the approval of a Court or grand jury.  Wilenchik has publicly acknowledged the subpoenas were issues as part of the "investigative phase" of the case, before ever appearing before the grand jury.

87.     On September 20, 2007, *The New Times* published "Below the Belt," by Paul Rubin, another decorated local reporter.  The article criticized Wilenchik's extra-judicial conduct in defending Sheriff Arpaio and others in a defamation suit brought by Buckeye Police Chief Dan Saban.  Rubin's story relied solely on interviews and public records.  It made no reference—none—to any grand jury investigation, nor did it contain the Sheriff's home address.

88.     Yet, less than 24 hours after Rubin's story appeared in *The New Times*, Wilenchik issued a grand jury subpoena to Rubin, seeking "all documents, records, and files" associated with the writing and editing of the Saban story, as well as "conversations and meetings relating to its publication."

89.     Again, Rubin's only "misstep" was in criticizing Arpaio and Wilenchik.  His story was not even remotely relevant to the matter Wilenchik had been hired to

pursue (a 2004 story by a different reporter).  Lacey and Larkin, in the column disclosing the corruption of the investigation that led to their arrest, succinctly summarized what was all too clear:  "It is impossible to view Rubin's subpoena as anything other than what it was: an act of vengeance by Wilenchik."  Wilenchik's subpoena was, once again, issued without notice to or the involvement of the Court or grand jury, without indictments or charges pending, and as part of Wilenchik's investigation of *The New Times*.

90.  And it did not stop there.  Wilenchik then made a crude, *ex parte* attempt on October 10, 2007, to influence or compromise Judge Anna Baca, who was presiding over the sitting County grand jury.  He did so by recruiting a political intermediary, Carol Turoff, a former lay member of the committee charged with appointing Appellate Judges **and the wife of a member of Thomas' senior management team**, Larry Turoff.  Ms. Turoff was instructed by Wilenchik to call Judge Baca at home to attempt to arrange a private meeting with Wilenchik.

91.  In an emergency closed hearing called October 11, 2007, Judge Baca called Wilenchik's attempt at initiating the *ex parte* communication "absolutely inappropriate."  Specifically, Judge Baca's recital of the ethical infractions was that she had been (a) called at home, (b) late at night, (c) by a third party Wilenchik had engaged to make the call, (d) at the instigation of a "prosecutor" (Wilenchik) the Judge did not even know, (e) for the purpose of soliciting *ex parte* communications between the Judge and Wilenchik, and (f) whilst Wilenchik had motions in *The New Times* matter and a judicial disqualification matter Against Judge Timothy J. Ryan pending before Judge Baca.

92.  Greatly concerned about the invalid, abusive, and intrusive subpoenas, the clandestine attempt to compromise the presiding Judge, and the patently inappropriate abuse of governmental power, Plaintiffs made a conscious decision to assert their First

Amendment rights and responsibilities to *The New Times'* readers by publishing information about the abusive prosecution and subpoenas.

93.    In their October 18, 2007, edition, the newspaper printed the demands of the "grand jury" subpoenas, revealing the unprecedented attempt to obtain the identity and reading habits of its readers.

94.    The publication of those rogue subpoenas was a selfless exercise of free press and the freedom to express political speech in opposition to facially improper government oppression.

95.    The newspaper's concerns were justified.  Wilenchik's subpoenas, were obviously unreasonable, facially unconstitutional affronts to freedom of speech and freedom of the press, and improper under both Arizona law and our Constitution.

96.    For example, in her final Order of November 28, 2007, Judge Anna Baca found a compelling case of grand jury abuse at the hands of Wilenchik.  No grand jury had approved the Wilenchik subpoenas—Wilenchik had acted as a one-man grand jury. County prosecutors, the Judge ruled, have no common law powers to subpoena witnesses or documents in Arizona (citing *Gershon v. Broomfield*, 131 Ariz. 507, 642 P.2d 852 (1982)).  A prosecutor seeking grand jury evidence by subpoena must either secure the prior permission of the grand jury or must notify the grand jury foreperson and the presiding criminal judge within 10 days of issuing a subpoena unilaterally. Wilenchik did neither.  The grand jury was nothing more than an empty prop to Dennis Wilenchik and his "investigation."

97.    Publishing the terms of a grand jury subpoena is a minor misdemeanor. The statute was designed primarily to "[protect] witnesses, targets of investigation and others from negative publicity."[9]  It was not designed to insulate, from public disclosure by a newspaper, the unethical and unlawful behavior of a prosecutor and Sheriff who are misusing their authority to attack the newspaper, its reporters, its readers' right to

---

[9] *See Samaritan Health System v. Sup.  Ct.*, 182 Ariz. 219 (Ct. App. 1994).

privacy, and Constitutional freedoms.   And it was certainly not designed to shield a prosecutor, Sheriff, or detective from conducting an unconstitutional investigation without the involvement of the grand jury process or the Court.   Wilenchik's investigatory subpoenas were not grand jury subpoenas at all; they were issued improperly and illegally without notice to, the approval of, or involvement by the grand jury or Court.

98.     *The New Times* published the demands of the Wilenchik subpoenas, and questioned the motives and actions of Arpaio, Thomas, and Wilenchik in pursuing its harassing investigation of the newspaper, despite the concerns of attorneys like Carter Olson and others, the obvious lack of merit to the claims, and the impact on Plaintiffs' constitutional and Arizona law rights.

**The Conspiracy Culminated:  Late-Night Raids and Arrests
by Arpaio's "Selective Enforcement Unit"**

99.     On October 18, 2007—the same date Plaintiffs published the article revealing the subpoenas—Wilenchik filed a Motion in the Court for an Order to Show Cause.

100.     The Motion demanded that Judge Baca hold *The New Times* in contempt, issue arrest warrants for Mr. Lacey, Mr. Larkin, and three of their lawyers, and fine the newspaper what could amount to a bankrupting $90 million.

101.     The requested fine was a blatant attempt to use prosecutorial power to target and ruin the business enterprises of *The New Times*, a newspaper that had been labeled an "Anti-Arpaio" paper for publishing articles critical of Arpaio, Thomas, and Wilenchik.

102.     But, the ire of these public officials, whose feelings were too wounded by this "misbehaving" newspaper, could not await the Court's ruling on Wilenchik's Motion.

103.    That same night, October 18, 2007, Defendants dispatched Arpaio's aptly named "Selective Enforcement Unit" in unmarked, black vehicles to arrest Plaintiffs and take them to jail.

104.    There was no probable cause for the arrests and, certainly, no justification for them.  They were done in furtherance of Defendants' improper motive to punish their political opponents for critical speech.

105.    Misdemeanor violations that do not threaten lives are usually handled by the issuance of citations, not by commando raids, arrests, handcuffs, and jail cells in the dead of night.

106.    Responsible prosecutors know these circumstances would never—never—justify such conduct.[10]  Some lawyers in Wilenchik's office have even claimed that they told that to MCSO officials and even began to draft the citation.  Yet, that is exactly how these Defendants chose to proceed.  They threw their journalistic opposition into jail in an attempt to silence Plaintiffs' criticism of their abusive public practices, criticism that is both fundamental to and fundamentally protected by the Constitution. The arrests and jailings were the crowing event in a long-effort and prosecution by Defendants, motivated by improper purposes.

107.    The public outcry after the arrests quickly forced Thomas to "fire" Wilenchik from further County criminal cases (but not civil cases, where he continues to collect tax dollars representing the County and Sheriff through the good offices of his former employee, Thomas).

---

[10]  Thomas referred to the jailing of Mr. Larkin and Mr. Lacey as "very disturbing"—noting that there had been "serious missteps taken" in the matter.  He expressed no contrition for having actively facilitated the appointment of an ethically and legally conflicted Dennis Wilenchik to act as Arpaio's personal prosecutor.  Nor did he admit the slightest understanding of a sentiment expressed nearly a century ago that encapsulates the corrupt moorings of his conduct in this case, to the letter.  "A county attorney has no right to turn a defendant over to his enemies, after first having armed them with the entire power of the state to be used as they see fit in his prosecution." *Hartgraves v. State*, 114 P. 343, 346 (Okla. 1911).

23

108.   The ethically corrupt and dangerous actions for which Thomas was later forced to fire Wilenchik were not, as Thomas sheepishly urged, a bolt from the blue. They were the perfectly foreseeable consequence of Arpaio's vengeance toward the newspaper and Thomas and Wilenchik's glaring conflicts of interest.  What Thomas could not foresee when he secured the appointment of Wilenchik was that *The New Times* would courageously resist Wilenchik's tactics, the public and the press would become enraged with this blatant assault on a free press, and Thomas would be forced to fire Wilenchik and abandon an investigation that he was told should never have been undertaken in the first place.

109.   Thomas eagerly disavowed knowledge or authorization of Wilenchik's actions in his October 20 news conference, instead claiming he was merely acting in an administrative capacity:

> There is a right way and a wrong way to bring prosecution, and to hold people accountable for their offenses.  And what happened here was the wrong way.  I do not condone it, I do not defend it.  And so it ends today.

110.   Of course Arpaio, too, disavowed advance knowledge of the subpoenas and denied that he ordered the arrests, even though Wilenchik has publicly claimed the arrests were conducted, authorized, approved, and/or directed by Arpaio and/or his aides, including Chief Hendershott.

111.   Wilenchik also denied ordering the arrests, and claimed that his issuance of subpoenas outside the grand jury process was inadvertent and accidental, although his office filed a Motion asking for such relief earlier in the day and Wilenchik's staff admits that they advised the Sheriff with respect to the arrests.  And Wilenchik's former partner, William French, disagreed and later confirmed that Wilenchik did indeed authorize and advise Arpaio to conduct the arrests by the "Selective Enforcement Unit"—the same arrests Wilenchik specifically sought in his Order to Show Cause Motion filed hours before the arrests occurred.

112.   The investigation, pursuit, and arrests of *The New Times* was unjustified and unwarranted.   It was the product of an improper conspiracy among Thomas, Wilenchik, and Arpaio.

113.   All of the Defendants are responsible for violating Plaintiffs' rights as alleged herein.

114.   Arpaio is the Sheriff who persistently and improperly pushed for this political persecution of a newspaper that criticized him too often and was asking too many questions about his curious cash real estate transactions.   His Office pressured attorneys to pursue the matter, despite obvious problems with the case and concerns about the legality of an investigation or criminal charge.   He applied unfair pressure and demands upon prosecutorial bodies, abusing the power of his office and influence, to investigate, prosecute, arrest, and jail Plaintiffs for improper and unconstitutional motives and to treat Plaintiffs differently than others based on the content of their speech and their conduct in political opposition to him.   He waited to request an investigation or push for an improper investigation and prosecution until he could secure a willing political ally in Thomas and he advocated and pushed for the hiring of his friend, ally, and personal counsel, Dennis Wilenchik, as Special "Independent" Deputy County Attorney and lead investigator.   And he and/or his Office and top officials and "Selective Enforcement Unit" ordered and/or made the late-night arrests and jailings.

115.   Wilenchik was the "Independent" Special Deputy Maricopa County Attorney who so eagerly did the bidding of Thomas and the Sheriff in their attempt to punish and financially ruin a newspaper that was too often critical of him too.   He filed odious papers in Court and issued unlawful subpoenas during the investigatory stage of the case, when no charges had been filed, no indictments issued, and without any involvement by a grand jury or approval from a court and/or Thomas.   He advised and counseled Arpaio to conduct the late night arrests and jailings and/or ordered that the

arrests occur and/or permitted them to occur.  He targeted the newspaper's readers and attempted to put the newspaper out of business through selective, malicious, and improper means and methods of investigation and prosecution.

116.    Thomas is the elected County Attorney and an official policymaker of Maricopa County, who actively sought and recommended to Maricopa County the appointment of Wilenchik to prosecute this annoying newspaper, in a highly questionable case, under a facially inapplicable statute, with no reasonable likelihood of conviction—a case he knew was contaminated by the same "conflict of interest" for both he and Wilenchik and a case that he knew was being pushed for improper means and motives by his ally, Arpaio.  He claims to have had no administrative oversight of the case, yet failed to properly supervise Wilenchik, failed to ensure he was properly trained and capable of handling a criminal investigation, and failed to provide him with training and supervision necessary to ensure that the criminal investigation was conducted constitutionally and in conformance with Arizona and federal law.  His actions are actions of the County.

117.    The County is responsible for its own failures to recognize and put an end to the abuses it was or should have been aware of, and for the irresponsible, reckless, negligent, and unconstitutional conduct of its agents, officers, divisions, and employees, as alleged herein.  The County failed to provide proper oversight, training, supervision, and policies and procedures with respect to investigations and prosecutions by its officers, officials, agents, employees, and policymakers.  And it ratified and/or approved the appointment of a special prosecutor in Wilenchik that it knew or should have known was improper and inappropriate.

118.    Thus, all of these Defendants share responsibility for the violations of Arizona and federal law in this case, and for the assault on the constitutional rights of Plaintiffs and on the rights of *The New Times*' officers, reporters, and readers.

### Defendants' Pattern and Practice of Misusing Their Power
### to Punish & Suppress Political Opposition Through Investigation, Arrests, and
### Prosecution

119.    Of course, this is not the first time these Defendants have abused their
authority for unconstitutional and improper motives and in order to obtain financial,
political, and other benefits and retaliate against their political opponents.  In fact, they
have a custom, pattern, and practice of doing so.

120.    For example, the Sheriff once authorized deputies to conduct surveillance
on two men, Tom Bearup and Ernest Hancock, who expressed interest in running
against him, including tapping their phones, tailing them, and searching their trash.  The
Sheriff's Office labeled them a "threat" to the Sheriff—even tapping the phones of a
campaign aide to Bearup, Jim Cozzolino.  Eventually, Mr. Cozzolino was arrested and
served time in jail under highly-suspect circumstances.  When he was released, he sued
the Sheriff's Office for violating his constitutional rights, a lawsuit the Sheriff's Office
quickly settled.

121.    Arpaio has also targeted others in the press who criticize or oppose him.
For example, the same night that Plaintiffs were arrested and jailed, Arpaio dispatched
his "Selective Enforcement Unit" to issue *The New Times* reporter Ray Stern—in the
middle of the night—with a citation for disorderly conduct, simply for arguing with
MCSO's lawyer, Michele Iafrate, earlier in the day about whether or not he was
permitted ***to photograph public records***.  The MCAO initially denied knowing about
the citation or the matter.  But, the charges have not been dropped and the case against
Mr. Stern continues to date.   And Mr. Stern is not alone.   Other reporters and
newspapers, including (among others and without limitation) the *The West Valley View*,
*The Arizona Republic*, and Channel 12 have been targeted or stonewalled by Arpaio for
seeking public records and publishing stories that were critical of him.

122.    Christy Fritz, too, was a target of Defendants' political retaliation.  Two
weeks before the November 2006 election, Sheriff's deputies arrived at her home and

confiscated her computers, utility bills, emails, and financial records.  But Fritz was neither a drug dealer nor a criminal; she was simply a graphic designer.  Her problem: She worked for a Democrat, Jackie Thrasher.  Ms. Thrasher was running against Jim Weiers, the father of a Maricopa County Sheriff's Deputy and an Arpaio ally.  Ms. Thrasher had been endorsed by the Arizona Conference of Police and Sheriffs, but not Sheriff Arpaio.  When one of her campaign mailers showed a corrections officer talking with her in front of a MCSO car, Mr. Weiers complained.  So, Arpaio launched an investigation that included hours of interviews and resulted in three raids on the homes of the corrections officer in the picture, the corrections officer's mother, and Christy Fritz.  Despite the issuance of three search warrants and the seizure of four computers, no charges were ever filed.

123.    Indeed, for these Defendants, no political opponent is beyond the reach of their power.  Their targets have ranged from the ACLU to members of the judiciary.  In October 2007, they used Wilenchik to attack a Superior Court Judge, the Honorable Timothy Ryan.  Judge Ryan, the County's Associate Presiding Criminal Judge, and other members of the bench had been attempting to instill standards that would require law enforcement to prove that aliens are, in fact, illegal, before they are denied bail under new laws.  But, that constitutional protection is contrary to Arpaio's and Thomas' popular political stance on immigration issues.  As a result, Thomas and Wilenchik unleashed an outrageous political attack on Judge Ryan and attempted to disqualify every single judge in the Maricopa County Superior Court.

124.    These and many other incidents (among others and without limitation) show that Defendants' actions against *The New Times* in this case were more than the aberrational consequence of simple neglect; they were the product of a long-standing pattern and practice of the abuse of power against dissenting voices—of intentional, punitive, and retaliatory conduct against the newspaper, its reporters and its readers, for their own benefit and gain.

# COUNT I

## (Gross-Negligence—Sheriff Arpaio and Dennis Wilenchik)

125.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

126.   Defendants have both a statutory and common law duties of care to Plaintiffs and all citizens when performing the functions of their positions.  Defendants also owe a duty of care to Plaintiffs with respect to conducting criminal investigations.

127.   Defendants are also legally responsible for the management of the criminal investigation system in Maricopa County, and the establishment and implementation of policies, procedures, and protocols that govern the investigation, processing, handling, and management of criminal investigations and prosecutions in their control.   Their responsibility includes making certain that such policies, procedures, and protocols satisfy all federal and state standards.

128.   Defendants Arpaio and Maricopa County are legally responsible for the screening, hiring, training, retaining, and supervision of all employees and agents who have responsibility for the investigation, processing, handling, and management of criminal investigations and prosecutions in their control.  This responsibility includes making certain that such screening, hiring, training, retaining, and supervision of such employees and agents  satisfy all federal and state standards.

129.   Defendants were grossly negligent in breaching their duties owed to Plaintiffs, as alleged herein this Complaint, by (*inter alia*), failing to conduct the duties of their positions with reasonable care; failing to and the establish and implement proper policies, procedures, and protocols governing the investigation, processing, handling, and management of criminal investigations and prosecutions in their control; and failing to properly screen, hire, train, retain, and supervise employees and agents who have responsibility for the investigation, processing, handling, and management of criminal investigations and prosecutions in their control.

130.   Defendants' breached their duties with actual or constructive knowledge that their acts and/or omissions would result in harm to Plaintiffs.

131.   Defendants' gross negligence caused Plaintiffs to suffer harm in an amount to be proven at trial.

## COUNT III

**(Violations of 42 U.S.C. § 1983:  Unconstitutional Policies, Customs, and Failure to Train—Arpaio and Maricopa County**

132.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

133.   Sheriff Arpaio is an official policy maker for the MCSO and Maricopa County.  Sheriff Arpaio has the authority and responsibility to establish policy for the MCSO and Maricopa County, and to properly supervise and train the officers, agents, and employees of the MCSO.  His actions are the actions of the County and his office.

134.   Thomas is a policy maker for the MCAO and Maricopa County.  He has the authority and responsibility to establish policy for the MCAO and Maricopa County, and to properly supervise and train the officers, agents, and employees of the MCAO. His actions are the actions of the MCAO and Maricopa County.

135.   Sheriff Arpaio and Andrew Thomas were acting under color of law at all times material hereto.

136.   Sheriff Arpaio is named in his official capacity, as well as his individual capacity, pursuant to 42 U.S.C. § 1983 supervisory and direct liability, for their conduct as alleged herein.

137.   Sheriff Arpaio and Maricopa County have oversight and supervisory responsibility over the investigation, processing, handling, and management of criminal investigations and prosecutions in their control, and the proper screening, hiring, training, retaining, and supervision of the officers, employees, and agents investigating, processing, handling, and managing such criminal investigations and prosecutions.

138.   Sheriff Arpaio and Maricopa County violated Plaintiffs' constitutional

1    rights and were deliberately and callously indifferent to Plaintiffs and the readers of *The*

2    *New Times* in training (or failing to train) their officers, agents, and employees in

3    (among other things and without limitation): The appropriate, lawful and constitutional

4    policies, procedures, and protocols for investigating, processing, handling, and

5    managing of criminal investigations and prosecutions in their control;  adopting policies

6    and procedures to ensure due process and equal protection for those subject to

7    investigation and prosecution; and for the selection, appointment, approval, training,

8    and oversight of appointed special prosecutors, like Wilenchik.

9         139.   Sheriff Arpaio and/or Maricopa County were deliberately and callously

10   indifferent to Plaintiffs and readers of *The New Times* through fostering, encouraging

11   and knowingly accepting formal and informal policies, procedures, practices, or

12   customs condoning indifference to the rights of the subjects of criminal investigations

13   and prosecutions under their control.

14        140.   Sheriff Arpaio and/or Maricopa County knew and should have known that

15   unconstitutional policies, practices, customs, and training existed with respect to the

16   screening, hiring, training, retaining, and supervision officers, employees, and agents

17   who have responsibility for the investigation, processing, handling, and management of

18   criminal investigations and prosecutions in their control, yet failed to properly address

19   them and/or failed to establish and implement appropriate policies, procedures,

20   protocols, and training to remedy them.

21        141.   Sheriff Arpaio and/or Maricopa County permitted the implementation of

22   inappropriate, unconstitutional, *de facto* policies which:  Authorized, approved,

23   condoned, and/or ratified unconstitutional criminal investigatory and prosecutory

24   practices, and failed to adequately train and supervise their personnel in these and other

25   relevant areas.

26        142.   The wrongful conduct of these Defendants alleged herein this Complaint

27   constitutes violations of Title 42 U.S.C. § 1983, in that they deprived Plaintiffs of the

28

1  rights, privileges, and immunities secured to them by the Constitution and laws of the

2  United States and their wrongful conduct was the moving force behind the violations of

3  Plaintiffs' rights by their agents, employees, officers, and personnel.

4       143.   The wrongful conduct of Defendants alleged herein constitutes violations

5  of the United States Constitution, Amendments I, IV, V, and XIV, in that Plaintiffs were

6  subjected to false imprisonment and arrest, malicious and selective prosecution,

7  retaliatory conduct from law enforcement, and were investigated/prosecuted, arrested,

8  and jailed without proper cause, with an unconstitutional motive, and without equal

9  protection or due process in an attempt to chill Plaintiffs' free speech and criticism and

10  intrude upon the privacy rights of all private citizens who read *The New Times*.

11       144.   As the direct and proximate result of Defendants' wrongful conduct,

12  Plaintiffs' constitutional rights were violated and they have suffered harm and have

13  been injured.

14       145.   The acts and omissions of Sheriff Arpaio acting in his individual capacity

15  for supervisory liability, as alleged herein, was malicious or reckless in disregard of the

16  rights of Plaintiffs.

17       146.   Punitive damages in an amount to be determined by a jury should be

18  awarded against Sheriff Arpaio under § 1983 to punish them for wrongdoing and to

19  prevent him and others from acting in a similar manner in the future.

20  **COUNT IV**

21  **(Violations of 42 U.S.C. § 1983:  First Amendment Retaliation;**
**Fourth Amendment False Arrest and Imprisonment, and Fourteenth Amendment**
22  **Selective Enforcement – All Defendants)**

23       147.   Plaintiffs reallege and incorporate by reference the allegations set forth in

24  each of the preceding paragraphs of this Complaint.

25       148.   At all times material hereto, Sheriff Arpaio, Andrew Thomas, and Dennis

26  Wilenchik were acting under color of law and in their capacity as officials and agents

27  for Maricopa County.

28

32

149.   The wrongful conduct of Defendants alleged herein this Complaint constitutes violations of the United States Constitution, Amendments I, IV, V, and XIV, in that Plaintiffs were deprived of privileges and immunities guaranteed to all citizens of the United States, were subjected to false imprisonment and arrest, malicious and selective prosecution, retaliatory conduct from law enforcement, and were investigated/prosecuted, arrested, and jailed without proper cause, with an unconstitutional motive, and without equal protection or due process in an attempt to chill Plaintiffs' free speech and criticism and intrude upon the privacy rights of all private citizens who read *The New Times*.

150.   As the direct and proximate result of Defendants' wrongful conduct, Plaintiffs' constitutional rights were violated and they have suffered harm and have been injured.

151.   The wrongful conduct of these Defendants alleged herein this Complaint was undertaken with malice and/or with improper and unconstitutional motives in an attempt to deter speech and conduct protected by the Constitution.  Plaintiffs were investigated, prosecuted, arrested, and/or jailed by Defendants for improper unconstitutional motives, were treated differently than others similarly situated, were subjected to improper abuse of process and power for improper motives, and were arrested and jailed without proper or probable cause.

152.   Plaintiffs were subjected to Defendants' wrongful and unconstitutional conduct in a particularly egregious, conscience-shocking manner.

153.   The acts and omissions of Defendants Arpaio and Wilenchik, acting in their individual capacities and under color of law, were malicious, punitive, in reckless disregard of Plaintiffs' rights and the rights of all those private citizens who read speech and criticism and intrude upon the privacy rights of all private citizens who read *The New Times*, and/or in an effort to intentionally deter conduct and speech protected by the Constitution.

154.   As a result, punitive damages in an amount to be determined by a jury should be awarded against Arpaio and Wilenchik to punish them for wrongdoing and to prevent them and others from acting in a similar manner in the future.

## COUNT V

**(Conspiracy to Commit Violations of 42 U.S.C. § 1983 –
Sheriff Arpaio and Dennis Wilenchik)**

155.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

156.   The wrongful conduct of these Defendants as alleged herein were undertaken pursuant to an agreement or meeting of the minds among these Defendants to act in concert violate Plaintiffs' constitutional rights, silence Plaintiffs' criticism of them, chill free speech, invade the privacy of those private citizens who read *The New Times*, and interfere with and financially ruin Plaintiffs' business.

157.   These Defendants' acts and/or omissions as alleged herein to pursue and conduct a criminal investigation and prosecution of *The New Times*, including (without limitation) the arrests and jailings, were undertaken pursuant to a conspiracy among Defendants to violate Plaintiffs' constitutional rights.

158.   As a direct and proximate cause of Defendants' conspiracy, Plaintiffs' constitutional rights were violated.

159.   The acts and omissions of Arpaio and Wilenchik in furtherance of their conspiracy, acting in their individual capacities and under color of law, were malicious and/or in reckless disregard of Plaintiffs' rights and the rights of all those private citizens who speech and criticism and intrude upon the privacy rights of all private citizens who read *The New Times*.

160.   As a result, punitive damages in an amount to be determined by a jury should be awarded against them to punish them for wrongdoing and to prevent them and others from acting in a similar manner in the future.

# COUNT VI

## (Violations of Arizona Law: Abuse of Process – Dennis Wilenchik)

161.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

162.   The wrongful conduct of these Defendants alleged herein constitutes violations of Arizona law, in that Defendants unlawfully detained Plaintiffs without consent, without lawful authority, without valid legal process, and without probable or proper cause; unlawfully and maliciously initiated criminal proceedings against Plaintiffs without probable cause that terminated in Plaintiffs' favor and harmed Plaintiffs; and willfully used the judicial process and/or criminal proceedings against Plaintiffs for a punitive, improper, and ulterior purpose not proper in the regular conduct of such process and proceedings.

163.   As a direct and proximate result of Defendants' acts and omissions alleged herein, Plaintiffs have been damaged in an amount to be proven at trial.

164.   Defendants' acts and omissions herein were undertaken with malice, in bad faith, and with the requisite evil mind sufficient to warrant the imposition of punitive damage to deter their conduct and that of others in the future.

## Jury Trial

165.   Plaintiffs hereby request a trial by jury.

## Prayer for Relief

WHEREFORE, Plaintiff prays for damages for judgment against Defendants as follows:

(a)   General damages in an amount to be proven at trial;

(b)   Punitive damages in an amount deemed just and reasonable against the individual Defendants as to the causes of action alleged herein;

(c)   Costs and attorneys' fees against all Defendants as to the causes of action alleged under the Constitution and laws of the United States, pursuant to 42 U.S.C. §

1 | 1988;

2        (d)     The costs of litigation;

3        (e)     All remedies provided by 42 U.S.C. § 1983; and

4        (f)     Such other and further relief which may seem just and reasonable under

5 | the circumstances.

6        RESPECTFULLY SUBMITTED this _____ day of September, 2013.

7                                       **STINSON MORRISON HECKER LLP**

8

9                        By:   s/ Michael C. Manning

10                             Michael C. Manning
                              Larry J. Wulkan

11                             Stefan M. Palys
                            1850 North Central Avenue, Suite 2100

12                             Phoenix, Arizona 85004-4584
                            Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2013, I caused the foregoing document to be filed electronically with the Clerk of Court through ECF; and that ECF will send an e-notice of the electronic filing to:

Timothy J. Casey
SCHMITT SCHENCK SMYTH CASEY & EVEN, P.C.
*Attorney for Defendants Wilenchik and Bartness*

William R. Jones, Jr.
Eileen Dennis GilBride
JONES SKELTON & HOCHULI
*Attorneys for Defendants Arpaio*

I hereby certify that on September 6, 2013, a courtesy copy was mailed to:

Judge Susan R. Bolton

s/ Kathleen Kaupke

# EXHIBIT 1

# MEMORANDUM

**To:**   **Honorable Robert Carter Olson**
        **Pinal County Attorney**

**From:** **Ron Lebowitz**
        **Director of Legal Affairs**
        **Maricopa County Sheriff's Office**

**Date:**  **November 28, 2005**

**Re:**    **Issues of First Amendment and Other Web Cite Listings**

---

### Introductory Statement

During the course of the November 15, 2005 meeting certain
issues re: the First Amendment, together with issues re: the
posting of the Sheriff's home address on other, different web
cites were discussed at length – to a degree separately, but also
to a degree linked together.  The purpose of this supplemental
memorandum is to review all possible aspects of these issues in
the hope that nothing related to them (or any one of them)
remains untouched or unresolved.

### *Query:  Do the provisions of A.R.S. §13-2401, et seq. infringe (generally speaking) upon First Amendment free speech and free press protections?*

The specifically proscribed "private information" items, (relating
to specified members of the criminal justice system) as listed in
A.R.S. §13-2401(D)(5), are a) home address, b) home
telephone number, c) pager number, d) personal photographs,
and e) directions to the person's home or vehicle.

Apart from these specific items, there is nothing about A.R.S.
§13-2401 that would preclude John Dougherty (or anyone else)

1

MCAO00912

from attacking the Sheriff as viciously, ruthlessly and/or relentlessly as possible regarding his performance in office – or virtually anything else for that matter. Apart from the "actual malice" standard announced in the *New York Times v. Sullivan*, 376 U.S. 254 (1964) case (relating to what a public official/public figure must overcome to successfully prosecute a libel action), First Amendment freedoms are well protected in this country.[1]

Therefore, does the Arizona legislature possess the constitutional power and authority to proscribe the release of those discrete items contained in 13-2401(D) (5) from being **made available** on the Web where doing so poses an **imminent and serious threat** which is **reasonably apparent** to the maker, and specifically, would such power and authority exist in this case to proscribe making of this Sheriff's home address available on the Web[2]? This office argues that it does for the following reasons:

- There is not and could not be any connection between the Sheriff's function as an elected public servant and his residential address.

- This statute was designed to provide a bare minimum of security to persons such as the Sheriff who serves the public as a whole as a working part of the criminal justice system.

- By passing A.R.S. §13-2401, et seq., into law, the Arizona State Legislature recognized that working within the criminal justice system, unlike numerous other occupations, brings with it various forms of personal risk.

---

[1] In England, by comparison, news stories can fall victim to prior restraint should they conflict with issues of national security, something unheard of here as proven in the *Pentagon Papers* case (*New York Times v. United States*, 403 U.S. 713 (1971).

[2] As discussed at length, *infra*, A.R.S. §13-2401 is not an inchoate offense. To satisfy the statutory requirements thereof, other critical elements must be proved.

2

MCAO00913

- Public policy dictates the importance of maintaining a criminal justice system of requisite size, dedication and talent to protect society from declining into a state of lawlessness and anarchy. In order for the system to protect society, however, members of that system require certain fundamentals of protection for themselves. That protection is what A.R.S. §13-2401, et seq. was intended to provide.[3]

### Query: Is there anything about A.R.S. §13-2401 or any part or application thereof that could be held to be "void for vagueness"?

It has been suggested that A.R.S. §13-2401 might be defective, if not in general, then in the present fact situation because it might be held to be "void for vagueness." This office must respectfully disagree. There was nothing vague about the key elements of this offense:

1. As conclusively shown by Dougherty's own April 28, 2005 admission, it was **he** who *made* the Sheriff's address available on the *New Times* Web Cite.

2. Dougherty's "*making*" clearly posed an imminent and serious threat to the Sheriff and Mrs. Arpaio – should there be any doubt about that, the answer lies in the believability of their testimony as witnesses, not unlike most other cases. The Sheriff himself made it quite clear, in advance of the "making" on the *New Times* web cite that such a particular making would indeed pose such an imminent and serious threat.

3. That said "**making**" actually *would* and *did* pose such an imminent and serious threat was *reasonably apparent* to Dougherty (as abundantly supported by the evidence) since the

---

[3] *Katrina* illustrated just how chaotic things can get when members of a police force, fearing personal safety under most risky conditions, walk off the job. Though this analogy could hardly apply to the instant case, it illustrates how the criminal justice system needs to be maintained, especially under the worst of conditions, and what happens when it is not there to serve.

3

MCAO00914

Sheriff had **told** Dougherty so **in advance** of Dougherty proceeding to do precisely that (make the address available on the web) and Dougherty had **twice admitted** (in his articles) that the Sheriff, in fact, had told him about his fear – although Dougherty had twice presented what the Sheriff had said to him as a vehicle to **ridicule** the Sheriff.

In connection with what has been stated already in response to the suggested "void for vagueness" issue in terms of the clarity of the elements of A.R.S. §13-2401, et seq. and how they could be proven in the instant case, it should be remembered that the "void for vagueness" argument is largely a 14th Amendment *due process* argument. To apply it to §13-2401, it must be argued that something about the wording of the statute itself fails to provide sufficient **notice** to an accused about what the crime is and/or how this particular law might be violated. A plain reading of the statute should defeat such an argument.

### Query: Is there or should there be any restriction on the exercise of constitutional rights or any one of them?

Unhappily, it is not unknown that the media (or certain members – often the least professional thereof) may feel free to act as they please, *confident* that public officials, fearful of being accused of committing some kind of freedom of the press violation, would hesitate before taking action against any such media member. Media members, or certain ones, at least, feeling confidant that such fears would be harbored by public officials – and often demonstrating the tact and civility of the paparazzi -- may feel in possession of "safe passage" to do as they wish because they feel totally shielded from accountability. That, however, is not true.

It has long been established, through decisions of the United States Supreme Court (and inferior courts), that 1st Amendment constitutional rights are **not** absolute. Rather, exercise of 1st Amendment rights correspondingly carries with

4

it certain forms of duty.  (If not, nobody could ever succeed in any libel suit against media members.)

Viewed on an even broader scale, the act of exercising *any* of the constitutionally conferred rights is subjected to undertaking some kinds of duty.  Furthermore, even the *exercise* of these rights themselves, when carefully measured against certain issues of public policy (i.e., matters of security – even if, at times, such matters may involve less than matters of *national* security -- even, at times, matters of common *societal decency*) may be required to *defer* to such protective measures or considerations for the sake of the common good.

[Nevertheless, where there *must be* such a deferral, due to a requirement to respect public policy matters, even those situations of deferral must always be **discrete, limited** and **clearly** defined exceptions, and not the rule.  So it is with A.R.S. §13-2401, et seq.]

### *Query: Does a reporter ever have the right to break the law as a part and parcel of "doing his job?"*

The simple answer to such a query is "no."  The mere fact that someone may be a reporter (quality and competence aside), it is never true that such a person, acting within the scope and course of that occupation, may freely violate the Arizona Criminal Code at will.  In an *exaggerated* extreme example (stated herein merely to make a point), a frustrated reporter wishing to force another person to talk about something that the reporter is seeking (under the rubric of that reporter trying to satisfy the public's "right to know") may not lawfully threaten that other person in any way in order to compel that person to speak.

### *Query: Is a defendant permitted to argue that he should be acquitted because he disagrees with a criminal statute, even on constitutional grounds?*

5

When confronted with the example illustrated above, nobody would disagree that such behavior would not be tolerated by a court of law. More simply put, nobody could seriously defend such a reporter's conduct. But could it be stated *with any validity* that a reporter may engage in criminal conduct of **_any_** sort in search of a "story" because that reporter enjoys immunity from prosecution due to the 1st Amendment protections? Once again, the answer is "no.

The constitution was designed, first and foremost, to create a government that would operate with stability. No amendment thereto was drafted and ratified with the intent or purpose of promoting lawlessness and anarchy. Therefore, when focusing upon an existing criminal statute such as A.R.S. §13-2401, and its application in a criminal prosecution, certain fundamental principles apply:

• It is **_not_** a defense to a criminal charge brought pursuant to the Arizona Criminal Code for a party to argue before the trier of fact his disagreement (including disagreement couched in constitutional terms) with the statute upon which the prosecution is based. Such an argument, at best, relates to an issue of *law* and not an issue of *fact*. Issues of law fall within the province of the judge and not the jury.

• It is the trial court's duty to instruct the sworn trial jurors about the statute – what it is and what the elements thereof are (all of which must be proven beyond a reasonable doubt) because that statute is the **_law_** of the State of Arizona and the jurors, upon selection to serve, swore under oath to follow the law as presented to them by the court when deliberating.

***Query:  Does the fact that other (different) web cites have listed the Sheriff's home address as of 7/08/04 insulate Mr. Dougherty from liability?***

6

MCAO00917

It is undisputed that that the Sheriff's home address appears on the Maricopa County Recorder's web cite, the Maricopa County Election Commission's web cite, and even (as recently discovered) the Republican Party's web cite. Consequently, an argument has been raised repeatedly on numerous occasions by numerous individuals that these other listings constitute an "Achilles heel," if you will, that would undermine (i.e., defeat) a successful prosecution of Mr. Dougherty. This being understood, it is nevertheless, also clear that the argument itself is fatally flawed and could never succeed in undermining such a prosecution. The counter-argument is far stronger legally and a lot more persuasively supportive of a conviction.

The argument repeatedly raised (regardless of form), in summary, can be distilled into a single thought:

> *If the Sheriff's home address existed on other web cites (and continues to exist there) Dougherty, when he made that same address available on the New Times web cite, did no more or less than others did and should not be singled out for prosecution.*

When, however, that "Achilles-heel" argument is examined closely, in conjunction with a clear reading of A.R.S. §13-2401, et seq., the fatal flaws and short-sightedness thereof become apparent:

- A.R.S. §13-2401, et seq., is not an *inchoate* statute. Proof of making available on the web the particular private information of a particular criminal justice system member -- alone and with *nothing else* -- fails to satisfy the requirements of the statute[4].

- There are, of course two (2) other critical elements to A.R.S. §13-2401 which must be proven beyond a reasonable doubt to

---

[4] **Ironically, if A.R.S. §13-2401 were an inchoate statute requiring only a showing of making the address available on the web, the fact that others may also have made such an address available on the web would be no defense, not unlike the non-defense to a speeding ticket that others also were speeding.**

7

satisfy the statutory requirements (i.e., 1) that such a making posed an imminent and serious threat to the Sheriff [and Mrs. Arpaio]; and 2) that it was reasonably apparent to Dougherty that the Sheriff [and Mrs. Arpaio] would react as he did if such a making occurred.) And it is these two critical elements which are highly significant the instant case.

- The inclusion of the two additional elements makes all the difference, both to the prosecution and to the victim himself.

  1. The making available of the Sheriff's home address on the Maricopa County Recorder web cite, the Election Commission web cite, and the Republican Party web cite did not pose an imminent and serious threat to the Sheriff or Mrs. Arpaio.

  2. It was not reasonably apparent to the Recorder, the Commission, nor the Republican Party that making the Sheriff's address on their respective web cites would pose an imminent and serious threat to the Sheriff or Mrs. Arpaio.

  3. Unlike the *New Times* web cite, the three (3) other web cites raised by others as examples are neutral. In other words, none of these other web cites are or have ever been historically anti-Arpaio, especially in the consistent and invariable way that *New Times* has been since 1993. None of the other web cites have openly revealed the intent or purpose to destroy the Sheriff's career as an elected official, using all the vigor it could muster.

  4. None of the other web cites, historically, have resorted to writing articles against the Sheriff, using language that is inflammatory, Insulting, vituperative, and the like – all of which having the effect of attracting those of the "lunatic fringe" who, for reasons of their own, view themselves as the Sheriff's sworn enemies and make it a practice to replicate *New Times* anti-Arpaio articles on

8

MCAO00919

web cites of their own or otherwise generally keep in
touch with *New Times* as anti-Arpaio "true believers."

5. By contract, in the case of the County Recorder, the
Sheriff's home address appears on that web cite,
together with the home addresses of hundreds of
thousands of other Maricopa County residents. The web
cite does not focus on the Sheriff any more than it does
on any other resident. Nothing derogatory about the
Sheriff appears on that web cite. It is not now nor has it
ever been reasonably apparent to the County Recorder
that the Sheriff (or Mrs. Arpaio) would or did fear the
placing of the home address on that web cite. The
Sheriff has never provided notice to anyone at the
Recorder's Office (prior to the posting) that he would
view such posting as an imminent and serious threat.

6. Much the same could be said about the other two web
cites, with the exception that the home addresses of
others appearing on those web cites may be smaller in
number, although no more threatening, abusive or
incendiary.

7. As discussed elaborately heretofore, however, Mr.
Dougherty had advance notice of the Sheriff's fears
regarding his address appearing on a *New Times* web
cite. Furthermore, Dougherty was aware that making
the Sheriff's home address available on the *New Times*
web cite (particularly after being informed by the Sheriff
***not to do it - knowing full well*** the Sheriff's aversion
to his doing that) was proscribed by Arizona law.

9